**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Gerald C. Bender, Esq.
Michael Savetsky, Esq.
Barry Z. Bazian, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and
Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| East Orange General Hospital, Inc., *et al.*,[1] | Case No. 15–31232 (    ) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) AUTHORIZING USE OF CASH COLLATERAL, (B) GRANTING
ADEQUATE PROTECTION, (C) SCHEDULING A FINAL HEARING
AND (D) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession East Orange General Hospital ("EOGH") and Essex Valley Healthcare, Inc. ("EVHI," and together with EOGH, the "Hospital" or "Debtors"), by and through their undersigned proposed counsel, submit this motion (the "Motion") for entry of an interim order substantially in the form attached hereto as **Exhibit A** (the ("Interim Order"), pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 and Fed.R.Bankr.P. 4001, (i) approving the use of cash collateral, (ii) providing adequate protection, and (iii) setting a final hearing (the "Final Hearing") pursuant to Fed.R.Bankr.P. 4001. In support of this Motion, the Debtors submit the *Declaration of Martin A. Bieber in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith, and respectfully state as follows:

---

[1] The Debtors and the last four digits of their Employer Identification Numbers are East Orange General Hospital, Inc. (7166) and Essex Valley Healthcare, Inc. (7667). The Debtors' principal place of business is located at 300 Central Avenue, East Orange, NJ 07018.

30826/2
11/10/2015 40744580.4

**JURISDICTION, VENUE AND STATUTORY PREDICATES**

1.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. sections 157 and 1334 and the Standing Order of Reference to the Bankruptcy Court Under Title 11 dated as of September 18, 2012 (Simandle, C.J.). Venue is proper in this district pursuant to 28 U.S.C. sections 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. section 157(b)(2).

2.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the applicable Local Bankruptcy Rules for the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

**BACKGROUND**

**A.    General Background**

3.  Located in East Orange, New Jersey, the Hospital is the only independent, fully accredited, acute-care hospital in Essex County and is a recognized leader in behavioral health services, renal dialysis, wound care, diagnostic services, emergency services, and family health care. In addition to providing comprehensive primary care services, the 211-bed Hospital continues to provide community-based wellness programs in keeping with its more than 100-year tradition of excellence, compassion and exceeding patient expectations.

4.  Founded in 1903 as the Newark Homeopathic Hospital, the Hospital was relocated to East Orange in 1926 and soon opened an outpatient clinic to better serve the community. Ongoing expansion continued throughout the decades culminating with the purchase of the former Kessler East Building, known as the East Pavilion. The Hospital's campus stretches four blocks along Central Avenue in East Orange and offers access to physician offices as well as a multitude of diagnostic, inpatient, outpatient and rehabilitation services.

5.  A regional and statewide leader in behavioral health services since the early 1970s, the Hospital offers a full continuum of psychiatric care, including special programs dealing with emotional challenges faced by children and adolescents. The Hospital has won

national acclaim by being one of only a few hospitals in the country to open an on-site, 24-unit residential behavioral health facility. Known as Hope Gardens, the behavioral health facility is a supportive housing facility that provides living space and support services for homeless individuals dealing with mental health and addiction issues.

6. During the past few years, the Hospital's role in the healthcare delivery marketplace has undergone dramatic change as a number of neighboring hospitals have closed or consolidated. The Hospital continues to redefine its mission, services and leadership in an effort to best serve an ever changing patient population and the community at large by working collaboratively to provide high quality, efficient, safe and accessible health care services with the utmost respect and compassion.

7. A more detailed description of the Debtors' business and the facts surrounding the commencement of the Chapter 11 Cases is set forth in the First Day Declaration, which is incorporated herein by reference.

**B.     The Debtors' Corporate Structure**

8. EOGH is a wholly-owned subsidiary of EVHI, which is a New Jersey not-for-profit corporation that serves the health care needs of residents of Essex County through the Hospital and its associated Hope Gardens supportive housing facility. EVHI is a holding company and does not conduct any operations of its own. In addition to its ownership of EOGH, EVHI is the 100% owner of The Foundation for East Orange General Hospital, Inc. (the "Foundation"), a non-debtor. The Foundation is a non-profit organization with a mission to develop relationships and financial resources in support of the Hospital. The Foundation accepts charitable gifts and works to fund both present and future equipment and program needs of the Hospital as determined by the Foundation's Board of Trustees. In the absence of donor restrictions, the Foundation has discretionary control over the amounts to be distributed to the Hospital, the timing of such distributions, and the purposes for which such funds are used.

9. The Hospital's Hope Gardens housing facility is run by Essex Valley Housing, Inc. ("EVH"), a non-debtor wholly-owned subsidiary of EOGH. EVH is a for-profit corporation and the general partner in Essex Valley Supportive Housing, LP ("EVSH"), which owns the property on which Hope Gardens is situated. EVH hold a .01% ownership interest in EVSH.

C. **The Debtors' Prepetition Capital Structure**

(i) Series 2006 A-2 Bonds

10. On November 22, 2006, the New Jersey Health Care Facilities Financing Authority (the "Authority") issued $13,200,000 in aggregate principal amount of its Revenue Bonds (Variable Rate Composite Program – East Orange General Hospital, Inc. Project) Series 2006A-2 (the "2006 Bonds") pursuant to that certain Trust Indenture dated as of November 1, 2006 (the "Indenture"), by and between the Authority and The Bank of New York Mellon (as successor to The Bank of New York), as trustee (the "Trustee"). The 2006 Bonds were issued pursuant to a financing program sponsored by the Authority, known as the Variable Rate Composite Program, in order to finance a project consisting of certain capital improvements to the Hospital, equipment purchases by the Hospital and the refunding of the Hospital's outstanding Revenue Bonds Series, 1990 B previously issued by the Authority.

11. The proceeds of the 2006 Bonds issuance were loaned by the Authority to EOGH pursuant to that certain Loan Agreement, dated as of November 1, 2006 (the "Loan Agreement"). Pursuant to the Indenture, the Authority assigned certain of its interests under the Loan Agreement, including its right to receive the payments under the Loan Agreement in respect of the 2006 Bonds, to the Trustee for the benefit of the holders of the 2006 Bonds.

12. The 2006 Bonds are supported by an irrevocable letter of credit (the "Letter of Credit") issued by PNC Bank, National Association ("PNC") to the Trustee. The Trustee can draw on the Letter of Credit, subject to the terms and conditions thereof, to pay the principal of the 2006 Bonds when due at maturity, upon redemption or upon acceleration, and up to 54 days' interest on the 2006 Bonds. EOGH's obligation to reimburse PNC for draws under

-4-

the Letter of Credit were set forth in that certain Letter of Credit and Reimbursement Agreement dated as of November 1, 2006, by and between EOGH and PNC, which reimbursement agreement was amended and restated in its entirety pursuant to that certain Amended and Restated Letter of Credit and Reimbursement Agreement dated as of October 14, 2011 (the "PNC LC Reimbursement Agreement"). Pursuant to the PNC LC Reimbursement Agreement, EOGH is obligated to reimburse PNC, with interest, for any draws under the Letter of Credit. The Letter of Credit was originally due to expire on November 22, 2011, but has been extended several times by amendments to the PNC LC Reimbursement Agreement. Unless further extended, the Letter of Credit will expire on February 1, 2016.

13. Subject to prior redemption, the 2006 Bonds have a maturity date of July 1, 2021 and bear interest at a variable rate calculated in accordance with the terms of the Indenture. As of the Petition Date, the principal amount outstanding and owed by EOGH in respect of the 2006 Bonds is approximately $5,710,000.

(ii) PNC Swap Agreement and PNC Prepetition Loan Agreement

14. In order to manage certain interest rate risk on the 2006 Bonds, EOGH and PNC entered into that certain ISDA Master Agreement dated as of November 17, 2006, the Schedule to the ISDA Master Agreement dated November 17, 2006, and that certain Confirmation of Transaction (Reference No. 014c001_6327) dated November 17, 2006 (collectively, the "PNC Swap Agreement"). The PNC Swap Agreement has a termination date of July 1, 2021.

15. Pursuant to that certain loan agreement by and between EOGH and PNC, dated as of June 15, 2007, as the same has been amended from time to time (the "PNC Prepetition Loan Agreement"), PNC made various term loans to EOGH, including a term loan in the original principal amount of $4,000,000, as evidenced by that certain Term Note dated June 15, 2007 (the "2007 Term Note," and together with the Letter of Credit, the PNC LC Reimbursement Agreement, the PNC Swap Agreement, the PNC Prepetition Loan Agreement and any other documents, instruments and agreements executed or delivered in connection

therewith, the "PNC Prepetition Loan Documents," and obligations thereunder, the "PNC Prepetition Obligations"). The 2007 Term Note bears interest at an annual rate equal to LIBOR (as defined therein) plus 65 basis points and has a maturity date of February 1, 2016.

16. PNC alleges that EOGH's obligations pursuant to the PNC LC Reimbursement Agreement are secured by a pledge of EOGH's Gross Receipts (as defined in the PNC Prepetition Loan Agreement and the PNC LC Reimbursement Agreement).

17. PNC alleges that, to further secure the PNC LC Reimbursement Agreement, and to secure all PNC Prepetition Obligations, EOGH entered into that certain Pledge Agreement dated September 10, 2012, with PNC ("PNC Pledge Agreement"), pursuant to which EOGH pledged all of its right, title and interest in the monies on deposit in EOGH's bank account number xxxxxx8486, which is maintained at PNC ("PNC Pledged Account").

18. PNC alleges that, to further secure the PNC Prepetition Obligations, on or about June 26, 2015, EOGH granted PNC a lien and mortgage on EOGH's East Pavilion property located at 240 Central Avenue, East Orange, New Jersey (the "PNC Mortgage," and together with the EOGH's Gross Receipts, and the PNC Pledged Account, the "Prepetition Collateral").

19. As of October 31, 2015, EOGH owed PNC approximately $480,000 on account of its obligations under the PNC Swap Agreement, and approximately $1,375,000 on account of its obligations under the PNC Prepetition Loan Agreement. Thus, as of the Petition Date, the PNC Prepetition Obligations total approximately $7,565,000.

(iii) Unsecured Trade Debt

20. As of the Petition Date, the Debtors had approximately $10,600,000 of accounts payable owed to trade vendors.

(iv) Capital Lease Obligations

21. As of the Petition Date, the Debtors' owed approximately $2,000,000 on account of capital lease obligations.

**D.    The Sale to Prospect**

22.    On May 28, 2014, the Debtors entered into an asset purchase agreement (the "Prospect APA") with Prospect EOGH, Inc. and Prospect Medical Holdings, Inc. (collectively, "Prospect").  Pursuant to the Prospect APA, Prospect agreed to purchase substantially all of the Hospital's assets for consideration consisting of a charitable grant to the Foundation, certain payments and commitments for capital construction projects and working capital, as well as other payments, commitments and the assumption of certain liabilities.

23.    On September 16, 2015, the Debtors received approval of a Certificate of Need from the New Jersey Department of Health for the sale of the Hospital's assets to Prospect, subject to certain conditions.  On October 7, 2015, the proposed sale to Prospect was approved by New Jersey Acting Attorney General John J. Hoffman pursuant to the Community Health Care Assets Protection Act ("CHAPA").  On October 28, 2015, the proposed sale to Prospect was approved by the Superior Court of New Jersey after a hearing held pursuant to CHAPA.

24.    The Debtors intend to file motions to establish bidding procedures and for approval of the sale shortly after the Petition Date.  The Debtors currently anticipate a closing on the sale within 60 days of the Petition Date.

## NEED FOR USE OF CASH COLLATERAL

25.    The Debtors are in the process of negotiating with several potential lenders regarding the terms of secured post-petition financing.  The Debtors intend to file a motion for approval of secured post-petition financing as soon as they reach an agreement with the lender that provides the most favorable terms.  In the meantime, the Debtors request authority to use cash collateral and to provide adequate protection to any parties that allege to have an interest in the cash collateral (collectively, the "Secured Parties").

26.    Without the immediate use of cash collateral, the Debtors will be unable to pay ordinary and necessary business expenses including, but not limited to, payroll and related obligations, taxes, utilities, amounts owed to vendors and other suppliers of goods and services, insurance, and other expenses that are crucial to patient care and operational needs of the

Hospital. The Debtors, therefore, request authority to use cash collateral in accordance with a budget (the "Budget") attached as **Exhibit 1** to the Interim Order. The use of cash collateral as requested herein will allow the Debtors to continue to provide quality healthcare services, which is critical to protecting the Hospital's patients and the public. The use of cash collateral will also preserve the value of the Debtors' estates for all parties-in-interest, including the Secured Parties, preserve employment for their approximately 610 employees, and preserve the Debtors' going-concern value while they run an expedited and orderly sale process under section 363 of the Bankruptcy Code.

## BASIS FOR RELIEF

27. Without the use of cash collateral, the Debtors will be unable to pay for goods and services that are crucial to patient care and operational needs of the Hospital. Moreover, the value of the Debtors' assets and operations will dissipate, hindering their ability to consummate the asset sale to the detriment of all interested parties. Thus, the Debtors' use of cash collateral is in the best interests of the Debtors' estates, creditors and all other stakeholders. In light of the foregoing, the Debtors seek Court approval to use cash collateral the cash collateral (together, the "Secured Parties") in accordance with the Budget.

28. Under section 363(c)(2) of the Bankruptcy Code, the Debtors may not use cash collateral without the consent of any entity with an interest in such cash collateral or authority granted by the Court. With respect the Secured Parties that may assert an interest in cash collateral, the Debtors respectfully submit that the Court should order the relief requested herein under section 363(c)(2)(B) of the Bankruptcy Code given the adequate protection being provided under sections 361 and 363(e) of the Bankruptcy Code as set forth herein.

29. Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Pursuant to section 363(c) of the Bankruptcy Code, a debtor-in-possession may not use cash collateral without the consent of the secured party

or Court approval. The Secured Parties, at this time, have not consented to the use of their alleged cash collateral.

30. Bankruptcy Code section 363(e) provides, in pertinent part, that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Examples of adequate protection are provided in section 361 of the Bankruptcy Code and include, but are not limited to: (a) lump sum or periodic cash payments to the extent that such use will result in a decrease in value of such entity's interest in the property; (b) provisions for an additional or replacement lien to the extent that the use of the property will cause a decrease in the value of such entity's interest in the property; and (c) such other relief as will result in the realization by the entity of the indubitable equivalent of such entity's interest in the property. 11 U.S.C. § 361.

31. By adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

32. While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by case basis. *See In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Swedeland Dcv. Grp.*, Inc., 16 F.3d 552, 564 (3d Cir. 1994); *In re N.J. Affordable Homes Corp.*, No. 05-60442, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *see also In re Mosello, 195 BR. 277*, 289 (Bankr. S.D,N.Y. 1996); *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy § 361.01[1] at 361-66 (15th ed. 1993)) (explaining that what constitutes adequate protection is not defined, and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

33.     For example, courts have held that replacement liens are sufficient adequate protection. *See In re Mt. Olive Hospitality, LLC*, Civil No. 13-3395 (RBK), 2014 WL 1309953, at *3, n. 6 (D.N.J. March 31, 2014); *see also In re Airport Inn Assocs., Ltd.*, 132 B.R. 951, 960 (Bankr. D. Col. 1990) ("The court could order a lien in postpetition accounts receivable as adequate protection if that relief was requested . . . ."); *In re Int'l Design & Display Grp., Inc.*, 154 B.R. 362, 364 (Bankr. S.D. Fla. 1993) (court authorized debtor to use cash collateral and, as adequate protection, granted secured creditor replacement lien on all postpetition accounts receivable, inventory and contracts to the extent the creditor's collateral was depleted).

34.     The Interim Order provides adequate protection of the interests of the Secured Parties in the form of valid, binding, enforceable, non-avoidable and automatically perfected replacement security liens on the Debtors' post-petition assets to the same extent, validity and priority that existed as of the Petition Date. Moreover, as set forth in the Interim Order, to the extent that the adequate protection provided for fails to protect the Secured Parties against any diminution in value of their collateral, the Secured Parties are being granted a superpriority administrative expense claim as provided for in Section 507(b) of the Bankruptcy Code.  In addition, with regard to PNC, the Debtors propose to continue making monthly payments in the same amount the Debtors paid immediately preceding the Petition Date, which is $35,000 per month.[2]  The Debtors believe that such adequate protection is fair and reasonable.

35.     The Hospital provides critical medical and health care needs to its patients, who are members of the local community.  The Hospital's ability to pay for goods and services, which include medical supplies, pharmaceuticals, pharmacy and lab operations, is crucial to patient care and operational needs of the Hospital.  Accordingly, the Debtors respectfully submit that the use of cash collateral on the terms set forth in the attached proposed Interim Order provides the Secured Parties with adequate protection and is in the best interest of the Debtors' patients, the public, the Debtors' estates, their creditors and all parties in interest, and, therefore should be authorized by this Court.

---

[2] The Debtors reserve their rights, however, with respect to whether and to what extent such payments should be applied to interest or principal.

**INTERIM APPROVAL SHOULD BE GRANTED**

36. Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral may not be commenced earlier than 14 days after service of such motion. The court, however, may conduct an expedited hearing prior to the expiration of such 14-day period and authorize the use of cash collateral where, as here, such relief is necessary to avoid immediate and irreparable harm to a debtor's estate.

37. For the reasons set forth above, the failure to obtain approval of the use of cash collateral on an expedited basis would very likely lead to immediate and irreparable harm to the Debtors' patients, the public, the Debtors' estates and the value of the Debtors' assets. Accordingly, the Debtors seek immediate entry of the Interim Order to prevent immediate and irreparable harm pending the Final Hearing, pursuant to Bankruptcy Rule 4001(b).

**REQUEST FOR FINAL HEARING**

38. Pursuant to Bankruptcy Rules 4001(b)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

**WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H)**

39. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**WAIVER OF MEMORANDUM OF LAW**

40. Because the legal basis upon which the Debtors rely is incorporated herein and the Motion does not raise any novel issues of law, the Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3).

**NO PRIOR REQUEST**

41. No prior motion for the relief sought herein has been made to this or to any other court.

## NOTICE

72. Notice of this Motion has been provided by email, fax, hand delivery or overnight mail to (i) the Office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, NJ 07102; (ii) the New Jersey Health Care Facilities Financing Authority (Attn: Mr. Mark E. Hopkins, Executive Director), Station Plaza Building #4, 22 S. Clinton Ave., Trenton, NJ 08609-1212; (iii) counsel for PNC Bank, National Association, c/o Blank Rome LLP (Attn: Heather Sonnenberg, Esq. and Regina Stango Kelbon, Esq.), One Logan Square, 130 North 18th Street, Philadelphia, PA 19103-6998; (iv) The Bank of New York Mellon, as indenture trustee, The Bank of New York Mellon - Public Finance, 385 Rifle Camp Road, Woodland Park, NJ 07424; (v) the Internal Revenue Service, 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016; (vi) the New Jersey Division of Taxation Compliance and Enforcement - Bankruptcy Unit, 50 Barrack Street, 9th Floor, Trenton, NJ 08695; (vii) the New Jersey Department of Health (Attn: Mr. William Conroy, Deputy Commissioner, Health Systems), 369 S. Warren St., Trenton, NJ 08608; (viii) the Office of the Attorney General of the State of New Jersey, Division of Law, Richard J. Hughes Justice Complex, 25 Market Street, Trenton, NJ 08625; (ix) the Office of the United States Attorney, Peter Rodino Federal Building, 970 Broad Street, Suite 700, Newark, NJ 07102; (x) the Debtors' twenty largest unsecured creditors on a consolidated basis; and (xi) those parties who have filed a notice of appearance and request for service of pleadings in these Chapter 11 Cases pursuant to Fed. R. Bankr. P. 2002. In light of the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**WHEREFORE**, the Debtors respectfully request that this Court: (i) enter an order, substantially in the form submitted herewith, granting the relief requested herein; and (ii) grant the Debtors such other and further relief as the Court deems just and proper.

Dated:  November 10, 2015	Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

*/s/  Kenneth A. Rosen*
Kenneth A. Rosen, Esq.
Gerald C. Bender, Esq.
Michael Savetsky, Esq.
Barry Z. Bazian, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)
krosen@lowenstein.com
gbender@lowenstein.com
msavetsky@lowenstein.com
bbazian@lowenstein.com

*Proposed Counsel to the Debtors and Debtors-in-Possession*