**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Gerald C. Bender, Esq.
Michael Savetsky, Esq.
Barry Z. Bazian, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and*
*Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>East Orange General Hospital, Inc., *et al.*,[1]<br><br>     Debtors. | Chapter 11<br><br>Case No. 15–31232 (  )<br><br>(Joint Administration Requested) |

**DECLARATION OF MARTIN A. BIEBER IN SUPPORT OF DEBTORS'**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Martin A. Bieber, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I am the interim President and Chief Executive Officer ("CEO") of East Orange General Hospital ("EOGH"), a New Jersey not-for-profit corporation. I have served in this capacity since November 17, 2014. I am also on the Board of Trustees of EOGH and of Essex Valley Healthcare, Inc. ("EVHI," and together with EOGH, the "Hospital" or "Debtors").

2.  I have worked in the health care industry for over 35 years. Prior to becoming interim President and CEO of the Hospital and a member of the Debtors' Board of Trustees, I served as CEO of the three-hospital, 614-bed Kennedy Health System based in Voorhees, New Jersey. Prior to that, I held executive positions at various hospitals including

---

[1] The Debtors and the last four digits of their Employer Identification Numbers are East Orange General Hospital, Inc. (7166) and Essex Valley Healthcare, Inc. (7667). The Debtors' principal place of business is located at 300 Central Avenue, East Orange, NJ 07018.

Catholic Health Services of Long Island's Mercy Medical Center in Rockville Centre, New York, and St. Francis Hospital in Flower Hill, New York.  In addition, I held executive positions at Beth Israel Medical Center in New York City. I hold a master's degree in health services administration from the New School for Social Research and a bachelor's degree in business administration from Baruch College in New York.  I am a member of the American College of Healthcare Executives, the American Institute of Certified Public Accountants and the New York State Society of Certified Public Accountants.

3.      As a result of my work for and on behalf of the Hospital, I am fully familiar with the Hospital's business, day-to-day operations and financial affairs.  I am duly authorized to make this declaration ("Declaration") on behalf of the Hospital.  Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Hospital's business operations, my review of relevant documents, information provided to me or verified by other managers, employees or the Hospital's professional advisors, including Lowenstein Sandler LLP and PricewaterhouseCoopers LLC, and/or my opinion based upon my experience, and/or knowledge and information concerning the Debtors' financial records and the healthcare industry generally.

4.      I submit this Declaration (a) in support of the Debtors' voluntary petitions for relief (together, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date"); (b) to provide general information about the Hospital, the nature of its business and an overview of its operations; (c) to describe the circumstances and events leading to the commencement of the Chapter 11 Cases; and (d) in support of and to describe the relief the Debtors seek through the various motions and applications (collectively, the "First Day Motions") they filed on the Petition Date.  The purposes of the First Day Motions are, among other things, to allow the Debtors to continue to provide vital medical services to the Hospital's patients and the public during the Chapter 11 Cases and to maximize the value of the Debtors' estates for the benefit of their creditors while they pursue a sale of their assets.

5.       This Declaration consists of three parts.  Part I provides an overview of the
Debtors' business, history, current operations, organizational and capital structure and pre-
petition efforts to sell their assets.  Part II describes the events and circumstances leading to the
commencement of these Chapter 11 Cases.  Part III provides a summary of relevant facts in
support of the First Day Motions.

## I.       FACTUAL BACKGROUND

### A.       Overview and Nature of the Debtors' Business

6.       Located in East Orange, New Jersey, the Hospital is the only independent,
fully accredited, acute-care hospital in Essex County and is a recognized leader in behavioral
health services, renal dialysis, wound care, diagnostic services, emergency services, and family
health care.  In addition to providing comprehensive primary care services, the 211-bed Hospital
continues to provide community-based wellness programs in keeping with its more than 100-
year tradition of excellence, compassion and exceeding patient expectations.

7.       Founded in 1903 as the Newark Homeopathic Hospital, the Hospital was
relocated to East Orange in 1926 and soon opened an outpatient clinic to better serve the
community.   Ongoing expansion continued throughout the decades culminating with the
purchase of the former Kessler East Building, known as the East Pavilion.  The Hospital's
campus stretches four blocks along Central Avenue in East Orange and offers access to physician
offices as well as a multitude of diagnostic, inpatient, outpatient and rehabilitation services.

8.       A regional and statewide leader in behavioral health services since the
early 1970s, the Hospital offers a full continuum of psychiatric care, including special programs
dealing with emotional challenges faced by children and adolescents.  The Hospital has won
national acclaim by being one of only a few hospitals in the country to open an on-site, 24-unit
residential behavioral health facility.  Known as Hope Gardens, the behavioral health facility is a
supportive housing facility that provides living space and support services for homeless
individuals dealing with mental health and addiction issues.

9.      During the past few years, the Hospital's role in the healthcare delivery marketplace has undergone dramatic change as a number of neighboring hospitals have closed or consolidated.  The Hospital continues to redefine its mission, services and leadership in an effort to best serve an ever changing patient population and the community at large by working collaboratively to provide high quality, efficient, safe and accessible health care services with the utmost respect and compassion.

**B.      Organizational Structure**

10.      EOGH is a wholly-owned subsidiary of EVHI, which is a New Jersey not-for-profit corporation that serves the health care needs of residents of Essex County through the Hospital and its associated Hope Gardens supportive housing facility.  EVHI is a holding company and does not conduct any operations of its own.  In addition to its ownership of EOGH, EVHI is the 100% owner of The Foundation for East Orange General Hospital, Inc. (the "Foundation"), a non-debtor.  The Foundation is a non-profit organization with a mission to develop relationships and financial resources in support of the Hospital.  The Foundation accepts charitable gifts and works to fund both present and future equipment and program needs of the Hospital as determined by the Foundation's Board of Trustees.  In the absence of donor restrictions, the Foundation has discretionary control over the amounts to be distributed to the Hospital, the timing of such distributions, and the purposes for which such funds are used.

11.      The Hospital's Hope Gardens housing facility is run by Essex Valley Housing, Inc. ("EVH"), a non-debtor wholly-owned subsidiary of EOGH.  EVH is a for-profit corporation and the general partner in Essex Valley Supportive Housing, LP ("EVSH"), which owns the property on which Hope Gardens is situated.  EVH hold a .01% ownership interest in EVSH.

**C.      Employees**

12.      As of the Petition Date, the Debtors employ approximately 860 individuals (collectively, the "Employees"), approximately 610 of whom are full-time,

approximately 90 of whom are part-time, and approximately 160 of whom work for the Hospital on a per diem basis. EVHI is a party to a collective bargaining agreement with the International Union of Operating Engineers, Local 68-68A-68B, AFL-CIO (the "Union"), which governs the terms of employment of 13 of the Debtors' engineer and building maintenance Employees.

**D.    The Debtors' Prepetition Capital Structure**

(i)      Series 2006 A-2 Bonds

13.      On November 22, 2006, the New Jersey Health Care Facilities Financing Authority (the "Authority") issued $13,200,000 in aggregate principal amount of its Revenue Bonds (Variable Rate Composite Program – East Orange General Hospital, Inc. Project) Series 2006A-2 (the "2006 Bonds") pursuant to that certain Trust Indenture dated as of November 1, 2006 (the "Indenture"), by and between the Authority and The Bank of New York Mellon (as successor to The Bank of New York), as trustee (the "Trustee"). The 2006 Bonds were issued pursuant to a financing program sponsored by the Authority, known as the Variable Rate Composite Program, in order to finance a project consisting of certain capital improvements to the Hospital, equipment purchases by the Hospital and the refunding of the Hospital's outstanding Revenue Bonds Series, 1990 B previously issued by the Authority.

14.      The proceeds of the 2006 Bonds issuance were loaned by the Authority to EOGH pursuant to that certain Loan Agreement, dated as of November 1, 2006 (the "Loan Agreement"). Pursuant to the Indenture, the Authority assigned certain of its interests under the Loan Agreement, including its right to receive the payments under the Loan Agreement in respect of the 2006 Bonds, to the Trustee for the benefit of the holders of the 2006 Bonds.

15.      The 2006 Bonds are supported by an irrevocable letter of credit (the "Letter of Credit") issued by PNC Bank, National Association ("PNC") to the Trustee. The Trustee can draw on the Letter of Credit, subject to the terms and conditions thereof, to pay the principal of the 2006 Bonds when due at maturity, upon redemption or upon acceleration, and up to 54 days' interest on the 2006 Bonds. EOGH's obligation to reimburse PNC for draws under

the Letter of Credit were set forth in that certain Letter of Credit and Reimbursement Agreement dated as of November 1, 2006, by and between EOGH and PNC, which reimbursement agreement was amended and restated in its entirety pursuant to that certain Amended and Restated Letter of Credit and Reimbursement Agreement dated as of October 14, 2011 (the "PNC LC Reimbursement Agreement").  Pursuant to the PNC LC Reimbursement Agreement, EOGH is obligated to reimburse PNC, with interest, for any draws under the Letter of Credit. The Letter of Credit was originally due to expire on November 22, 2011, but has been extended several times by amendments to the PNC LC Reimbursement Agreement.  Unless further extended, the Letter of Credit will expire on February 1, 2016.

16.     Subject to prior redemption, the 2006 Bonds have a maturity date of July 1, 2021 and bear interest at a variable rate calculated in accordance with the terms of the Indenture.  As of the Petition Date, the principal amount outstanding and owed by EOGH in respect of the 2006 Bonds is approximately $5,710,000.

(ii)     PNC Swap Agreement and PNC Prepetition Loan Agreement

17.     In order to manage certain interest rate risk on the 2006 Bonds, EOGH and PNC entered into that certain ISDA Master Agreement dated as of November 17, 2006, the Schedule to the ISDA Master Agreement dated November 17, 2006, and that certain Confirmation of Transaction (Reference No. 014c001_6327) dated November 17, 2006 (collectively, the "PNC Swap Agreement").  The PNC Swap Agreement has a termination date of July 1, 2021.

18.     Pursuant to that certain loan agreement by and between EOGH and PNC, dated as of June 15, 2007, as the same has been amended from time to time (the "PNC Prepetition Loan Agreement"), PNC made various term loans to EOGH, including a term loan in the original principal amount of $4,000,000, as evidenced by that certain Term Note dated June 15, 2007 (the "2007 Term Note," and together with the Letter of Credit, the PNC LC Reimbursement Agreement, the PNC Swap Agreement, the PNC Prepetition Loan Agreement

and any other documents, instruments and agreements executed or delivered in connection therewith, the "PNC Prepetition Loan Documents," and obligations thereunder, the "PNC Prepetition Obligations").  The 2007 Term Note bears interest at an annual rate equal to LIBOR (as defined therein) plus 65 basis points and has a maturity date of February 1, 2016.

19.     PNC alleges that EOGH's obligations pursuant to the PNC LC Reimbursement Agreement are secured by a pledge of EOGH's Gross Receipts (as defined in the PNC Prepetition Loan Agreement and the PNC LC Reimbursement Agreement).

20.     PNC alleges that, to further secure the PNC LC Reimbursement Agreement, and to secure all PNC Prepetition Obligations, EOGH entered into that certain Pledge Agreement dated September 10, 2012, with PNC ("PNC Pledge Agreement"), pursuant to which EOGH pledged all of its right, title and interest in the monies on deposit in EOGH's bank account number xxxxxx8486, which is maintained at PNC ("PNC Pledged Account").

21.     PNC alleges that, to further secure the PNC Prepetition Obligations, on or about June 26, 2015, EOGH granted PNC a lien and mortgage on EOGH's East Pavilion property located at 240 Central Avenue, East Orange, New Jersey (the "PNC Mortgage," and together with the EOGH's Gross Receipts, and the PNC Pledged Account, the "Prepetition Collateral").

22.     As of October 31, 2015, EOGH owed PNC approximately $480,000 on account of its obligations under the PNC Swap Agreement, and approximately $1,375,000 on account of its obligations under the PNC Prepetition Loan Agreement.  Thus, as of the Petition Date, the PNC Prepetition Obligations total approximately $7,565,000.

(iii)    Unsecured Trade Debt

23.     As of the Petition Date, the Debtors had approximately $10,600,000 of accounts payable owed to trade vendors.

(iv)    Capital Lease Obligations

24.    As of the Petition Date, the Debtors' owed approximately $2,000,000 on account of capital lease obligations.

**E.    Recent Financial Performance**

25.    For the nine months ending September 30, 2015, the Hospital incurred an unaudited net operating loss of approximately $8,900,000 with an EBIDA loss of approximately $4,200,000.  For the fiscal year ending December 31, 2014, the Hospital incurred an unaudited net operating loss of approximately $19,200,000 with an EBIDA loss of approximately $13,200,000.  For the fiscal year ending December 31, 2013, the Hospital incurred a net operating loss of approximately $10,700,000 with an EBIDA loss of approximately $5,400,000.

26.    The Hospital's performance appears to have declined over the past two years for a number reasons, including insufficient working capital to invest in staff retention, recruitment, training and development, and insufficient capital to assure (i) current, state of the art technology, (ii) replenishment or replacement of fixed and moveable equipment, and (iii) needed upgrades to the physical infrastructure.  The Hospital's loss of valued and experience staff over the last several years has further eroded the institution's operating effectiveness.

27.    As explained in more detail below, despite the Hospital's decline in performance over the last two years, the Hospital's finances have improved significantly and are stabilizing.

**F.    The Sale to Prospect**

28.    On May 28, 2014, the Debtors entered into an asset purchase agreement (the "Prospect APA") with Prospect EOGH, Inc. and Prospect Medical Holdings, Inc. (collectively, "Prospect").    Pursuant to the Prospect APA, Prospect agreed to purchase substantially all of the Hospital's assets for consideration consisting of a charitable grant to the Foundation, certain payments and commitments for capital construction projects and working capital, as well as other payments, commitments and the assumption of certain liabilities.

- 8 -

29.    On September 16, 2015, the Debtors received approval of a Certificate of Need from the New Jersey Department of Health for the sale of the Hospital's assets to Prospect, subject to certain conditions.  On October 7, 2015, the proposed sale to Prospect was approved by New Jersey Acting Attorney General John J. Hoffman pursuant to the Community Health Care Assets Protection Act ("CHAPA").  On October 28, 2015, the proposed sale to Prospect was approved by the Superior Court of New Jersey after a hearing held pursuant to CHAPA.

30.    The Debtors intend to file motions to establish bidding procedures and for approval of the sale shortly after the Petition Date.

## II.    EVENTS LEADING TO THE DEBTORS' CHAPTER 11 FILING

31.    I was engaged on November 17, 2014 by the Hospital to oversee and facilitate the Hospital's sale and transition of its ownership to Prospect.  It quickly became apparent to me that the Hospital was in a dire financial position, as the Hospital sustained an average EBIDA loss of approximately $1,100,000 per month in 2014.

32.    Accordingly, at my direction, the Hospital immediately took steps to improve its performance and minimize operational losses, including, but not limited to, replacing certain management positions, hiring an experienced consultant to oversee the Hospital's financial operations, identifying ways to minimize operational losses, including by reducing the Hospital's work force to a level consistent with operations, creating new programs to increase business and referrals from certain providers, eliminating unnecessary contracts with vendors and renegotiating contracts with physicians.  Through these and other efforts, within eight months of my engagement, the Hospital substantially decreased its 2014 loss of approximately $19,200,000 on annual operating revenues of approximately $88,665,000, with operating expenses of $101,908,000.

33.    The Hospital has also improved many internal processes, including cash collection and claims denial and reduction processes, implemented weekend ambulatory procedure programs, implemented a clinical documentation improvement program and changed

the Emergency Room Physician Group servicing the Hospital to improve the patient experience, facilitate better throughput and instill greater confidence by the medical staff.

34.     The Hospital has worked hard to improve the quality of its services by increasing the nurse to patient staffing ratio, strengthening case management, initiating new performance improvement programs, re-aligning business incentives with key medical staff in a regulatory compliant manner, and increasing nursing salaries and staffing mix to improve confidence in bedside care.  In fact, a recent survey of the Hospital by The Joint Commission-- one of healthcare's leading accrediting bodies--resulted in zero "Conditions of Participation" citations and nine "Direct Impact Standard" citations as compared to two "Conditions of Participation" citations and twenty-three "Direct Impact Standard" citations in the previous triennial survey.

35.     These and other efforts improved the Hospital's performance and cut the Hospital's losses significantly.  Despite these efforts and improvements, the Hospital is currently sustaining losses of approximately $200,000 per month.  The Hospital requires both capital and working capital investment in order to support volume and program growth, which the contemplated transaction with Prospect was designed to achieve.  The lack of simple equipment (including a sufficient number of beds and gurneys) as well as limitations in the current information technology environment, other related technology, as well as critical staff vacancies prevents the Hospital from servicing additional volume at this time.  In addition, as salaries are below market levels, the ability to recruit and retain needed staff is an ongoing challenge.  At the current spending rate, the Hospital will run out of cash in early December 2015.

36.     After exploring all available options, the Debtors' management and Board of Trustees have concluded that commencing these Chapter 11 Cases would be in the best interests of the Debtors' creditors and will preserve the going-concern value of their business while they continue to pursue the sale of their assets pursuant to section 363 of the Bankruptcy Code to Prospect or some other buyer.  The Debtors intend to file motions to establish bidding

- 10 -

procedures and for approval of the sale shortly after the Petition Date.  The Debtors currently anticipate a closing on the sale within 60 days of the Petition Date.

37.     In addition, the Debtors are in the process of negotiating with several potential lenders regarding the terms of secured post-petition financing.  The Debtors intend to file a motion for approval of secured post-petition financing as soon as they reach an agreement with the lender that provides the most favorable terms.  In the meantime, the Debtors request authority to use cash collateral and to provide adequate protection to any parties that allege to have an interest in such cash collateral.  The Debtors will finance ongoing operations of the Hospital during these Chapter 11 Cases through the use of cash collateral and the anticipated post-petition financing.  The use of cash collateral and financing will allow the Debtors to continue to provide quality healthcare services, preserve employment for their employees, and preserve the Debtors' going-concern value while they run an expedited and orderly sale process under section 363 of the Bankruptcy Code.

## III.     <u>FIRST DAY MOTIONS</u>

38.     To minimize the potentially disruptive impact the commencement of these Chapter 11 Cases might have on the Debtors, the Debtors have filed several First Day Motions.  Through the First Day Motions, the Debtors seek relief, on an expedited basis, intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates while they pursue a sale.  Unless this "first day" relief is granted, I believe the Debtors' business operations will suffer significant adverse, immediate, and irreparable consequences.

39.     Several of the First Day Motions request authority to pay certain pre-petition claims.  I am told by my advisors that rule 6003 of the Federal Rules of Bankruptcy Procedures (the "<u>Bankruptcy Rules</u>") provides, in relevant part, that the Court shall not consider motions to pay pre-petition claims during the first 21 days following the filing of a chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable harm."  In

light of this requirement, and as set forth below, the Debtors have narrowly tailored their requests for immediate authority to pay certain pre-petition claims to only those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Accordingly, certain requests for relief will be deferred for consideration at a later hearing.

40.    I have reviewed each of the First Day Motions or had their contents explained to me. The facts stated therein and described below are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations. A brief summary of the relief sought in each of the First Day Motions is as follows:[2]

## A.    Administrative Motions

i.    *Application for Designation as Complex Chapter 11 Cases (the "Complex Chapter 11 Application")*

41.    By the Complex Chapter 11 Application, the Debtors request entry of an order designating the Debtors' Chapter 11 Cases as complex chapter 11 cases pursuant to Exhibit F to the Court's *General Order Governing Procedures for Complex Chapter 11 Cases*, and rule 6003-1 of the Local Bankruptcy Rules.

42.    I believe that the relief requested in the Complex Chapter 11 Application is in the best interest of the Debtors' estates, their creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their business in a streamlined fashion and allow the U.S. Trustee and other parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency. Accordingly, on behalf of the Debtors, I respectfully submit that the Complex Chapter 11 Application should be approved.

---

[2]    This section is intended only as a summary of the key provisions of the First Day Motions and the relief sought therein. To the extent that this Declaration is inconsistent with any provisions of any of the First Day Motions, the terms of the First Day Motions shall control. The Court is respectfully referred to the First Day Motions for the full details thereof.

ii.    *Debtors' Application for Expedited Consideration of First Day Matters (the "Expedited First Day Application")*

43.    The Debtors request entry of an order designating their First Day Motions as requiring expedited consideration before this Court.  I believe that the relief requested in the Expedited First Day Application is essential to avoid the potentially disruptive impact the commencement of the Chapter 11 Cases might have on the Debtors and will facilitate the Debtors' orderly transition into Chapter 11 and increase going concern value.  Accordingly, on behalf of the Debtors, I respectfully submit that the Expedited First Day Application should be approved.

iii.    *Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")*

44.    The Debtors request entry of an order pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1015(b) directing joint administration of the Chapter 11 Cases for procedural purposes only.  Specifically, the Debtors request that this Court maintain one file and one docket for each of the Chapter 11 Cases under the lead case, East Orange General Hospital, Inc.  Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 Cases to indicate the joint administration of the Chapter 11 Cases.

45.    The Debtors also seek authority to file the monthly operating reports required by the U.S. Trustee's Operating Guidelines on a consolidated basis, but intend to track and break out disbursements on a Debtor-by-Debtor basis.

46.    Given the integrated nature of the Debtors' business, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest.  Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases will almost certainly affect each of the Debtors.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.

47.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

iv.    *Debtors' Application for Entry of an Order Authorizing the Retention of Prime Clerk LLC as Claims and Noticing Agent Effective as of the Petition Date (the "Prime Clerk Application")*

48.    Pursuant to the Prime Clerk Application, the Debtors seek to retain Prime Clerk LLC ("Prime Clerk") as claims and noticing agent in the Chapter 11 Cases.  I believe that by retaining Prime Clerk, the Debtors' estates, and particularly their creditors, will benefit from Prime Clerk's services.   Prime Clerk specializes in noticing, claims processing, and other administrative tasks necessary to operate chapter 11 cases effectively.   It is my understanding that Prime Clerk is fully equipped to manage claims issues and provide notice to creditors and other interested parties in the Chapter 11 Cases.   Therefore, on behalf of the Debtors, I respectfully submit that the Prime Clerk Application should be approved.

v.    *Debtors' Motion for an Order Extending the Debtors' Time to File Their Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements Motion")*

49.    The Debtors request entry of an order granting a 31-day extension of the time to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements") for a total of 45 days after the Petition Date.  The nature and scope of the Debtors' operations require them to maintain voluminous records and intricate accounting systems.   The complexity of the Debtors' business, the limited staff available to perform the required internal review of their financial records and affairs, the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these Chapter 11 Cases, and the pressure incident to the

commencement of the Chapter 11 Cases, necessitate additional time to file the Schedules and Statements.

50.     In addition, focusing the attention of the Debtors' key accounting and legal personnel on critical operational and restructuring issues during the early days of the Chapter 11 Cases will help the Debtors make a smoother transition into chapter 11 and, therefore, ultimately maximize the value of their estates for the benefit of creditors and all parties-in-interest.

51.     I believe that the relief requested in the Schedules and Statements Motion is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and Statements Motion should be granted.

> vi.     *Debtors' Motion for Entry of an Order (I) Granting the Debtors an Extension of Time to File Their List of Creditors and (II) Authorizing the Debtors and/or Their Agent to (A) Prepare Consolidated Lists of Creditors and Interest Holders in Lieu of a Mailing Matrix, (B) File a Consolidated List of the Debtors' 20 Largest Unsecured Creditors, and (C) Mail Initial Notices (the "Creditor Matrix Motion")*

52.     Pursuant to the Creditor Matrix Motion, the Debtors request entry of an order granting them an extension of time to file their list of creditors for an additional 30 days after the Petition Date.  The Debtors also propose to prepare a consolidated list of creditors and interest holders available to all parties-in-interest in lieu of submitting a mailing matrix.  Additionally, the Debtors seek authority to file a consolidated list of the Debtors' creditors holding the 20 largest unsecured claims.  Finally, the Debtors request that Prime Clerk, their proposed notice and claims agent, undertake all mailings directed by this Court, the U.S. Trustee, or as required by the Bankruptcy Code, including the notice of commencement of the Chapter 11 Cases.

53.     The Debtors have hundreds of potential creditors, and the breadth of the Debtors' business operations requires the Debtors to maintain voluminous books and records. Given the size and scope of the Debtors' operations and the number of creditors, I submit that the large amount of information that must be assembled to prepare the list of creditors, and the significant number of employee and advisor hours required to complete it, would be unnecessarily burdensome to the Debtors at the beginning of the Chapter 11 Cases, which is a critical time for the Debtors.   The Debtors are sensitive to the need to complete the list of creditors as soon as possible, and they intend to complete the list of creditors before the proposed 30-day deadline, if possible.

54.     I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.   Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be granted.

**B.      Operational Motions**

55.     The Debtors intend to ask for relief with respect to the following First Day Motions that directly impact the Debtors' ability to operate their business and manage their properties as a going concern.

vii.     *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Scheduling a Final Hearing and (D) Granting Related Relief (the "Cash Collateral Motion")*

56.     As stated above, the Debtors are in the process of negotiating with several potential lenders regarding the terms of secured post-petition financing.   The Debtors intend to file a motion for approval of secured post-petition financing as soon as they reach an agreement with the lender that provides the most favorable terms.   In the meantime, the Debtors request authority to use cash collateral and to provide adequate protection to any parties that allege to have an interest in such cash collateral (collectively, the "Secured Parties").

57.     I believe that the Debtors' use of cash collateral will allow the Debtors to continue to provide quality healthcare services and is, therefore, critical to protecting the Hospital's patients and the public.  The use of cash collateral will also preserve the value of the Debtors' estates for all parties-in-interest, including the Secured Parties, preserve employment for the Debtors' employees, and preserve the Debtors' going-concern value while they run an expedited and orderly sale process under section 363 of the Bankruptcy Code.

58.     The Debtors propose to provide adequate protection of the interests of the Secured Parties in the form of valid, binding, enforceable, non-avoidable and automatically perfected replacement security liens on the Debtors' post-petition assets to the same extent, validity and priority that existed as of the Petition Date.  Moreover, to the extent that the adequate protection provided for fails to protect the Secured Parties against any diminution in value of their collateral, Secured Parties will be granted superpriority administrative expense claims.  In addition, with regard to PNC, the Debtors propose to continue making monthly payments in the same amount the Debtors paid immediately preceding the Petition Date.[3]  I believe, and I have been advised, that the adequate protection proposed is fair and reasonable.

59.     The Debtors' ability to pay for goods and services, which include medical supplies, pharmaceuticals, pharmacy and lab operations, is crucial to patient care and operational needs of the Hospital.  Accordingly, I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors' patients, the public, the Debtors' estates and creditors.  Therefore, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be granted.

---

[3] The Debtors reserve their rights, however, with respect to whether and to what extent such payments should be applied to interest or principal.

      *viii.*     *Debtors' Motion for an Order (I) Authorizing the Debtors to Continue and Maintain Their Existing Cash Management System, Bank Accounts and Business Forms, (II) Modifying the Investment Guidelines, (III) Providing the United States Trustee With a 60-Day Objection Period and (IV) Granting Related Relief (the "<u>Cash Management Motion</u>")*

60.     On the Petition Date, the Debtors maintained bank accounts with various banks including, but not limited to, Wells Fargo Company, PNC and Investors Bank. In the ordinary course of their operations, the Debtors maintain a cash management system to receive and disburse funds. Receipts from the Debtors' patients, their insurers, and other payors are made via check, electronic fund transfers and wires, or credit card transactions. Upon receipt, the Debtors' funds are transferred to a payroll account and a medical benefits account used to fund the Debtors' payroll and employee benefits obligations, with the remaining funds flowing to a concentration account (the "<u>Concentration Account</u>"). Funds sitting in the Concentration Account are channeled to the Debtors' disbursement accounts to fund operating expenses as needed.

61.     Through the Cash Management Motion, The Debtors request entry of an order (i) authorizing them to maintain their existing bank accounts and cash management system and continue to use existing business forms and records, (ii) modifying the investment guidelines set forth in section 345 of the Bankruptcy Code, (iii) providing the U.S. Trustee with a 60-day objection period, and (iv) granting related relief.

62.     If the Debtors are required to open separate accounts as debtors-in-possession and modify the Cash Management System in accordance with the U.S. Trustee Guidelines, such process would necessitate opening new accounts for collections, cash concentration, and disbursements. In fact, the Debtors would need to open dozens of new bank accounts. Thus, the Debtors' treasury, accounting, and bookkeeping employees would be forced to focus exclusively on immediately opening new bank accounts, instead of on their daily responsibilities during this critical juncture of the Chapter 11 Cases. The opening of new bank accounts would certainly increase operating costs, thereby negatively impacting the Debtors'

cash flow.  Most importantly, delays that would result from opening new accounts, revising cash management procedures, instructing customers to redirect payments, and implementing new information technology protocols would negatively impact the Debtors' ability to operate their business while pursuing these arrangements.  Additionally, the Debtors would be subject to significant administrative burdens and expenses because they would need to execute new signatory cards and depository agreements, and create an entirely new manual system for issuing checks and paying post-petition obligations.

63.    I believe the Debtors' continued use of the Cash Management System will greatly facilitate their transition into the Chapter 11 Cases by, among other things, avoiding administrative inefficiencies and expenses, minimizing delays in payment of post-petition debts, and providing important internal controls.  I believe that parties-in-interest will not be harmed by the Debtors' maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.  Specifically, the Debtors and their advisors have implemented internal protocols that prohibit payments on account of pre-petition debts without the prior approval of appropriate managers.  In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

64.    Given the nature of the Debtors' business, I believe that any disruption to the Cash Management System could have severe consequences for the Debtors' patients, the public, the Debtors' estates, their creditors and all parties in interest.  Therefore, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

ix.    *Debtors' Motion for an Order (I) Authorizing, But Not Directing, the Debtors to Pay Pre-Petition Wages, Salaries And Related Obligations and Taxes, and (II) Directing All Banks to Honor Checks and Transfers for Payment of Pre-Petition Employee Obligations (the "*Wages Motion*")*

65.    In the ordinary course of their business operations, the Debtors employ approximately 860 individuals (collectively, the "Employees"), approximately 610 of whom are employed full-time, approximately 90 of whom are employed part-time, and approximately 160 of whom are employed by the Debtors on a per diem basis. Debtor EVHI is party to a collective bargaining agreement with the Union, which governs the terms of employment of 13 of the Debtors' Employees.

66.    In addition to their Employees, the Debtors utilize the services of approximately one hundred and ten (110) contracted physicians with various medical specialties and expertise in order to assist the Debtors in providing a wide array of vital healthcare services to hospital patients. Specifically, the Debtors contract with (a) seven (7) overnight attending physicians (the "Nocturnists") who provide a wide variety of inpatient services during shifts that run from 7 p.m. to 7 a.m., (b) four (4) charity care hospitalists that treat patients that do not have a primary care physician and are admitted to the hospital through the hospital's Emergency Department (the "Hospitalists"), (c) approximately eleven (11) primary care physicians with various specialties that provide services in the Debtors' Family Health Center for charity care and lower income patients in a medical office setting (the "Family Health Center Physicians"), and (d) numerous other physicians with various specialties that provide a variety of services within the hospital including, but not limited to, medical directorship services, "on call" services, forensics, EKG services, stroke care, emergency room surgery, pathology, and treatment of infectious diseases (collectively, with the Nocturnists, Hospitalists, and Family Health Center Physicians, the "Physician Contractors").

67.    The Debtors also utilize the services of two (2) nurse staffing companies, Nurses 24/7 and Careline Services (together, the "Nursing Agencies"), to provide the Debtors with temporary nursing services (the "Nursing Services") on an as needed basis.

68.     In addition, the Debtors utilize the services of Security Resources, Inc. ("<u>Security Resources</u>") to provide the Debtors with supplemental security guard services ("<u>Security Services</u>") in the hospital on an as needed basis.  The Security Services are vital to the safety and security of the hospital and its patients.

69.     The Debtors also currently utilize the services of three (3) third party coding service providers (the "<u>Coding Service Providers</u>") in order to ensure that the Debtors' claims for reimbursement are timely and accurately submitted to Medicare, insurance companies, and other payors in compliance with Medicare rules and regulations and the requirements of the insurance companies and other payors, as applicable.

70.     The continued, uninterrupted services of the Debtors' Employees and Physician Contractors, as well as the continuing services provided by the Nursing Agencies, Security Resources and Coding Service Providers are essential to the Debtors' efforts to ensure the smooth and successful operation of the hospital.  Any delay in paying outstanding wages, salaries, and other compensation due to the Employees, Physician Contractors, Nursing Agencies Security Resources and Coding Service Providers as of the Petition Date, or the failure by the Debtors to continue their prepetition practices, programs, and policies with respect to Employee benefits could severely disrupt the Debtors' relationship with their Employees and Physician Contractors, impair morale at this critical juncture, and disrupt the Debtors' operations, all of which would irreparably harm the Debtors' estates and, most importantly, their patients.

71.     Accordingly, by the Wages Motion, the Debtors seek an order authorizing, but not directing, the Debtors to (i) pay all pre-petition Employee claims for wages, salaries, commissions, sick pay, personal day pay, vacation pay, holiday pay, and other accrued compensation; (ii) make all payments for which Employee payroll deductions were withheld pre-petition; (iii) make pre-petition contributions and pay benefits under certain employee benefit plans; (iv) honor workers' compensation programs; (v) pay other miscellaneous Employee-related costs including, but not limited to, processing costs and fees; (vi) continue Employee

programs with respect to vacation, sick, personal, and holiday leave; (vii) continue certain health, welfare, savings, and other benefit programs; and (viii) pay all amounts owed to the Physician Contractors, Nursing Agencies, Security Resources and Coding Service Providers (collectively, the "Prepetition Obligations").

72.      The Debtors also request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor, and pay any and all checks, wire transfers, drafts, ACH debits, and other transfers drawn on the Debtors' bank accounts on account of the Prepetition Obligations, irrespective of whether such items are presented before, on, or after the Petition Date.

73.      I believe that any delay in paying the Prepetition Obligations could severely disrupt the Debtors' relationship with the Employees, Physician Contractors, and agencies providing services to the Debtors and irreparably impair morale at the very time that their dedication, confidence, and cooperation are most critical.  The Debtors face the risk that their operations may be severely impaired if the Debtors are not granted authority to pay all accrued but unpaid Prepetition Obligations.  At this critical stage, the Debtors simply cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure to pay Prepetition Obligations in the ordinary course of business.  Accordingly, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors, their patients, the public, the Debtors' estates and creditors, and all other parties-in-interest in the Chapter 11 Cases, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases uninterrupted.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be granted.

   x. *Debtors' Motion For Entry of Interim and Final Orders (I) Prohibiting Utility Companies From Discontinuing, Altering or Refusing Service on Account of Pre-Petition Invoices, (II) Approving the Debtors' Proposed Form of Adequate Assurance of Future Payment and (III) Establishing Procedures For Resolving Requests For Additional Adequate Assurance (the "<u>Utilities Motion</u>")*

   74. In connection with the operation of their facilities, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, electricity, gas, internet, telephone and similar utility products and services (collectively, the "<u>Utility Services</u>") from various utility companies (the "<u>Utility Companies</u>").

   75. Uninterrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, to the success of these Chapter 11 Cases. Any interruption of Utility Services, even for a brief period of time, would negatively affect the Debtors' operations, compromise the health and well-being of the Debtors' patients, and could seriously jeopardize the Debtors' efforts in these Chapter 11 Cases for the benefit of their creditors and other stakeholders. It is, therefore, critical that Utility Services continue uninterrupted during these Chapter 11 Cases.

   76. Accordingly, through the Utilities Motion, the Debtors request entry of interim and final orders (i) prohibiting the Utility Companies from discontinuing, altering or refusing service on account of pre-petition invoices, (ii) approving the Debtors' proposed form of adequate assurance of future payment and (iii) establishing procedures for resolving requests for additional adequate assurance.

   77. The Debtors intend to pay post-petition obligations owed to the Utility Companies in a timely manner. To provide additional assurance of payment for future Utility Services to the Utility Companies, the Debtors propose to deposit, within ten (10) business days following entry of the interim order granting the Utilities Motion, into a single, segregated, newly-created, interest-bearing account, an amount equal to the estimated aggregate cost for two (2) weeks of Utility Service from each respective Utility Company (the "<u>Adequate Assurance</u>

Deposit"), calculated based upon the Debtors' average utility costs over the past twelve (12) months, provided, however, that no deposit will be made on account of any Utility Company that is holding a pre-petition security deposit in an amount that is in excess of any pre-petition claim plus the estimated amount of the two (2) weeks' average utility costs.  With respect to those entities that currently hold a security deposit in an amount in excess of their pre-petition claim plus the estimated amount of two (2) weeks' cost, each such Utility Company can continue to hold the balance of the existing deposit as adequate assurance of future payment.  Based on this methodology, the total amount of the Adequate Assurance Deposit will be $69,370.16.

78.    As set forth in detail in the Utilities Motion, the Debtors also seek to establish reasonable procedures by which Utility Companies may request additional adequate assurance of payment in the event that a Utility Company believes that the Adequate Assurance Deposit does not provide it with satisfactory adequate assurance.

79.    I believe, and I am advised that, the proposed adequate assurance procedures and the proposed Adequate Assurance Deposit provide concrete assurance of the Debtors' payment and of their future obligations to the Utility Companies and that such assurance satisfies the requirements the Bankruptcy Code for adequate assurance.

80.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' patients, the public, the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their business in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

      *xi.    Debtors' Motion For Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to Pay Pre-Petition Claims of Critical Vendors and Service Providers (the "Critical Vendor Motion")*

81.    The Debtors, with the assistance of their advisors and operations management, have identified certain critical business relationships, suppliers of goods and

providers of essential services (collectively, the "<u>Critical Vendors</u>"), the loss of which could immediately and irreparably harm the Debtors' business, put patient care and safety at significant risk, and significantly impair their going-concern value.   Accordingly, through the Critical Vendor Motion, the Debtors seek the entry of interim and final orders authorizing, but not directing, the Debtors to pay the Critical Vendors' prepetition claims.

82.     The Debtors propose to condition the payment of Critical Vendor claims on the agreement of each individual Critical Vendor to continue supplying the relevant goods and/or services to the Debtors on terms that are as or more favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Critical Vendor and the Debtors in the twelve (12) months prior to the Petition Date (the "<u>Customary Trade Terms</u>"), or such other trade terms as are agreed to by the Debtors and each Critical Vendor.   The Debtors reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

83.     I believe that the authority to pay the Critical Vendors as requested in the Critical Vendor Motion is necessary to enable the Debtors to continue to ensure the smooth and successful operation of the Hospital, maintain the quality of patient care the Hospital provides, prevent any risk to patient health and safety, maximize the value of the Debtors' business for the benefit of their creditors, and avoid the termination of business or trade credit by Critical Vendors and the resulting need for increased funding that could impede the Debtors' ability to operate.   The authority to pay the Critical Vendor Claims on the terms set forth in the Critical Vendor Motion is, therefore, in the best interests of the Debtors' patients, the public, the Debtors' estates, their customers, and creditors.   Accordingly, on behalf of the Debtors, I respectfully request that the relief requested in the Critical Vendor Motion be granted.

xii.    *Debtors' Motion for an Order Authorizing, But Not Directing, the Debtors to Pay Certain Pre-Petition Sales, Property and Other Miscellaneous Taxes and Fees, and Granting Related Relief (the "*Tax Motion*")*

84.    In the Tax Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors to pay certain sales and real property taxes (the "Taxes") and certain license and permit fees (the "Fees") in connection with obtaining licenses and permits necessary to operate their business, that accrued or arose in the ordinary course of business before the Petition Date.

85.    The Debtors must continue to pay all Taxes and Fees when due to continue operating.  Failure to pay all Taxes and Fees when due could result in taxing authorities suspending the Debtors' ability to operate, filing liens, and/or seeking relief from the automatic stay to take action against the Debtors.

86.    The relief the Debtors seek in the Tax Motion will enable the Debtors to continue to operate their business during the Chapter 11 Cases uninterrupted.  Accordingly, to prevent immediate, irreparable harm to the Debtors' business, I believe that the relief requested in the Tax Motion is in the best interests of the Debtors and their estates and creditors and all other parties-in-interest in the Chapter 11 Cases and, therefore, should be granted.

xiii.    *Debtors' Motion for an Order Authorizing the Debtors to (I) Pay Pre-Petition Insurance Premiums (II) Continue Pre-Petition Insurance Policies and Programs and (III) Perform All Pre-Petition Obligations in Respect Thereof (the "*Insurance Motion*")*

87.    By the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to continue to pay and perform under various prepetition insurance programs covering a variety of matters such as general liability, umbrella liability, workers' compensation, directors' and officers' liability, fiduciary liability, and pollution storage tank liability. (the "Insurance Programs"), and pay all pre-petition and post-petition obligations in respect thereof in the ordinary course of their business.

88.     In connection with the day-to-day operations of their business, the Debtors maintain various Insurance Programs and related insurance policies as set forth on a non-exhaustive list attached to the Insurance Motion through several different insurance providers (the "Insurance Providers").

89.     The Debtors are required to pay premiums under the Insurance Programs based on a fixed amount established and billed by each Insurance Provider.  Depending on the particular Insurance Policy, premiums are either (i) paid in installments to the carrier over an agreed period or (ii) pre-paid at a policy's inception or renewal.

90.     It is my understanding that the Debtors are current on all of their insurance obligations as of the Petition Date.  However, the Debtors have filed the Insurance Motion in an abundance of caution in order to obtain authority to continue their pre-petition insurance policies and programs, and pay and perform, as may be necessary, all pre-petition obligations in respect thereof.

91.     Accordingly, on behalf of the Debtors, I respectfully request that the relief requested in the Insurance Motion be granted to prevent any disruption of the Debtors' Insurance Policies and Insurance Programs and any attendant harm to the Debtors' business that such disruption would cause.

## IV.     CONCLUSION

92.     The relief sought in each of the First Day Motions will minimize the adverse effects of the Chapter 11 Cases on the Debtors, allow the Debtors to continue to provide quality health care to their patients and the public, and result in maximum creditor recoveries. Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each First Day Motion be granted in its entirety, together with such other and further relief as this Court deems just and proper.

*[Signature Page To Follow]*

- 27 -

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*/s/ Martin A. Bieber*
Martin A. Bieber
Interim President and CEO

Date: November 10, 2015