TRENK, DIPASQUALE,
DELLA FERA & SODONO, P.C.
347 Mount Pleasant Avenue, Suite 300
West Orange, New Jersey 07052
(973) 243-8600
Joseph J. DiPasquale (jdipasquale@trenklawfirm.com)
Sam Della Fera, Jr. (sdellafera@trenklawfirm.com)
Adam D. Wolper (awolper@trenklawfirm.com)
*Proposed Co-Counsel for Official Committee of Unsecured Creditors*

-and-

ARENT FOX LLP
1675 Broadway
New York, New York 10019
(212) 484-3925
Robert Hirsh (robert.hirsh@arentfox.com)
Leah Eisenberg (leah.eisenberg@arentfox.com)
*Proposed Co-Counsel for Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>EAST ORANGE GENERAL<br>HOSPITAL, INC., et al.,<br><br>    Debtors. | Chapter 11<br><br>Case No. 15-31232 (VFP)<br>(Jointly Administered) |

**COMMITTEE'S OBJECTION TO DEBTOR'S MOTION
FOR ORDER APPROVING BIDDING PROCEDURES, BID PROTECTIONS,
AND FORM AND MANNER OF SALE NOTICES**

The Official Committee of Unsecured Creditors (the "**Committee**") in the chapter 11 bankruptcy cases of East Orange General Hospital, Inc. (the "**EOGH**") and Essex Valley Healthcare, Inc. ("**EVH**," and collectively with EOGH, "**Debtors**"), by way of objection to Debtors' motion [ECF No. 57] for, *inter alia*, an order approving bidding procedures, bid protections, and form and manner of sale notices (the "**Motion**"), by and through its proposed undersigned counsel, hereby respectfully states as follows:

## INTRODUCTION

1.      To be clear, this objection is more than a typical committee "limited" objection to bidding procedures.  Indeed, because the proposed sale to Prospect EOGH, Inc. ("**Proposed Buyer**") set forth in the Motion is such a flagrant violation of the most basic tenets of bankruptcy law, any steps taken in furtherance of that sale would be equally flagrant.

2.      More specifically, while Proposed Buyer proposes to pay **_$0.00_** to the estate[1] for the benefit of unsecured creditors, it is paying **_$10 million_** to a non-debtor "Foundation" which will have many of the same board members as Debtors, whose sole apparent purpose will be to indirectly support Proposed Buyer and guaranty certain obligations of Debtors to one of its non-debtor affiliates.  When combined with the fact that Debtors currently own multiple unencumbered parcels of real property (one of which was under contract for $12,800,000 as recently as June 2015) and are rumored to have approximately $13 million of accounts receivable and substantial unencumbered tangible personal property, it is becoming increasingly apparent to the Committee that the unsecured creditors as a group would likely benefit more if the hospital were to close and be liquidated piecemeal.[2]  While this may not be a politically popular stance, it is nevertheless the unfortunate truth.[3]

3.      But that is just the tip of the iceberg as far as the Motion goes.  Even if the Court permits the auction to proceed, the proposed terms of that auction have been so gerrymandered that it is almost impossible to envision there being any bidders – other than Proposed Buyer –

---

[1] While Proposed Buyer will allegedly be assuming certain executory contracts as part of the sale, it has not yet identified those contracts specifically, and the Committee cannot rely on such a nebulous indication.  But more importantly, cure amounts paid to holders of assumed contracts are not payments to the "estate."

[2] The Committee's financial advisor is prepared to offer testimony to that effect.

[3] Indeed, in a March 2015 report by Navigant Consulting that was commissioned by the New Jersey Health Care Facilities Financing Authority (*available at* www.njhcffa.com) , Navigant recommended that EOGH cease operating as a hospital and instead become an ambulatory care facility (p. 103).

2

being able to present a bid.[4]  Despite the fact that Proposed Buyer only proposes to pay (inclusive of assumed liabilities) somewhere between $11.5 million and $17 million to the estate (all of which will be used to pay off PNC, the DIP lender, and the transfer of the Medicare/Medicaid license), the bidding at the auction starts at **_$100 million_** (an amount that includes nearly $70 million of hypothetical future capital expenditures that the buyer will make to the hospital once the sale is already completed and Debtors have no interest in it anymore).  Worse yet, that $100 million includes the breakup fee and expense reimbursement – **_in the outrageous amount of nearly 37% of the actual cash purchase price of $11.6 million_** – that must be paid to the buyer.  Accordingly, there is no conceivable way that the bidding procedures proposed by the Debtors can lead to a competitive bidding process.

## BACKGROUND FACTS

**A.**     *Current State of Affairs*

4.     As an initial matter, the lack of transparency at this stage of the case must be addressed.  While Debtors are seeking approval of the asset purchase agreement attached to the Motion (the "**APA**"), they have tellingly failed to file or disclose the voluminous schedules, exhibits, and annexes to the APA.  Debtors have also not filed their bankruptcy schedules, meaning that the Committee has no idea of the extent or value of the Debtors' assets that are being sold.  Indeed, the assets to be purchased by Proposed Buyer under the APA include all of the Debtors' accounts receivable ("**A/R**") and avoidance actions, yet the creditors have never been provided with the actual amount of the A/R or the universe of potential preferences and fraudulent transfers.  At a more fundamental level, Debtors have not filed a creditor matrix, so

---

[4] The Committee's professionals have already been contacted by Prime Healthcare Services, who has indicated a strong interest in making a bid on Debtors' assets, but who is constrained by the current timeframes.

3

the Committee is not even able to determine with any degree of certainty the amount of potential unsecured claims.

5. Further, the Motion does not disclose or address any of the potentially troubling relationships at issue in the sale. For instance, while the Foundation for East Orange General Hospital (the "**Foundation**") stands to benefit handsomely from the sale, the "Foundation Agreement" (as defined in the APA) has never been disclosed, and Debtors fail to note that six members of the Debtors' boards will be members of the board of the Foundation after the closing is completed (See *October 7, 2015 Correspondence from John J. Hoffman, Acting Attorney General, to Honorable Walter Koprowski, Jr., J.S.C.*, a copy of which is annexed hereto as Exhibit A (hereinafter, the "**AG Letter**"), at p. 52). Further, the Foundation will be guaranteeing certain liabilities of Debtors to non-debtor affiliate Essex Valley Supportive Housing Partners, LP ("**EVSHP**"),[5] and will also be liable to the limited partner of EVSHP for any lost tax credits in an amount up to $3,175,000 (Id. at 43).[6] Even worse, EOGH, which has an $800,000 mortgage on EVSHP's real property, proposes to assign that mortgage to the Foundation for no consideration. (AG Letter at pp. 8 and 48.)

6. Also, the Motion does not disclose that the Proposed Buyer (or an affiliate thereof) has allegedly had its employees embedded in Debtors' management for at least the past year, running up significant fees and expenses in the amount of approximately $2 million (which conveniently is not included in Debtor's list of the twenty largest unsecured creditors). Discovery will be necessary on all of these relationships and guarantees.

---

[5] "The Foundation will also sign a financial guaranty for EVSHP[.]" (Id. at p. 48.)
[6] "[I]n the event the limited partner of EVSHP loses tax credits, the Foundation will guarantee reimbursement of lost tax credits." (AG Letter at p. 43.) It goes on to provide that such guarantee liability could be as high as $3,175,000 in the year of closing. Id.

4

7.  Most importantly, the Motion does not address the reason for why the $10 million Foundation payment (the "**Foundation Payment**") is a part of the sale, a matter that cries out for discovery to be taken (particularly when it appears that a significant part of the Foundation Payment will be used to benefit affiliates of Debtors). Debtors' counsel has intimated that the Debtors and Proposed Buyer would not have been able to obtain government and court approvals for the sale – in particular, the recommendation of the New Jersey Attorney General and the approval by the Essex County Superior Court pursuant to the Community Healthcare Assets Preservation Act, N.J.S.A. 26:2H-7.10 et seq. ("**CHAPA**") – unless the APA included the Foundation Payment. However, no support has been provided for that assertion.[7] Rather, as set forth in the next paragraph, it is clear that the Attorney General's understanding at the time he granted CHAPA approval was that all liabilities of Debtors were being paid in full by Proposed Buyer. (In fact, upon information and belief, the *previous* APA between Proposed Buyer and Debtors provided that Proposed Buyer would be satisfying *all* of Debtors' unsecured liabilities.) Finally, it appears that in the early negotiations between Debtors and Prospect, it was ***Debtors*** who requested that the Foundation Commitment be increased from $7 million to $10 million. (AG Letter at p. 34.)

8.  In the Attorney General's thorough and incisive letter recommending that the state court grant CHAPA approval for the sale, he noted as follows:

> In prior CHAPA transactions, we have calculated the amount of assets to be set aside as a charitable obligation to reflect the 'net proceeds' from the sale, *i.e.*, the proceeds of the sale, plus any excluded assets retained by the Hospital and minus any excluded liabilities retained by the Hospital, as those terms are defined in the definitive agreement. However, in nearly every hospital conversion transaction reviewed under CHAPA, the hospital's liabilities far exceed the proceeds received from its sale, resulting in no funds

---

[7] It should be noted that even if the Foundation Payment really was a condition of the sale approval, it is still improper as a matter of bankruptcy law, and the Committee vehemently opposes it.

5

> being set aside as a charitable obligation. This is not the case here. And, we have already determined the fair market value of the Hospital. As discussed in Section IV(e)(i) above, we calculated the fair market value to be between $3,000,000 and $11,000,000.

(AG Letter at p. 47.) He further noted that "the Hospital advised that it will retain . . . no liabilities[.]" (Id.) Thus, it seems readily apparent that CHAPA only requires ***net*** sale proceeds (i.e., the amount of proceeds remaining after ALL debts have been paid) to go to the Foundation. Moreover, it is clear that the representations made by Debtors and Proposed Buyer to the Attorney General – i.e., that Debtors will be left with no liabilities as a result of the sale – are no longer true. In that same document, the Attorney General referenced a May 2015 submission in which Debtors stated that the value of the assets being purchased by Proposed Buyer was $62,368,000 (AG Letter at p. 39). That number shows that the $17 million (which includes assumed liabilities) going to the estates as part of the sale is woefully inadequate.

**B.**     *Summary of Consideration under APA*

9.     It is also important to clarify exactly what consideration Debtors are receiving under the APA. Section 2.6(a) of the APA provides that the "aggregate consideration for the Purchased Assets" consists of the following:

    a.     the *Foundation Commitment*, which is a $10 million payment being made ***to the non-debtor Foundation***;

    b.     the *Liquidity Payment*, which is a $500,000 payment being made to the estates;

    c.     the *PNC Payment*, which is a $7,610,000 payment to PNC on behalf of the estates;

    d.     the *Aggregate CMS Liability*, which is either a payment or an assumption of an alleged $19 million CMS liability (but one that will be substantially offset by the

6

approximately $13 million of accounts receivable being purchased by Proposed Buyer as part of the APA);

   e. *payment to DIP lender* in the amount of $3,500,000 on behalf of the estates;

   f. the *Projected CapEx Commitment*, which is a future commitment by Proposed Buyer/Prospect to put $30,000,000 into the hospital that it will own (with amounts unused after five years going to the Foundation);

   g. the *Projected Capital Maintenance Commitment*, which is a future commitment by Proposed Buyer/Prospect to put $22,000,000 into the hospital that it will own; and

   h. the *Working Capital Amount*, which is an $8,000,000 payment to be made by Prospect to Proposed Buyer (i.e., itself).

 10. This analysis shows that of the purported "$96 million" aggregate consideration, ***only approximately $17 million of funds are actually going to the estate***. It must also be noted that EOGH is transferring its stock in Essex Valley Housing, Inc., and its mortgage on EVSHP's real property, to the Foundation for no consideration at all.

### LEGAL ARGUMENT

**I.** *Bidding Procedures in Support of an Improper Sale Cannot be Approved*

 11. In this case, it is not even necessary to consider the bidding procedures, because they are in support of a sale process that violates the Bankruptcy Code and case law thereunder.

  **A.** **Debtors Cannot Pay Proceeds of Sale of Estate Assets Without Satisfying Unsecured Claims in Full**

 12. Pursuant to Third Circuit case law, a sale under Section 363(b) of the Bankruptcy Code cannot be approved unless, *inter alia*, there is a sound business purpose for the sale and the

7

sale price is fair.  In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 149-50 (3d Cir. 1986).  Before even getting to the "sub rosa plan" analysis, it is clear the proposed sale is improper because the sale price being received by the estates is at least $40 million less than the $62 million value of the estates' assets (see Paragraph 8, above), it circumvents the priority rules of the Bankruptcy Code, and leaves the post-sale Debtors as administratively insolvent shells, Debtors have vitiated any possibility that the sale has a sound business purpose.

13.     Pursuant to the APA, Debtors will be paying proceeds from the sale of *estate* assets to a non-debtor affiliate of Debtors (i.e., the Foundation) that has no claim or interest (whether real or hypothetical) against Debtors despite the fact that unsecured claims are not being paid in full (indeed, they are not being paid at all).  This is akin to paying a debtor's shareholders while paying nothing to its unsecured creditors.  Without the consent of the class(es) of general unsecured claims, there is no legal support for such an end-run around the Bankruptcy Code.

      **B.**     ***Sub Rosa* Plan; Violation of Absolute Priority Rule**

14.     Bankruptcy debtors are prohibited from selling estate property under 11 U.S.C. § 363(b) if such sale would amount to a "*sub rosa* plan."  In re Iridium Operating LLC, 478 F.3d 452, 467 (2d Cir. 2007).  A *sub rosa* plan is a transaction outside of a chapter 11 plan (i.e., a sale or settlement) that dictates the terms of a prospective chapter 11 plan.  In re Shubh Hotels Pittsburgh, LLC, 439 B.R. 637, 645 (Bankr. W.D. Pa. 2010).  To prove that a sale constitutes an improper *sub rosa* plan, the objector "must clearly articulate the rights and benefits the unsecured creditor is being deprived of through the sale that it would gain through a Chapter 11 plan."  In re Summit Global Logistics, Inc., No. 08-11566 (DHS), 2008 WL 819934 at *14 (Bankr. D.N.J. Mar. 26, 2008).

8

15. In this case, the APA provides for every monetizable asset in Debtors' bankruptcy estates – including accounts receivable, avoidance actions, and insurance proceeds – to be sold to the Proposed Buyer. All of the proceeds of such sale of *estate* assets (except for the "Liquidity Payment," which also will be used to pay administrative priority claims) are being distributed simultaneously with their receipt by Debtors: PNC will receive payment in full of its prepetition claim, the DIP lender will receive payment in full of its administrative claim, CMS's prepetition claim will be assumed, the Foundation (in essence, equity) will receive the Foundation Payment, and Debtors' chief executive officer will receive payment (through the form of an assumption of liability by Proposed Buyer) of his prepetition unsecured claim (even though he will not be going to work for the Proposed Buyer after the sale). Once these sale proceeds are distributed, there will literally be no funds left in the estate to distribute to holders of general unsecured claims, and no assets to monetize to raise any funds to do so in the future. The result is that claim holders are going to receive distributions on account of their prepetition and administrative claims, and a person lower in the priority rank than the unsecured creditors – i.e., the Foundation – is going to receive a distribution of proceeds from the sale of *estate* assets (based on the erroneous assumption reported to the Attorney General that all unsecured claims are being paid in full). This will all happen without the unsecured creditors having a chance to vote on such arrangement, and without the protection afforded to the unsecured creditors by Section 1129 of the Bankruptcy Code.

16. Accordingly, the unsecured creditors are being deprived of the rights they would have if this process were properly conducted pursuant to a plan. Indeed, if the Foundation Payment was to be made pursuant to a plan of reorganization, that plan could not be confirmed without the consent of the unsecured creditors. To wit:

    a.  Debtors cannot satisfy the cramdown requirements of 11 U.S.C. § 1129(b)(2), because the Foundation (which does not even have a claim or interest) is receiving estate funds even though general unsecured claims are not being fully satisfied (indeed, they are not even being *partially* satisfied).

    b.  When taking into account the fact that the actual consideration being paid to the estate in this case is only in the range of approximately $11.5 million to $17 million, there is a strong possibility that general unsecured creditors would fare better in a chapter 7 liquidation of Debtors after a shutdown of the hospital. As shown above, (i) Debtors possess significant unencumbered real estate and unencumbered personal property, and prospective buyers would not need to obtain CHAPA approval if the hospital is no longer in operation; and (ii) as recently as seven (7) months ago, Debtors valued their assets at approximately $62,000,000. Thus, Debtors have not satisfied, and likely will not be able to satisfy, 11 U.S.C. § 1129(a)(7)(A).

  **C.**  **Proposed Buyer and Prospect Should not be Stalking-Horse Bidders**

  17.  Quite simply, Debtors have not shown a valid reason why it should enter into the APA with Proposed Buyer now, instead of holding an auction where Proposed Buyer can participate like all other bidders.

  18.  First, neither Proposed Buyer (which is a shell entity), nor its parent company Prospect Medical Holdings, Inc. ("**Prospect**") are posting an at-risk deposit pursuant to the APA. This means that if they wrongfully fail to complete the transaction, the estates' only recourse would be to commence an extremely costly and time-consuming lawsuit against Prospect (the primary assets of which are located in California), and then have to begin the even more costly and more time-consuming process of trying to collect on the judgment that is obtained in such litigation. (And all of this assumes that Prospect even has sufficient assets to satisfy a judgment,

10

which Debtors have not shown.) It is therefore hard to envision how it is a reasonable exercise of Debtors' business judgment to enter into what they deem to be a "$96 million" transaction without any deposit whatsoever.

19. Next, the APA itself can only be described as setting forth the polar opposite of a typical "as is, where is" bankruptcy sale. In fact, the APA contains 22 pages of extremely detailed representations and warranties of the Debtors (which are to remain in effect even *after* the closing) and 11 pages of arduous covenants on Debtors, the breach of any of which would entitle the Proposed Buyer to terminate the deal. In light of the fact that Proposed Buyer already terminated its last APA with Debtors for this exact reason, it is difficult to envision what value Debtors receive by entering into the APA now.

20. The APA also obligates Debtors' estates to pay multiple potentially costly fees, yet the Motion does not even provide an estimate of what the expense will be to the estate. For example, Debtors are obligated to purchase tail insurance for professional and general liability claims for an unlimited tail period (APA § 6.8) and are also required to pay any real property transfer taxes in connection with the sale (APA § 11.2). Debtors have given no indication of the amount of these obligations, nor where the funds will come from to satisfy them.

21. Debtors are likely to argue that it is imperative to keep Proposed Buyer as the stalking horse because Proposed Buyer is the only potential bidder with CHAPA approval. However, it is highly questionable whether Debtors' prior CHAPA approval is still valid, in light of the fact that the CHAPA approval of the sale to Proposed Buyer was based on Debtors having a positive net asset value, which is no longer the case (Section 6.5(b) of the APA even references this uncertainty). As such, Debtors presumably will need to again seek CHAPA approval.

### D. Cannot Sell Avoidance Actions

22. Without so much as citing any legal authority for doing so, Debtors cavalierly plan to transfer all of the estates' potential avoidance actions to Proposed Buyer. Presumably, Proposed Buyer wants the avoidance actions so that it can dangle them over the heads of unsecured creditors when it is negotiating cure amounts with them. What Debtors and Proposed Buyer fail to take into account, however, is that Debtors cannot sell avoidance actions to Proposed Buyer.

23. A debtor may not transfer an estate's avoidance actions. See, e.g., Mellon Bank v. Glick (In re Integrated Testing Products Corp.), 69 B.R. 901, 904 (D.N.J. 1987) (holding that a trustee may not assign its right to recover preferential payments); AFD Fund v. Transmed Foods, Inc. (In re Ameriserve Food Distrib., Inc.), 315 B.R. 24, 31-32 (Bankr. D. Del. 2004) ("[W]here a successful recovery would only benefit the representative [as assignee of avoidance action] and not the estate or its unsecured creditors, § 1123 does not authorize such a party to prosecute a claim, in spite of plan provisions that authorize that party to do so."). Moreover, even assuming that the transfer is somehow permitted, the Debtors fail to provide an analysis of their potential avoidance actions and potential recovery thereon. Hence, it is impossible to determine whether Proposed Buyer is paying a reasonable price for them.

### II. *The Bidding Procedures are Not a Reasonable Exercise of Debtors' Business Judgment*

24. The bidding procedures proposed by Debtors are a dereliction of their fiduciary duty to creditors and can in no way be deemed a good faith exercise of Debtors' business judgment.[8]

---

[8] It should be noted that the Committee's pre-submission attempts to consensually resolve the subject matter of this objection with Debtors and Proposed Buyer were unsuccessful.

### A. Starting Bid Price; Deposit

25. Amazingly, despite the fact that only about $11.5 million of consideration is actually being paid to the estate pursuant to the APA, the bidding procedures provide that the bidding will start at $96 million (and that does not even take into account the breakup fee and expense reimbursement of $4.2 million, and the as-yet-unknown amount of "Assumed Liabilities," which include at least one insider salary). This means that if a bidder wanted to submit a bid in the amount of $40 million (paid only in cash to the estate) it would be precluded from doing so, even though such a bid would satisfy all of the general unsecured claims in full. For the Debtors to make potential bidders come up with $100 million in cash (the vast majority of which would not be paid to the estates) is an outrageous request that almost certainly will prevent any real bidding at the auction. Even more egregiously, the bid requirements require that in order for a bid to be a qualified bid, the bid must include the Foundation Payment. There is no basis for such a demand, and the fact that it has been requested calls into question the disinterestedness of Debtors' management. The Foundation Payment should <u>not</u> be a requirement of all bidders (nor should Proposed Buyer even be permitted to make such a payment).

26. That same reasoning applies to the part of the bidding procedures which includes the amount of any potential breakup fee or expense reimbursement in the minimum bid increments. Because a $40 million bid could be a better bid for the estates than Proposed Buyer's nominal "$96 million" bid, comparing bids in this case is not an "apples to apples" calculation. It therefore does not make sense to include the bid protection amounts in the minimum overbid amount.

27. Based on the bogus "$96 million" sale valuation, the bid procedures require potential bidders to post a 10% "Good Faith Deposit" in a minimum amount of ***$10 million*** despite the fact that the (a) the actual value of the sale is nowhere near $100 million, and (b) the Proposed Buyer has not posted ***any*** deposit. Requiring such an absurdly high deposit, while at the same time giving the Proposed Buyer an advantage by not having to put down any deposit, would put a nail in the coffin of the bidding process before it even started.

### B. Breakup Fee and Expense Reimbursement

28. Debtors' request to pay Proposed Buyer a $2,880,000 break-up fee (the "**Breakup Fee**") and a $1,440,000 expense reimbursement (the "**Expense Reimbursement**"), is similarly nonsensical and improper.

29. In determining whether a bidder should be entitled to receive a breakup fee or expense reimbursement as an administrative expense under 11 U.S.C. § 503(b), the requesting party must show that such fee is actually necessary to preserve the value of the estate. In re Reliant Energy Channelview LP, 594 F.3d 200, 206 (3d Cir. 2010). In this case, there is no question that Proposed Buyer has done nothing to entitle it to either the Breakup Fee or Expense Reimbursement. Not only should Proposed Buyer be denied its requested bid protections, but as the Committee sets forth above, it should not even be the stalking-horse bidder. Thus, it would make more sense for Debtors to drop Proposed Buyer as the stalking-horse than to agree to the Breakup Fee and Expense Reimbursement.

30. First, it should be noted that this is actually the second round of bidding on Debtors' assets. In 2013-2014, Proposed Buyer was one of three entities who bid on Debtors' assets in a non-bankruptcy competitive bidding process, and Debtors' ultimately selected Proposed Buyer as the winning bidder (despite the fact that the other two bidders offered ***more***

value to Debtors than Proposed Buyer).  (See AG Letter at pp. 17-18.)   Proposed Buyer entered into an asset purchase agreement with Debtors in May 2014, and that agreement remained in effect until it was terminated by Proposed Buyer in late October/early November 2015.  The APA is substantially similar to that original asset purchase agreement (with nearly the same aggregate consideration being provided to Debtors).  Accordingly, the APA is simply the post-bankruptcy iteration of the same transaction that Proposed Buyer would have entered into pre-bankruptcy.  Thus, in no way can it be said that a breakup fee was needed to preserve the same value that Proposed Buyer was already willing to pay (especially in light of the fact that other bidders have already bid just as much).

31.     Second, Proposed Buyer has done nothing to set a baseline value for Debtor's assets.  Indeed, the consideration it is paying to the estates includes the following: (i) approximately $7,500,000 to satisfy PNC's secured debt; (ii) approximately $3,500,000 to satisfy the possible DIP financing of Indigo; (iii) a $500,000 "Liquidity Payment;" and (iv) assumption of up to $11,000,000 of CMS liability, which upon information and belief will most likely be offset by the approximately $5.3 million of A/R from CMS that it is purchasing.  As shown, other than the *de minimis* liquidity payment, to calculate its purchase price, Proposed Buyer simply calculated Debtors' secured debts and net CMS liability – a calculation that is obvious to any potential bidder because it represents the minimum amount at which the assets can be purchased free of alleged secured/setoff claims.[9]  Moreover, Debtors ignore the fact that other bidders have already bid on these exact assets, and at least one of those other bidders – Prime Healthcare Services – is interested in bidding again.

---

[9] For the avoidance of doubt, the Committee does not concede that the CMS liability constitutes a secured claim or a valid setoff claim, and reserves the right to challenge same.

15

32. Third, even if the Court were to approve a breakup fee and expense reimbursement in concept, the amounts requested by Debtors are at least 1,200% greater than the standard "3%" breakup-fee that it refers to in the Motion. As stated *ad nauseum* throughout this objection, the actual cash being received by Debtors' bankruptcy estates totals approximately $11.6 million at the high end. Thus, paying the Breakup Fee and Expense Reimbursement – in the aggregate amount of 4,320,000 – would result in total bid protections equal to approximately **_thirty-seven percent_** of the purchase price. There is no basis in law or fact for such an absurdly high number.

33. Finally, apropos of the Expense Reimbursement in particular, it defies credulity to think that Proposed Buyer should be entitled to a reimbursement of nearly $1.5 million of expenses that it almost certainly incurred prior to the commencement of this bankruptcy case, under an asset purchase agreement that did not even provide for an expense reimbursement. To the extent that Proposed Buyer is prepared to assert that the Expense Reimbursement represents its estimated post-petition expenses, it should be noted that such an assertion has no basis in reality, nor does the Motion even attempt to support such an estimate.

34. All of that being said, in the event the Court is inclined to approve a breakup fee and/or expense reimbursement, the Committee submits that a breakup fee of $350,000 (representing 3% of $11.6 million), and an expense reimbursement of $250,000 (representing a fair estimate of Proposed Buyer's post-petition costs, would be appropriate.

### C. Additional Objections to Bidding Procedures

35. It should be clear that the Committee's consent is needed to (a) determine whether a bidder is a "Qualified Bidder" pursuant to paragraph 15(d) of the bid procedures; and (b) determine which bid is the "Successful Bid" pursuant to paragraph 15(n) of the bid procedures.

Further, Debtors should be required to include the Committee in all discussions and communications with prospective bidders. Seeing as this is a liquidating chapter 11 case, this sale is being conducted (at least in theory) for creditors' benefit, and it makes sense for creditors to have a say during all aspects of the process.

36. Next, the bid submission and auction deadlines in the bidding procedures are unduly restrictive, and should all be pushed back by at least two weeks (resulting in a bid submission deadline of January 13, 2016, and an auction date of January 29, 2016). Without this time reprieve, potential bidders may be discouraged from bidding.

37. Further, to the extent that the Court approves some amount of bid protections, Proposed Buyer should nevertheless not be able to credit-bid the amount of such protections during an auction. The bid protections do not constitute a secured claim, and therefore Proposed Buyer has no interest in the assets that it is able to use to accomplish same. Additionally, the proposed bidding procedures order should not approve the APA, as that is a matter to be considered at the hearing to approve the actual sale.

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court deny the Motion.

                                                  Respectfully submitted:

                                                  TRENK, DIPASQUALE,
                                                  DELLA FERA & SODONO, P.C.

Dated: December 4, 2015                        By: /s/ *Joseph J. DiPasquale*
                                                          Joseph J. DiPasquale