# EXHIBIT A



### State of New Jersey

CHRIS CHRISTIE
*Governor*

KIM GUADAGNO
*Lt. Governor*

OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
25 MARKET STREET
PO Box 106
TRENTON, NJ 08625-0106

JOHN J. HOFFMAN
*Acting Attorney General*

MICHELLE L. MILLER
*Acting Director*

October 7, 2015

**VIA OVERNIGHT MAIL**

The Honorable Walter Koprowski, Jr., P.J.Ch.
Chancery Division
Wilentz Justice Complex
212 Washington Street
8th Floor
Newark, N.J. 07102

> Re:  Sale of the Assets of East Orange General
> Hospital, Inc. to Prospect Medical Holdings, Inc.

Dear Judge Koprowski:

The Attorney General's Office has completed its review of the application submitted by East Orange General Hospital, Inc. (the "Hospital"), a New Jersey nonprofit corporation, and subsidiary of Essex Valley Healthcare, Inc. ("EVHI"), a New Jersey nonprofit corporation, in connection with the proposed sale of substantially all of the assets of the Hospital. The proposed purchaser of the assets of the Hospital is Prospect EOGH, Inc. ("Prospect EOGH"), a New Jersey for-profit corporation, formed by, and affiliated with, Prospect Medical Holdings, Inc. ("PMHI"), a Delaware for-profit corporation. Prospect EOGH is a wholly-owned subsidiary of Prospect NJ, Inc., a Delaware for-profit corporation, which in turn is a wholly-owned subsidiary of PMHI. ("Prospect EOGH," "PMHI," and "Prospect NJ, Inc." are collectively referred to as "Prospect.")

By letter dated May 1, 2014, we received notice from the Hospital that it had entered into a Letter of Intent with PMHI dated January 28, 2014, whereby the parties acknowledged their intent to, among other things, have an affiliate of PMHI (the newly-formed Prospect EOGH) purchase substantially all of the

assets of the Hospital and make certain post-closing capital commitments.[1]  Prospect EOGH, the Hospital, and EVHI subsequently entered into an Asset Purchase Agreement dated May 28, 2014 (the "APA").  Upon the receipt of all required approvals and the closing of the sale, Prospect EOGH will own and operate East Orange General Hospital.

EVHI is also the sole member of The Foundation for East Orange General Hospital, Inc. (the "Foundation").  The Foundation is a New Jersey nonprofit 501(c)(3) corporation that supports the Hospital.  The Hospital is also the sole shareholder of Essex Valley Housing, Inc. ("Essex Valley Housing"), which is in turn, the general partner and owner of 0.01% share of Essex Valley Supportive Housing Partners, LP ("EVSHP") that operates Hope Gardens, a supportive housing development near the Hospital.  In connection with the sale, the shares of Essex Valley Housing will be transferred to the Foundation.  With a few exceptions, the Foundation will take on the rights and responsibilities of the Hospital with respect to Hope Gardens.  The sale of assets of the Hospital to Prospect and transfer of Hope Gardens to the Foundation will hereinafter collectively be referred to as the "Proposed Transaction."  The Hospital, EVHI, the Foundation, Prospect EOGH, PMHI, and Prospect NJ, Inc. will collectively be referred to as the "Transacting Parties."

The Transacting Parties seek approval for the Proposed Transaction in accordance with the Community Health Care Assets Protection Act ("CHAPA"), N.J.S.A. 26:2H-7.10, et seq. The purpose of this submission is to advise the Court of our findings and recommendations related to our examination of the Proposed Transaction under CHAPA. We are recommending that the Court approve the Proposed Transaction, with certain conditions set forth below.

CHAPA requires that a nonprofit hospital licensed pursuant to N.J.S.A. 26:2H-1, -14, shall satisfy the requirements of the statute before applying to the Superior Court of New Jersey for approval prior to entering into a transaction that results in the acquisition of the hospital.

The Proposed Transaction constitutes an "acquisition" of the Hospital by Prospect as that term is defined in CHAPA.  Under

---

[1] The Foundation also acknowledged the APA with respect to the transfer of certain Hospital assets to the Foundation and Prospect's payment of $10,000,000 to the Foundation, and Prospect's post-closing commitments, such as capital commitments and the creation of a local advisory board.  In addition, the Foundation will execute agreements related to the sale.

CHAPA, an "acquisition" means the purchase ... transfer of control or other disposition of a substantial amount of assets or operations, whether through a single transaction or series of transactions, with one or more persons or entities." N.J.S.A. 26:2H-7.11. The Proposed Transaction constitutes a fundamental corporate change involving a transfer of control of effectively all the operations and charitable assets of the Hospital, requiring CHAPA review.

CHAPA mandates the participation of the Attorney General, the Commissioner of the Department of Health (the "Commissioner"), and the Superior Court in reviewing the Proposed Transaction. The Attorney General is required to ascertain whether the acquisition is in the public interest by determining whether appropriate steps have been taken to safeguard the value of the charitable assets of the hospital being acquired. The Commissioner must decide whether the Proposed Transaction is likely to result in the deterioration in the quality, availability or accessibility of health care services in the affected community.

Pursuant to N.J.S.A. 26:2H-7.11(1), "[u]pon completion by the Attorney General of the review of the application required by this act, the nonprofit hospital shall apply to the Superior Court for approval of the proposed acquisition. In that proceeding, the Attorney General shall advise the court as to whether he supports or opposes the proposed acquisition, with or without any specific modifications, and the basis for that position."

We have reviewed the application submitted by the Hospital in response to our numerous requests for documentation relating to the Proposed Transaction, including over thirteen thousand (13,000) pages of due diligence materials submitted by the Hospital. We have examined the applicable law. We also heard comments at the public hearing conducted on September 9, 2015, and considered written submissions from Hospital management, Hospital trustees, a representative of Prospect, members of the Hospital's medical staff and employees, local elected officials, and representatives from public interest and community groups. In addition, the Hospital provided in its submissions letters of support from local government leaders and local organizations.

Further, by letter dated September 16, 2015, Acting Commissioner Cathleen D. Bennett approved, with twenty-seven (27) conditions, the Certificate of Need ("CN") application for the transfer of ownership of the Hospital to Prospect EOGH. The Acting Commissioner's decision to allow this transfer is based on the reasons set forth therein.

In addition, in a letter from Acting Commissioner Cathleen D. Bennett to Acting Attorney General John J. Hoffman dated September 16, 2015 (attached hereto as Exhibit A), the Acting Commissioner stated that "...based upon all information reviewed in connection with the CN application, the Department does not believe that the proposed transaction will result in the deterioration of the quality, availability or accessibility of health care services in the affected communities."

Based on our independent analysis of the information provided, and for the reasons set forth below, the Office of the Attorney General supports the Proposed Transaction as described herein and finds that it is in the public interest, with the following conditions:

(i) The Foundation for East Orange General Hospital, Inc. (the "Foundation") will comply with the requirements of the Community Health Care Assets Protection Act, P.L. 2000, c. 143, as amended, that relate to a nonprofit entity receiving charitable assets, including, but not limited to:

a. Any member of the Board of Trustees of the Foundation (the "Foundation Board") who accepts a position as a director, officer or employee of Prospect EOGH, Inc., Prospect NJ, Inc., Prospect Medical Holdings, Inc. (collectively "Prospect"), or any of their parents, subsidiaries, or affiliates, shall resign from the Foundation Board, effective as of the closing of acquisition of East Orange General Hospital, Inc. (the "Hospital") by Prospect EOGH, Inc.;

b. The current trustees and senior managers of the Hospital shall be prohibited from investing in Prospect or its subsidiaries or affiliates for a period of three (3) years following the acquisition;

c. No member of the Foundation Board shall serve as an officer, director or employee of Prospect, or any of its parents, subsidiaries, or affiliates;

d. The Foundation shall provide the Attorney General with an annual report which shall include an audited financial statement and a detailed description of its grant-making and other charitable activities related to its use of the charitable assets received pursuant to P.L. 2000, c. 143, as amended. The annual report shall be made available to the public at both the Attorney General's office and the office of the Foundation, as

well as on the Foundation's website(if one currently exists or is established in the future); and

e. The Foundation's assets and its directors, officers, trustees, subsidiaries, or affiliates shall be independent of any influence or control by Prospect, its directors, officers, trustees, subsidiaries, or affiliates.

(ii) The Foundation shall file the proposed Amended and Restated Certificate of Incorporation and Bylaws as attached to this letter and provide thirty (30) days prior written notice to the Attorney General and the opportunity to approve any changes to said governing documents.[2]

(iii) The Foundation shall send notice to the Calvin A. Agar Foundation and the Florence P. Ott Trust of the acquisition of the Hospital and advise them of the new purpose and mission of the Foundation, and for the fiduciaries to determine if a cy pres application is necessary or continued donations to the Foundation are appropriate.

(iv) In the event that the Foundation uncovers or receives any funds restricted for use by the Hospital, the Foundation shall notify the donor and/or fiduciary of the Foundation's modified purpose, and for the fiduciaries to determine if a cy pres application is necessary or continued donations to the Foundation are appropriate.

(v) Foundation Board members are prohibited from serving on the Local Advisory Board if the board member receives any form of compensation or remuneration from Prospect or any of its subsidiaries, parents, or affiliates, whether directly or indirectly.

(vi) The Foundation shall not delegate to the Local Advisory Board any oversight or monitoring of compliance by Prospect EOGH's, Prospect NJ's, or Prospect Medical Holdings, Inc.'s, or any of its affiliates' obligations under the Asset Purchase Agreement if any Local Advisory Board member (other than the President of Prospect EOGH, the President of the Prospect EOGH medical staff, and the member selected by Prospect EOGH in accordance with the Foundation Agreement) is an employee, officer, director, or senior

---

[2] The proposed Amended and Restated Certificate of Incorporation and Bylaws are attached hereto as Exhibits B and C.

        manager of Prospect EOGH, Prospect NJ, or Prospect Medical Holdings, Inc., or any of its affiliates.

(vii)  The Foundation and Essex Valley Supportive Housing Partnership, L.P. shall obtain an independent fair market value opinion for the Supportive Housing Services Agreement (including, but not limited to, the leased space, supportive services, and maintenance and operation services) for this Office's review. If in the opinion of the consultant Prospect is receiving benefits in excess of fair market value, Prospect EOGH, the Foundation, and EVSHP must renegotiate the terms of the Supportive Housing Services Agreement so that fair market value will be paid.

(viii) All compensation arrangements between any former officer, director, board member or senior manager of the Hospital, or the Hospitals' Affiliates, and Prospect, or any of Prospect's affiliates, shall be in the form of a written contractual agreement and Prospect shall submit to the Attorney General for a period of two (2) years from the date of closing of the acquisition of the Hospital by Prospect for the Attorney General's prior review and approval, any such agreements. In conjunction with the submission of such written compensation arrangements, the Attorney General shall require the submission of a certification from an independent compensation consultant engaged by Prospect documenting that compensation to be paid in any such arrangement is set at fair market value for services rendered.

(ix)  The Foundation shall submit to the Attorney General the detailed written reports of funds expended from or applied to Prospect's capital expenditures for the next five (5) years following the closing of the transaction as provided for in Section 4(a) of the Foundation Agreement.

(x)  The Foundation shall submit to the Attorney General detailed annual written reports of funds expended from or applied to Prospect's indemnification holdback.

### I. The Proposed Transaction

The following sections describing the parties and events leading up to the Proposed Transaction is derived from the Hospital's CHAPA application. It distills over thirteen thousand (13,000) pages of documents, including narrative responses provided by the Hospital, minutes of meetings of the board and committees of the Hospital for approximately three years prior to the Proposed Transaction, as well as reports, analyses, and presentations made by the Hospital's consultants.

(a) <u>Description of the Transacting Parties and the Proposed Transaction</u>

(i)   East Orange General Hospital, Inc.

East Orange General Hospital, Inc., a New Jersey non-profit and section 501 (c)(3) tax-exempt corporation, owns and operates a 212-bed licensed acute care, community hospital located at 300 Central Avenue, East Orange, New Jersey. The Hospital is owned by a single corporate member, Essex Valley Healthcare, Inc., a New Jersey nonprofit corporation and Section 501 (c)(3) tax-exempt corporation. The Hospital's primary core service area includes the cities of East Orange and Orange, New Jersey. The Hospital's secondary service area includes West Orange, Montclair, and parts of Newark, Irvington, and South Orange. The Hospital provides both inpatient and outpatient health services to the community. The Hospital's mission is "to improve the health of the community by working collaboratively to provide high quality, efficient, safe and accessible health care services with the utmost respect and compassion."

(ii)   Essex Valley Healthcare, Inc.

Essex Valley Healthcare, Inc. is a New Jersey non-profit corporation and Section 501(c)(3) tax-exempt corporation and is the parent company of the Hospital and Essex Valley Realty Foundation, Inc., a New Jersey nonprofit corporation. The Boards of Trustees of the Hospital and EVHI have identical makeup and hold joint board meetings. EVHI is also the sole member of The Foundation for East Orange General Hospital, Inc., a New Jersey nonprofit corporation and Section 501(c)(3) corporation, which solicits and receives contributions for the benefit of the Hospital.

(iii) Essex Valley Supportive Housing Partners, LP

The Hospital is the sole shareholder of Essex Valley Housing, Inc., which is in turn, the general partner and owner of

0.01% share of Essex Valley Supportive Housing Partners, LP. ("EVSHP"). EVSHP operates "Hope Gardens," a supportive housing development of twenty-four efficiency apartments for low-income and previously homeless individuals with behavioral health issues. Hope Gardens is located at 80 South Munn Avenue, across the street from the Hospital, property that is restricted for use by easement for low-income housing.

EVSHP received federal low income housing tax credits ("Federal Tax Credits") as part of the original financing of Hope Gardens. EVSHP then sold the Federal Tax Credits and received approximately $4,900,000 from the tax credit investor limited partner. The tax credit investor limited partner has the right to claim federal income tax credits for ten years so long as Hope Gardens is operated in compliance with Section 42 of the Internal Revenue Code ("IRC"). Hope Gardens also received a $1,220,000 loan from the New Jersey Housing and Mortgage Finance Agency ("NJHMFA"). In addition, the U.S. Department of Housing and Urban Development ("HUD") loaned $800,000 to the Hospital, who in turn loaned the funds to EVSHP.[3] The NJHFMA loan bears one percent interest and is payable only from available funds, and not from the EVSHP partners. The NJHMFA loan is secured by a mortgage on the Hope Gardens property. The loan from the Hospital to EVSHP bears 4.89% interest, which loan will be assumed by the Foundation at closing.

      (iv)    Prospect EOGH, Inc.; Prospect NJ, Inc.; Prospect Medical Holdings, Inc.

Prospect EOGH, Inc. is a New Jersey for-profit corporation formed on April 25, 2014 to purchase the assets of the Hospital. Prospect EOGH is a wholly-owned subsidiary of Prospect NJ, Inc., a Delaware for-profit corporation and wholly-owned subsidiary of Prospect Medical Holdings, Inc. Prospect's ultimate parent company is Ivy Holdings Inc. By and through its subsidiaries and affiliates, Prospect operates 13 acute-care and behavioral hospitals in Southern California, Texas, and Rhode Island, with a total of approximately 2,258 licensed beds. Representatives of Leonard Green & Partners, a private equity firm, own the majority of Ivy Holdings, Inc. stock. Prospect's management owns the remainder of the stock.

      (v)    Description of the Proposed Transaction

In accordance with the APA, the Proposed Transaction consists of a number of parts that occur on or after the closing of

---

[3]  On August 13, 2015, the NJHMFA approved the transfer of the general partnership from the Hospital to the Foundation.

the Proposed Transaction. First, Prospect EOGH will purchase substantially all of the Hospital's and EHVI's assets - obtain all right, title, and interest to the assets of the Hospital, including the land and buildings, personal property, leases, inventory, business records, certain contracts, current assets, accounts receivable, transferrable permits and approvals, bank accounts, plans, and other assets. However, Prospect will not assume certain excluded assets, such as: excluded contracts, non-transferrable permits or government approvals, employee benefit plan, charitable restricted assets, assets of the Foundation, EVH, EVSHP, and the Hospital's auxiliary, and corporate books and records.

Next, and in consideration, Prospect will commit: (1) $4,000,000 to an indemnification holdback; (2) $10,000,000 for the Hospital's and EVHI's Medicaid Disproportionate Share Hospital ("DSH") Liability; (3) $30,000,000 toward new capital projects and previously deferred capital maintenance projects; (4) $22,000,000 toward routine maintenance and capital expenditures; and (5) $8,000,000 toward working capital expenses.

The $4,000,000 indemnification holdback will be held for three years and be used for, among other things, Prospect's liability for breaches of the Hospital's representations, the Hospital's transaction costs, and the Hospital's and EVHI's wind-down expenses. If less than $500,000 is drawn from the holdback during the first 18 months post-closing, the unused portion (up to $500,000) is paid to the Foundation. At the end of the three year period, 75% of the remaining holdback will be paid to Prospect EOGH for capital expenditures (in addition to the APA amounts) and 25% will be paid to the Foundation.

Third, Prospect will also assume the Hospital's normal operating liabilities, long-term liabilities, and estimated third-party settlements, following application of certain Hospital assets and Prospect's capital commitments. The Hospital's cash and cash equivalents will be used at closing to defease the Hospital's long-term debt, calculated to be over $10,000,000 as of the second quarter of 2015.[4] Prospect will also apply the $10,000,000 DSH

---

[4] In a letter dated September 28, 2015, Mark E. Hopkins, Executive Director of the New Jersey Health Care Facilities Financing Authority (the "Authority") to Deputy Attorney General Jonathan Peitz, Mr. Hopkins advised that, as of June 30, 2015, East Orange General Hospital had $6,645,000 in principal amount of debt outstanding with the Authority, and that:

> The staff of the Authority has no objection to
> the proposed transaction and we have no reason

commitment toward the Hospital's DSH liability. However, the Hospital's current long-term debt and DSH liability exceed the Hospital's current cash and cash equivalents and the DSH commitment. The balance will be credited against Prospect's $30,000,000 capital commitment.[5]

Fourth, Prospect EOGH will pay $10,000,000 to the Foundation and the Foundation will receive a "Right of First Refusal" for a period of 10 years post-closing with respect to the ownership and operation of the Hospital as a general acute care hospital within its existing facility. Pursuant to the Foundation Agreement to be entered into between the Foundation, Prospect EOGH, and Prospect Medical Holdings (the "Foundation Agreement"), if Prospect EOGH receives an offer to purchase the hospital (or a larger group of assets that include the hospital), it must provide the Foundation with written notice. The Foundation will then have sixty days to notify Prospect of its election to purchase the hospital for the same purchase price and on the same terms and conditions. The Foundation Agreement will also allow the Foundation to enforce Prospect's post-closing commitments, such as Prospect's capital commitments.

Fifth, Prospect has agreed to other post-closing non-monetary relief: offers of employment to the Hospital's employees; employ a Coordinated Regional Care Platform ("CRCP") model; adopt the Hospital's existing charity care policies; maintain the Hospital as an acute-care facility for at least five (5) years; and commit to continued membership and privileges of current Hospital medical staff. Prospect will also form a local advisory board ("LAB") consisting of 15 to 19 members, including (as ex officio members): the Chairman of the Board of the Foundation; the post-closing CEO of Prospect EOGH; and President of the medical staff.

---

> to believe that the Authority Members would object. In fact, the Authority staff believes that under current market conditions, the added capital provided from Prospect Medical Holdings resulting from this transaction along with the negotiating advantages of being party of a larger system may strengthen the operations of East Orange General Hospital.

[5] In addition, the parties also entered into a side letter agreement that addresses a potential regulatory issue. Under the agreement, if Prospect provides funds to the Hospital to satisfy the issue, these funds will be credited against the indemnification holdback, or if those funds have been expended, from Prospect's capital commitment.

A member of the board of directors of Prospect will also be a member of the LAB. The LAB will be self-perpetuating, and consist of the current Hospital board members. The LAB will make recommendations and suggestions to Prospect regarding medical staff, policies and clinical programs, strategic and capital planning, operating and capital budgets, physician recruitment efforts, succession plans for hospital leadership, community health initiatives, Prospect's plans and CRCP model, monitor compliance with Prospect's obligations under the APA (if the Foundation asks), make suggestions regarding the operation of EVSHP, and to monitor Prospect's quality of care.

Sixth, in connection with the sale of assets, with a few exceptions, the Foundation will then take on the rights and responsibilities of EOGH with respect to Hope Gardens. The Hospital will transfer its shares of Essex Valley Housing to the Foundation, as well as a loan note and mortgage held by the Hospital. As discussed in Section IV(i)(4), the Foundation, EVSHP, and Prospect EOGH, Inc. will enter into a Supportive Housing Service Agreement wherein Prospect EOGH will provide certain services currently provided by the Hospital, and the Foundation will enter into a financial guaranty for certain financial obligations of Essex Valley Housing, Inc. and EVSHP. No consideration will be paid by the Foundation or the Hospital regarding this transfer.

Finally, in accordance with the APA, the Hospital Auxiliary's assets will be transferred to the Foundation, along with any other restricted Hospital assets. Further, Essex Valley Realty Foundation, Inc., who currently holds no assets, will dissolve. After all the obligations of EVHI and the Hospital under the APA are completed, it is anticipated that both entities will dissolve.

(b) Chronology of Events Leading up to the Proposed Transaction[6]

At the start of 2011, the Hospital's CEO advised the Hospital's Board of Trustees ("Hospital Board") that it should begin to consider potential affiliation due to the oversaturation of hospitals in Essex County, as well as the Hospital's then-

---

[6] It is noted that the Hospital's imprecise narrative and document responses, as well as the sparseness of the Hospital's board minutes, have made it difficult in many instances to accurately determine specific historical items, and the chronology provided is based upon the available record.

attractiveness to potential partners. At the time, the Hospital's Board and management were reviewing external factors - the current status of on-going national healthcare reform, the State of New Jersey's budget, and hospital affiliation activity. Then, in April 2011, the Hospital received $3,000,000 in Health Care Stabilization Fund grant funds from the New Jersey Department of Health conditioned upon the Hospital pursuing strategic alternatives to function without stabilization aid.

In response, the Chair of the Hospital's Board appointed an ad hoc "Affiliation Committee" on May 10, 2011 to identify potential strategic partners and alliances to preserve the mission of the Hospital. The Affiliation Committee's membership included the Chair of the Foundation's Board of Trustees ("Foundation Board") and Hospital trustees. Over the course of the next two years, the Affiliation Committee and Hospital Board focused first on a potential affiliation with Barnabas Health ("Barnabas"). However, discussions with Barnabas failed to yield a definitive proposal. In light of declining finances and conditions to receipt of stabilization funds, the Hospital Board shifted focus to an open bidding process for a strategic partner and options to remain a stand-alone facility. In 2013, the Hospital Board engaged a strategic consultant and issued a Request for Proposals ("RFP") to over twenty healthcare systems. After receiving three bids, the Hospital prepared selection criteria, delved into the bids and bidders themselves, and ultimately selected Prospect. Prospect and the Hospital then entered into the APA.

### (i) Barnabas Discussions and Financial Distress

In June 2011, Barnabas representatives met with the Affiliation Committee to discuss opportunities for the Hospital in connection with a potential restructuring of Essex County healthcare. Barnabas, a New Jersey nonprofit health system that operates nonprofit hospitals in Essex County, was then involved in discussions related to the separation of University Hospital from the University of Medicine and Dentistry of New Jersey. As 2011 turned into 2012, the Hospital's board continued to monitor the fate of University Hospital, and its relation to continued discussions with Barnabas.[7] Also, between 2011 and 2012, the Hospital's management made inquiries to other healthcare systems about potential affiliation - Atlantic Health System, Meridian Health System, Virtua Health, Robert Wood Johnson Health System,

---

[7]  In early 2012, the Hospital Board approved hiring of outside anti-trust counsel, ultimately hiring the law firm of Epstein Becker.

and North Shore Long Island Jewish Health System. However, these systems did not wish to affiliate, citing various reasons, such as: lack of geographic fit, financial responsibility for a safety net hospital, and focus on system-to-system affiliations, rather than with stand-alone hospitals.

In January 2012, the Hospital's auditor, ParenteBeard, prepared a presentation regarding the Hospital's current and future financial state. ParenteBeard noted that the Hospital had declining patient volumes, low out-patient utilization, high charity care costs and weak payor mix, high capital improvement needs, and potential Medicaid/Medicare liabilities, but a strong balance sheet. The financial projections showed negative cash balances starting in 2015. ParenteBeard also provided options to the Hospital Board for potential financial stability as a stand-alone facility, suggesting actions, such as - expanding and/or narrowing services as a niche provider, and working on models to identify costs and expenses.

On June 28, 2012, the New Jersey Legislature passed the New Jersey Medical and Health Sciences Education Restructuring Act (P.L. 2012, c. 45). Under this act, University Hospital is now a stand-alone hospital supported by the State. And, at its July 11, 2012 meeting, the CEO of the Hospital advised the Hospital Board of the conditions of the Hospital receiving a Health Care Stabilization Fund grant - reporting requirements to the Department of Health on operational and capital improvements and plans to maintain services without additional funds.

At its July 2012 meeting, the Affiliation Committee discussed potential affiliation with Barnabas along with the on-going changes in Essex County hospitals, including University Hospital and the nearby St. Michael's Medical Center. The President of the Hospital presented three strategic scenarios to the Affiliation Committee: (1) continue as an independent entity; (2) defer affiliation consideration for 1 to 3 years; and (3) aggressively pursue affiliation with University Hospital or Barnabas. While independence or deferring decision may provide continued local control, an affiliation with University Hospital and/or Barnabas would provide long-term stability. The presentation also noted that the Hospital's declining finances made independence difficult, and without significant new revenue streams, the Hospital would likely need to sell assets or discontinue service lines to stay open. At the September 21, 2012 Hospital Board retreat, the President and CEO of Barnabas discussed potential affiliation options with the Hospital Board. During its discussions, the Hospital Board raised questions regarding potential affiliation for the Affiliation Committee to review. At

the October 2012 Hospital Board meeting, the Affiliation Committee presented to the Hospital Board, answered the series of questions raised by the trustees, and discussed a possible affiliation with Barnabas and an Essex County regional plan.

In its presentation, the Affiliation Committee noted that while a formal request for proposal process was not initiated, the Hospital's CEO had reached out to other New Jersey healthcare systems. These systems decided not to pursue affiliation, citing various reasons: (1) geographic distance; (2) financial responsibility for a safety net hospital; and (3) preference for a health-system partner over a standalone hospital partner. Of note, for-profit systems were not contacted due to fears the for-profits would focus strictly on a return on investment, rather than focus on community needs. In response to a question about a stand-alone option, the Hospital CEO suggested the board engage ParenteBeard, its auditor, to evaluate and test financial projections and develop stand-alone options.

At the January 9, 2013 board meeting, ParenteBeard presented its findings. Initially, ParenteBeard informed the Board that the Hospital would conclude 2012 with a net loss of over $1,000,000, with losses increasing through 2016 due to negative trends for small, urban hospitals. However, ParenteBeard did provide options for continuing as a stand-alone facility by expanding safety net services, focusing on chronic care management, maintaining ambulatory services for the local community, and continuing inpatient and outpatient behavioral health services.

At the same meeting, the Hospital CEO updated the Hospital Board on the discussions with Barnabas, as well as recent affiliation interest expressed by the for-profit healthcare system Hudson Holdco (now known as CarePoint Health ["CarePoint"]). The CEO also advised that three consulting firms had been interviewed if the Hospital Board decided to issue a formal RFP. After discussing options, the Hospital Board then set a deadline of May 1, 2013 for a proposal from Barnabas, and the Hospital Board requested an outside firm calculate the value of the Hospital. However, the Barnabas affiliation did not materialize, and according to the Hospital, Barnabas subsequently advised that Barnabas would end affiliation discussions because of its consulting-only role with University Hospital.

### (ii) Engaging Experts and Issuing an RFP

While discussions with Barnabas continued, the Hospital did not engage a strategic consultant to prepare a formal RFP because the Affiliation Committee felt an RFP would not yield

additional proposals. However, the Hospital did receive interest from for-profit institutions, namely CarePoint Health and Prime Healthcare Services ("Prime"), and the CEO of the Hospital advised the Affiliation Committee that Prospect was interested in acquiring a New Jersey hospital. The Hospital's finances also continued to deteriorate. At the March 2013 combined meeting of the Finance and Investment Committee and the Audit and Compliance Committee, the committees noted that the Hospital lost $1,639,000 over the past year and discussed options in the event the Hospital did not meet its bond covenants.

By June 2013 (and presented to the Hospital Board at its August 2013 meeting), ParenteBeard completed a cash flow and debt analysis with an eye toward the Hospital remaining a stand-alone facility. The scenarios presented by ParenteBeard resulted in the Hospital running out of cash at best sometime in 2014. To remain a solvent facility, ParenteBeard reviewed options such as: paying off or deferring bonds, and the sale/leaseback of hospital assets. Based on the recommendation of the Affiliation Committee, the Hospital Board decided to issue an RFP. In July 2013, the Hospital CEO advised the Affiliation Committee of additional difficulties in remaining a stand-alone facility - adapting to healthcare reform, transitioning to a short stay medical facility, and expanding certain service areas.

Around this time, the Hospital received a $4,000,000 Health Care Stabilization Fund grant (less than the $5,000,000 requested). The grant was conditioned upon monthly reports to the Department of Health regarding: the Hospital's search for a partner; plan to preserve cash during the pendency of a transaction; and contingency plans if a transaction did not occur. The Hospital's Board also noted the absence of stabilization grant funding from the Fiscal Year 2014 New Jersey budget.

The Affiliation Committee had reviewed three strategic consulting firms. The Hospital Board ultimately approved the recommendation to engage Executive Resources, LLC ("Executive Resources") to conduct a "comprehensive Strategic Organizational Alternative Analysis" and assist "in identifying a strategic partnership with a finically viable partner." The Hospital Board also sought an outside firm to evaluate the Hospital's value, and on June 27, 2013, Curtis Financial Group, LLC ("Curtis Financial"), an affiliate of ParenteBeard, issued a draft fair market value opinion of the Hospital's net assets between $26,500,000 and $32,500,000.

The Affiliation Committee, with help from Executive Resources, prepared an RFP. At the Hospital Board's August 14,

2013 meeting, the Hospital CEO recommended requirements for the RFP (which were ultimately approved): (1) bidders must provide a plan for the hospital over a specific time period; (2) the RFP will not require the current Hospital board or management remain; (3) a $15,000,000 minimum short-term capital investment, with additional capital investment for facility upgrades and physician acquisition; (4) a right of first refusal for the Foundation; and (5) detailed plan for the future of the medical staff.

Approved by the Hospital Board, the RFP was circulated on August 15, 2013 to over 20 New Jersey and non-New Jersey health care systems with responses due September 27, 2013. In the RFP, the Hospital sought a strategic partner to sustain the long-term viability of the Hospital and advance its mission and objectives, as well as its commitment to the community, and improve efficiencies. The Hospital did not limit an affiliation to a sale of assets, but also offered any type of legal structure, such as – merger, joint venture, consolidation, or member substitution. The RFP also required answers to specific questions related to the bidders' corporate governance, management, service delivery model, medical staff, financial and capital investment, track record, and (if structured as a sale of assets) the proposed purchase price.

At the Hospital Board's September 13, 2013 board meeting, consultants presented to the Hospital Board in order to educate the Hospital Board's decision making process. The Hospital's governmental affairs consultant (David Filippelli, Esq. from the Gibbons, PC law firm) updated the Board on local and national hospital trends, the thoughts of government officials, and governmental issues facing hospitals. Scott Kobler, Esq. (legal counsel to the Hospital and Foundation chairman) advised on the governmental approvals required and the considerations when dealing with a taxable organization.

Executive Resources advised that six organizations (and ultimately seven) signed confidentiality agreements, and one organization submitted a letter of intent (later identified as Prime). Executive Resources also reviewed two sets of criteria (prepared by Executive Resources with help from the Hospital CEO) to be used by the Hospital's Board in reviewing the proposals. One set of criteria evaluated each bidder, while the second set of criteria evaluated each proposal. The intent was to use the criteria to narrow the field to finalists, and then to a runner-up and a winner. After a discussion, the Hospital Board requested additional criteria be added – ability to timely obtain governmental approval and specific plans for the Hospital's staff.

Ultimately, the Hospital Board approved the following criteria for evaluating the bidders with associated percentage weight: (1) Financial strength [22%]; (2) Organizational Fit/Strategic Direction [18%]; (3) Operating efficiencies [13%]; (4) Cultural similarities/differences [13%]; (5) Reputation/track record with successful transactions with New Jersey hospitals [24%]; and (6) Ability to complete the transaction on a timely basis [10%]. The Hospital Board also approved criteria for evaluating the proposals with associated percentage weight: (1) Commitment to community & enhancement of access to healthcare [18%]; (2) Demonstrated approach to high quality service delivery [21%]; (3) Financial position & capital commitment [24%]; (4) Commitment to maintain essential clinical services & adding new programs [21%]; and (5) Commitment to governance, management, employees & medical staff [16%].

### (iii)      Choosing Prospect

Three healthcare systems - Prime, CarePoint, and Prospect - submitted bids. Each bid proposed the sale of substantially all of the Hospital's assets and the financial commitments in each bid were similar, while CarePoint also offered a Management Contract Option.[8] The Affiliation Committee reviewed the bids, interviewed the bidders, and initially scored both the bidders and proposals. On November 13, 2013, and again on January 6, 2014, Executive Resources and the Affiliation Committee prepared a side-by-side analysis of the three bids. The Committee sent follow-up questions to the bidders between November 15, 2013 and December 23, 2013. The Affiliation Committee then reviewed and scored the bidders and bids again on January 6, 2014. Between December 16, 2013 and January 8, 2014, the bidders made presentations to the Hospital Board.

Prime's bid was calculated to include total financial commitments of $87,000,000, broken down as follows: $30,000,000 cash at closing (presumed to include capital commitments, deferred capital expenditures, pre-closing liabilities, and working capital), $22,000,000 capital maintenance over five years, $25,000,000 new capital expenditures over two years, and $10,000,000 in third party settlements.

CarePoint's bid was calculated to include total financial commitments of $82,000,000, broken down as follows: $25,000,000

---

[8]    Five other organizations (including Barnabas) signed confidentiality agreements but did not bid. Reasons for not bidding included other pending transactions and lack of business model fit.

cash at closing (presumed to include capital commitments, deferred capital expenditures, pre-closing liabilities, and working capital), $22,000,000 capital maintenance over five years, $25,000,000 new capital expenditures over two years, and $10,000,000 in third party settlements.

After some clarification, Prospect's financial commitments totaled $84,000,000, broken down as follows: $7,000,000 paid to the Foundation upon closing; $5,000,000 committed to deferred capital expenditures within the first year; $22,000,000 committed to annual capital maintenance expenditures over five years; $4,000,000 used to fund undisclosed pre-closing liabilities; $25,000,000 new capital expenditures over 5 years; $11,000,000 working capital infusion upon closing; and $10,000,000 in third-party settlement assumption.

Over the course of the review, the Affiliation Committee and Executive Resources also identified pros and cons for each bidder. Prospect had the least experience in New Jersey and may not achieve market penetration since (at the time) Prospect had only one acquisition pending. However, Prospect operates hospitals in other states, had no pending governmental investigations, and had a focus on behavioral health services.

Next, while Prime was in the process of acquiring three other hospitals in New Jersey, governmental approval was delayed.[9] Prime also had a pending governmental investigation and a lawsuit with CarePoint regarding anti-competitive behavior. In addition, Prime used sale/leasebacks of acquired hospital assets to finance acquisition.

Finally, while CarePoint had successfully acquired three New Jersey hospitals and timely completed the transactions, CarePoint was the subject of negative press due to its business model and out-of-network status. Further, like Prime, CarePoint used sale/leasebacks to finance acquisitions. In addition, the Affiliation Committee also identified some deficiencies in the bids. For instance, while Prospect's and CarePoint's bids included a willingness to provide a right of first refusal and to address the future of the Foundation, Prime's bid did not discuss this right or its intentions for the Foundation.

---

[9] Prime's acquisition of Saint Mary's Hospital in Passaic and Saint Clare's Healthcare System were ultimately approved. Saint Michael's Medical Center recently filed for bankruptcy and Prime's proposed acquisition of Saint Michael's Medical Center is now subject to the bankruptcy court process.

At its January 8, 2014 meeting, the Hospital Board chairman provided an overview of the hospital's process and reasons for affiliating – challenges due to healthcare reform and financial distress, conditions placed by the Department of Health on receipt of stabilization funds, and unsuccessful discussions with Barnabas and University Hospital. While one trustee motioned to delay the decision to allow the new Mayor of East Orange (who attended the meeting) to get up to speed, the motion did not pass because the trustees believed delay would not be in the best interest of the hospital and community.

The Affiliation Committee then presented its findings to the Board. The CEO advised that the Affiliation Committee had scored the three bidders in the following order: Prospect, CarePoint, and Prime, with both CarePoint and Prime "extremely strong" second candidates. In addition to the rankings themselves, the Affiliation Committee saw Prospect as the best partner because: (1) Prospect committed to maintain EOGH as an acute care general hospital for at least five years; (2) Prospect will maintain key essential services; (3) Prospect's focus on behavioral health services and its integration with medical staff; (4) commitment and track record to quality; (5) service to under-served communities; (6) strong corporate team; (7) cultural fit; (8) financial strength, including Prospect's indication that a sale/leaseback was not a funding strategy; (8) openness during the RFP process; (9) success in other markets without relying on out-of-network strategies; (10) flexible approach to physician integration; and (11) no negative industry feedback. The CEO then advised the next step was to develop a non-binding letter of intent, as well as advise the losing bidders of the Hospital's decision.

After negotiations, the Hospital and Prospect entered into a non-binding Letter of Intent, and started to draft the APA. ParenteBeard conducted reverse due diligence on Prospect, and the Hospital Board received a finalized valuation for the Hospital from Curtis Financial.

On April 16, 2014, the Board approved a substantially final form of APA, subject to the resolution of certain remaining open terms by the authorized officers, and approved the open terms at its May 14, 2014 meeting. The Foundation also approved a substantially final form of APA on April 16, 2014, subject to the resolution of certain remaining open terms by the authorized officers. The Transacting Parties signed the APA on May 28, 2014 with the Foundation acknowledging certain provisions of the APA.

## II. CHAPA Review Process

Counsel for the Hospital notified this Office of the Proposed Transaction by letter dated May 2, 2014. On May 9, 2014, we advised counsel that the Proposed Transaction required review under CHAPA. We provided a list of requests for materials designed to elicit the information needed for us to review the Proposed Transaction. By letter dated September 15, 2014, we acknowledged receipt of the Hospital's submission of sixteen (16) volumes of documents constituting its initial application under CHAPA. The materials that were submitted included copies of the APA, board minutes, consultants' reports, the Hospital valuation, and other documents.[10] We asked a first set of completeness questions on October 15, 2014, and the Hospital responded by letters dated November 21, 2014 and December 15, 2014 with written responses and an additional four (4) volumes of documents. Over the course of the next seven months, we submitted additional questions and the Hospital provided written responses as well as additional documentation. By letter dated August 20, 2015, we deemed the Hospital's application complete. The Hospital's application provides a comprehensive description of the Proposed Transaction, as well as the process leading to the Board's decision to sell.

Public notice of the Proposed Transaction was published in the Star Ledger once per week for three consecutive weeks, beginning on September 24, 2014. Notice of the Transaction was also published in the Spanish language newspaper, El Diario. The entire application has been available for public inspection at the Attorney General's office in accordance with N.J.S.A. 26:2H-7.11(f).

On September 9, 2015, in accordance with N.J.S.A. 26:2H-7.11(f), representatives of the Acting Attorney General and the Acting Commissioner conducted a joint public hearing at Langston Hughes Elementary School, 160 Rhode Island Avenue, East Orange, New Jersey to provide members of the affected community the opportunity to comment on the Proposed Transaction. Notice of the public hearing was published in advance of the hearing in the Star Ledger and El Diario, and was posted at the Hospital and on its web site. The public hearing was conducted by Assistant Attorney General Kavin K. Mistry on behalf of Acting Attorney General Hoffman and by Scott Owens, Health Systems Specialist, on behalf of Acting Commissioner Bennett.

---

[10] The Hospital withheld or redacted certain documents and provided the Attorney General with a privilege log (and later a revised privilege log) for all of the redactions. A Deputy Attorney General reviewed redacted documents at counsel's office.

At the hearing, statements were made by 14 speakers (including two representatives of the Hospital and one representative from Prospect) who all voiced support for the Proposed Transaction. Martin Bieber, Interim CEO of the Hospital, advised that community residents rely on East Orange General Hospital, and the sale to Prospect will provide financial stability and continued healthcare to the community. Leonard Murray, Chairman of the Hospital's Board, discussed the steps taken by the Board in selecting Prospect, and the benefits of the sale – infusion of capital, continuity of employees, and Prospect's success in other states with its business model. Otis Story, Chief Transition Officer for Prospect, advised that Prospect intends to bring realistic initiatives and partner with healthcare providers to provide optimal healthcare to the community.

Other speakers, including elected officials, Hospital employees, and community groups, all voiced support for the transaction, advising that a closure of East Orange General Hospital would negatively impact the community, and a for-profit owner would bring much-needed tax revenue to East Orange. Further, many speakers believed closure of the Hospital would greatly impact local residents because the Hospital is easily accessible through public transportation, while other nearby hospitals are not. Assemblyman Thomas P. Giblin spoke and endorsed the sale. He advised that the Hospital is a "beacon for patients and families," fills a "vital need" in the community, and that the Hospital's continued viability is "paramount." Assemblywoman Sheila Y. Oliver expressed concerns about the impact on the community in the event the Hospital closed, describing the Hospital as "a primary engine in th[e] community" and recognizing that "we can no longer maintain [the Hospital] as a private community-based institution." Renée Steinhagen, Esquire, Executive Director of New Jersey Appleseed, spoke in support of the transaction, but also expressed concern about lack of clarity in the purchase price and the post-closing Foundation's governance and its continued involvement with the Hospital. In addition, and in response to our question, the Hospital provided letters of support from various local community groups, along with the Hospital's efforts to educate the public about the Proposed Transaction.

In accordance with N.J.S.A. 26:2H-7.11(1), each person who filed a written comment or exhibit, or appeared and made a statement at the public hearing is considered a party to and should receive notice of the Superior Court proceeding to approve the Proposed Transaction.

III. **Attorney General's Scope of Review Under CHAPA**

Under CHAPA, it is the responsibility of the Acting Attorney General to examine and analyze transactions of this type, to obtain all material information, and to consider all of the pertinent factors enumerated in CHAPA before making a determination whether or not the transaction is in the public interest and warrants support, with or without modification. It is the Acting Attorney General's duty to analyze the Proposed Transaction to determine its impact upon the public interest and to ensure that the process used to do so is open to public comment and scrutiny. This transparent process is designed to maximize the public's confidence in the final decision.

The historical role of the Attorney General is to enforce the provisions of the charitable trust and charitable corporation laws to fully protect charitable assets for the benefit of the public. These laws recognize the principle that charitable trusts and charitable corporations, unlike private, profit-making business entities, are created to benefit the public. CHAPA provides that the Attorney General shall review the transaction in furtherance of the Attorney General's common law responsibilities as protector, supervisor, and enforcer of charitable trusts and charitable corporations. N.J.S.A. 26:2H-7.11. The Proposed Transaction will not be considered in the public interest unless the Attorney General determines that appropriate steps have been taken to safeguard the value of the charitable assets of the hospital being acquired and to ensure that such assets are irrevocably dedicated for charitable health care purposes. N.J.S.A. 26:2H-7.11(b)

The criteria which the Acting Attorney General is to consider in making this determination are set forth in N.J.S.A. 26:2H-7.11(c) and (d). The criteria to be considered in any particular transaction depend on the corporate structure and state of incorporation of the acquirer. The weight accorded to any single criteria in determining whether a particular transaction is in the public interest depends upon the specific facts and circumstances of the transaction under review. Since the Proposed Transaction involves the transfer of the assets of a New Jersey nonprofit hospital to a New Jersey for-profit corporation, the Proposed Transaction is subject to a higher level of scrutiny, requiring the Attorney General to consider all of the factors found at N.J.S.A. 26:2H-7.11(c) and (d) in our review and in making our recommendation to the Court. The criteria found at N.J.S.A. 26:2H-7.11 (c) are as follows:

(1) whether the acquisition is permitted under the "New Jersey Nonprofit Corporation Act," Title 15A of the

New Jersey Statutes, and other applicable State statutes governing nonprofit entities, trusts or charities;

(2) whether the nonprofit hospital exercised due diligence in deciding to effectuate the acquisition, selecting the other party to the acquisition and negotiating the terms and conditions of the acquisition;

(3) the procedures used by the nonprofit hospital in making its decision, including whether appropriate expert assistance was used;

(4) whether conflicts of interest were disclosed, including, but not limited to, conflicts of interest related to board members of, executives of and experts retained by the nonprofit hospital, purchaser or other parties to the acquisition;

(5) whether any management contract under the acquisition is for reasonable fair value; and

(6) whether the acquisition proceeds will be used for appropriate charitable health care purposes consistent with the hospital's original purpose or for the support and promotion of health care and whether the proceeds will be controlled as charitable funds independently of the purchaser or parties to the acquisition.

The criteria found at N.J.S.A. 26:2H-7.11(d) are as followed:

(1) whether the nonprofit hospital will receive full and fair market value for its assets. The Attorney General may employ, at the nonprofit hospital's expense, reasonably necessary expert assistance in making this determination;

(2) whether charitable funds are placed at unreasonable risk, if the acquisition is financed in part by the nonprofit hospital;

(3) whether a right of first refusal has been retained to repurchase the assets by a successor nonprofit corporation or foundation if, following the acquisition, the hospital is subsequently sold to, acquired by or merged with another entity;

(4)    whether the nonprofit hospital established appropriate criteria in deciding to pursue a conversion in relation to carrying out its mission and purposes;

(5)    whether the nonprofit hospital considered the proposed conversion as the only alternative or as the best alternative in carrying out its mission and purposes;

(6)    whether the nonprofit hospital exercised due care in assigning a value to the existing hospital and its charitable assets in proceeding to negotiate the proposed conversion;

(7)    whether officers, directors, board members or senior management will receive future contracts in existing, new, or affiliated hospitals or foundations; and

(8)    any other criteria the Attorney General establishes by regulation to determine whether a proposed acquisition by any person or entity other than a corporation organized in this State for charitable purposes under Title 15A of the New Jersey Statutes is in the public interest.

In addition, in a proposed acquisition of a nonprofit hospital by an entity that is not a New Jersey nonprofit corporation, the Attorney General, after consultation with the principal parties to the transaction, shall make a determination as to the amount of assets which the nonprofit hospital shall set aside as a charitable obligation, based on the full and fair market value of the hospital at the time of the proposed acquisition as determined by the Attorney General. N.J.S.A. 26:2H-7.11(g).

The set aside amount must be placed in a non-profit charitable trust or one or more existing or newly established 501(c)(3) tax-exempt organizations, whose governance is subject to the review and approval by the Attorney General. N.J.S.A. 26:2H-7.11(h). The trust or organization is subject to the following requirements found in N.J.S.A. 26:2H-7.11(h):

(1)    The charitable mission and grant-making functions of [the] charitable entity ... shall be dedicated to serving the health care needs of the community historically served by the predecessor nonprofit hospital;

(2)    [The] charitable entity ..., the directors, officers, and trustees, ... and the assets of [the] charitable entity,

including any stock involved in the acquisition, shall be independent of any influence or control by the acquiring entity, its directors, officers, trustees, subsidiaries, or affiliates;

(3)     The governance of [the entity] shall be broadly based;

(4)     Neither the charitable trust or organization nor any officer, director, or senior manager of the trust or organization shall be affiliated with the acquiring entity;

(5)     No officer, director, or senior manager of the trust or organization shall be a full-time employee of State government;

(6)     No officer, director, or senior manager of the trust or organization shall have been a director, officer, agent, trustee, or employee of the nonprofit hospital during the three years immediately preceding the effective date of the acquisition, unless that person can demonstrate to the satisfaction of the Attorney General that the person's assumption of the position of officer, director, or senior manager of [the entity] would not constitute a breach of fiduciary duty or other conflict of interest;

(7)     The governing body of [the entity] shall establish or demonstrate that it has in place, as the case may be, a mechanism to avoid conflicts of interest and to prohibit grants that benefit the board of directors and management of the acquiring entity or its affiliates or subsidiaries; and

(8)     The governing body of [the entity] shall provide the Attorney General with an annual report which shall include an audited financial statement and a detailed description of its grant-making and other charitable activities related to its use of the charitable assets received pursuant to P.L. 2000, c. 143.    The annual report shall be made available to the public at both the Attorney General's office and the office of [the entity].

          In addition, if the hospital facilities are subsequently acquired by a non-profit entity and serves the same population, the remaining set aside charitable assets held by the charitable entity can be used by the non-profit acquirer of the facilities (if approved by the Attorney General and Superior Court) upon a showing that allocating the assets would be more consistent with East Orange Hospital's original purpose.  N.J.S.A. 26:2H-7.11(h)(4).

**IV. Review of the Proposed Transaction Under CHAPA**

This section examines the Proposed Transaction under each of the above-referenced statutory criteria:

(a) Compliance With the Nonprofit Corporation Act - CHAPA Subsection (c)(1)

Pursuant to N.J.S.A. 26:2H-7.11(c)(1), the Attorney General shall consider, "[w]hether the acquisition is permitted under the 'New Jersey Nonprofit Corporation Act,' Title 15A of the New Jersey Statutes, and other applicable State statutes governing nonprofit entities, trusts or charities. In accordance with N.J.S.A. 15A:10-11, by Resolution dated April 16, 2014, the combined Boards of Trustees of the Hospital and EVHI approved the APA with Prospect in order to "allow the communities within the Hospital service area to continue to have access to a local acute care hospital." Further, by Resolution adopted April 16, 2014, the Board of Trustees of the Foundation also approved the APA. Based upon our review of the materials submitted and applicable law, the Proposed Transaction is permitted by the New Jersey statute governing nonprofit corporations.

(b) Due Diligence Criteria - CHAPA Subsections (c)(2), (c)(3), (d)(4), (d)(5)

Two significant due diligence criteria are found at N.J.S.A. 26:2H-7.11(c)(2) and (3):

(2) Whether the nonprofit hospital exercised due diligence in deciding to effectuate the acquisition, selecting the other party to the acquisition and negotiating the terms and conditions of the acquisition; and

(3) The procedures used by the nonprofit hospital in making its decision, including whether appropriate expert assistance was used.

Furthermore, we will consider additional due diligence criteria relating specifically to the sale of the assets of a nonprofit hospital to an entity that is not a domestic nonprofit corporation. We are asked to examine whether the nonprofit hospital: (i) established appropriate criteria in deciding to pursue a conversion in relation to carrying out its mission and purposes, N.J.S.A. 26:2H-7.11(d)(4); and (ii) considered the proposed conversion as the only alternative or as the best alternative in carrying out its mission and purposes, N.J.S.A. 26:2H-7.11(d)(5).

These statutory criteria do not require our Office to decide whether, as a factual matter, the Hospital's trustees made optimal decisions or the best possible choices in pursuing the Proposed Transaction. Rather, CHAPA requires, in part, that our office ascertain whether the trustees exercised their duty of care in deciding to pursue this course of action and in the process they used to effectuate it. Although the term, "due diligence," is not defined in CHAPA, the New Jersey Nonprofit Corporation Act provides at N.J.S.A. 15A:6-14, as follows:

> Trustees and members of any committee shall discharge their duties in good faith and with that degree of diligence, care and skill which ordinarily prudent persons would exercise under similar circumstances in like positions.

"Due diligence" is generally defined to be "a measure of prudence, activity, or assiduity, as is properly expected from, and ordinarily exercised by, a reasonable and prudent man under the circumstances; not measured by any absolute standard, but depending on the relative facts of the special case." Black's Law Dictionary (5th ed. 1979).

Along with the duty of care, there are two other components to the trustees' fiduciary duty; the "duty of obedience" and the "duty of loyalty." The duty of obedience requires trustees to be faithful to the advancement of the hospital's charitable mission and purpose. The duty of loyalty requires that trustees must act solely in the interest of the hospital, which is the object of their fiduciary duty. To do so is the essence of acting in good faith.

In this case, we inquire whether the Board exercised due diligence by: (i) establishing appropriate criteria and used appropriate procedures in deciding to effectuate the proposed conversion and considered other alternatives in carrying out its mission; (ii) selecting the other party to the acquisition; and, (ii) negotiating the terms and conditions of the document governing the Proposed Transaction.

### (i) Effectuating the Proposed Acquisition - CHAPA Subsections (c)(2)

Based upon our prior review of transactions under CHAPA, we have come to anticipate that counsel or consultants will advise the trustees to follow certain procedures or processes in embarking on a course of action which may eventually culminate in the

transfer of a nonprofit hospital subject to CHAPA review. These processes may be discerned, in part, from the statutory criteria themselves, from our well-traveled series of "fifty" questions, which are often sent to counsel for hospitals contemplating a CHAPA transaction, and, from those procedures we have recognized and commended in our recommendation letters to the courts in prior CHAPA matters, in particular, those involving sales to for profit entities - notably the sales of the assets of Bayonne Medical Center, Mountainside Hospital, Meadowlands Hospital, Christ Hospital, St. Mary's Hospital, and Saint Clare's Health System. We have recognized that the use of these decision-making processes generally meet CHAPA's due diligence standards and we strongly suggest that nonprofit hospitals considering a transfer of assets access these sources of information.

Prior to considering a sale, we would anticipate that the trustees of a financially distressed nonprofit hospital would have done everything practicable to attempt to reverse its fortunes in order to continue to use its charitable assets in furtherance of its mission to serve the community. It would seek to employ available and affordable expertise in attempting to turn things around financially, exploring revenue enhancement and cost containment methods, as well as seeking options to affiliate or joint venture with other facilities which have the right fit in terms of its mission and purposes. In seeking potential venture partners, the Hospital trustees, with the possible assistance of a consultant, would establish goals and objectives, including how a potential partner would fit into its strategic plan, and, once such partners are solicited and identified, establish criteria to evaluate and prioritize them.

In this case, as described in detail in Section I(b) above, the Hospital most recently sought an affiliate as a condition of receipt of a Health Care Stabilization Fund grant in 2011 and the continued financial decline of the Hospital. However, even prior to that specified condition, the Hospital's Board had started to review the Hospital's future, especially within the Essex County marketplace.

Also as a condition of State Stabilization Grant funding, the Hospital explored its options to remain a fiscally sound stand-alone facility. Starting in 2012, ParenteBeard, the Hospital's auditor, presented options to the Affiliation Committee and the Hospital Board. These included expanding and/or narrowing services as a niche provider, working on models to identify costs and expenses. Indeed, at its July 2012 meeting, in considering whether to pursue an affiliation with Barnabas, the Affiliation Committee reviewed the stand-alone option or delaying a decision. The

Affiliation Committee determined that the Hospital would likely need to sell assets or discontinue service lines to survive, unless other significant new revenue streams arose. Of note, closure of Saint Michael's Medical Center (which is still operating while in bankruptcy) was listed as a potential source of new revenue.

The Hospital's RFP listed a series of initiatives engaged in by the Hospital: transition its family health center to a family centered medical home, develop a behavioral health home, integrate primary and behavioral healthcare, develop physician group practices, implement a comprehensive palliative care program, reduce readmission rates, improve patient satisfaction scores, achieve length of stay targets, improve employee morale, and renovate the inpatient psychiatric unit. The Hospital also sold assets. In 2011, the Hospital sold its transportation system, and during the pendency of the Proposed Transaction, engaged in a bidding process to sell its Medical Arts Building ("MAB"). However, the sale of the MAB did not close. In addition, during the pendency of the Proposed Transaction, the Hospital renegotiated its long term debt with PNC Bank.

The Hospital was also facing continued financial decline. In 2012, ParenteBeard presented findings on the Hospital's financial projections, opining negative cash balances may exist in 2015. In 2012 alone, the Hospital experienced a $3,000,000 loss from operations that increased to $11,000,000 in 2013, due in part to a significant drop in net patient revenue. Over time, ParenteBeard's conclusions remained consistent – the Hospital's finances continued to weaken, and options to remain independent did not change - sell assets and expand some services, while contract other services.

In light of the above, the Hospital's Board acted appropriately in seeking a partner. The Hospital first pursued discussions with Barnabas. At the time, the status of University Hospital was in flux, and the Hospital would have been part of a restructuring of Essex County healthcare. Barnabas is a non-profit healthcare system, and a potential affiliation could have provided the Hospital Board with a continued role in the Hospital's governance and a continued non-profit status. The Hospital even engaged a law firm (Epstein Becker) to review anti-trust issues regarding a potential Barnabas transaction. However, Barnabas ultimately ended discussions (and later did not submit a bid in response to the RFP).

And, despite a focus on Barnabas, the Hospital's management reached out to other non-profit organizations, however these organizations expressed little interest in affiliation. When

the Barnabas discussions broke down, the Hospital engaged expert assistance – a strategic consultant (Executive Resources), legal counsel (its outside counsel, McCarter & English), and a valuation firm (Curtis Financial, an affiliate of ParenteBeard) – to engage in a bidding process. During this time, the Hospital was also contacted by for-profit organizations expressing interest in the Hospital.

In light of the Hospital's deteriorating finances, and the mandate placed upon the Hospital by the receipt of critical State Stabilization Grant funds, the trustees had no choice but to pursue a strategic partnering process, and ultimately engaged expert assistance in issuing an RFP. The trustees thus acted with due diligence in deciding to effectuate the acquisition.

### (ii) Selecting Prospect – CHAPA Criteria (c)(2), (c)(3), (d)(4), and (d)(5)

As described in more detail above, the selection of Prospect resulted from a bidding process using expert assistance and selection criteria. The Hospital engaged Executive Resources to conduct a "comprehensive Strategic Organizational Alternative Analysis" and assist "in identifying a strategic partnership with a financially viable partner." The Affiliation Committee and Executive Resources prepared a formal Request for Proposals ("RFP") that was ultimately circulated in August 2013 to more than 20 New Jersey and non-New Jersey health care systems. In the RFP, the Hospital advised that it sought a strategic partner to sustain the long-term viability of the Hospital and advance its mission and objectives, as well as its commitment to the community, and improve efficiencies. Of note, the Hospital did not limit an affiliation to the sale of asset structure ultimately chosen, but offered any type of legal structure, such as a merger, joint venture, consolidation, or member substitution. The RFP reflects the Board's hope to find a financially secure partner with diversified governance and a solid track record, who could commit to maintain the Hospital's services to the community and improve the community's access to care. This hope kept with the Hospital's mission (as outlined in the RFP) to "improve the health of the community by working collaboratively to provide high quality, efficient, safe and accessible health care services with the utmost respect and compassion" and the Hospital's vision - "To be your community hospital of first choice."

With the help of Executive Resources, the Board approved two sets of criteria – one to review each bidder and one to review each proposal. In reviewing the criteria, we saw that the Board's concerns - the bidder's financial strength, track record,

efficiencies, and ability to complete a transaction timely - evidences the Board's focus was on finding a partner with prior hospital success and avoiding financial insolvency. Criteria involving organizational fit and reputation evidence the Board's hope that a bidder would continue the Hospital's mission post-closing. Finally, having two sets of criteria allowed the Board to address separately the bidder's history from the bidder's vision for the Hospital. Of note, the Board did not simply accept the initial draft criteria presented by the Affiliation Committee and Executive Resources, but asked that two additional criteria be added, to ensure the Board's goals (and not those of its paid consultants) were met.

While the Hospital submitted the RFP to over twenty institutions, and despite some entering confidentiality agreements, no non-profit organizations submitted a bid. Signed non-disclosure agreements allowed potential bidders access to the Hospital's data room, and the potential bidders could submit questions to the Hospital before submitting a bid. Only three for-profit organizations submitted bids - Prime, Prospect, and CarePoint. Over the course of the ensuing months, the Affiliation Committee and senior management reviewed the bids in consultation with Executive Resources, interviewed candidates, submitted additional questions, and scored and re-scored the bidders and proposals using the Board's approved criteria. The Affiliation Committee and Executive Resources presented their findings to and received feedback from the Hospital Board during this time. Executive Resources provided the Affiliation Committee with side-by-side analyses of the bids, and interacted with the bidders on behalf of the Hospital. The bidders were provided the opportunity to present to the full Hospital Board before final decision.

As discussed in Section I(b) above, the Hospital ultimately chose Prospect. In reviewing the bids, it was noted that the financial commitments in the bids were similar - ranging from $82,000,000 by CarePoint to $87,000,000 by Prime. While the Affiliation Committee ultimately recommended Prospect as the strongest bidder, CarePoint and Prime were "extremely strong" second candidates and strong potential partners. Based on our review of the submissions, the Affiliation Committee contrasted certain non-financial aspects of Prime and CarePoint against Prospect. For instance, CarePoint and Prime both had used sale/leaseback of acquired assets to finance prior hospital acquisitions, while Prospect had not. In addition, Prospect had no negative industry feedback and had success without relying on an out-of-network model. Of note, the Affiliation Committee found Prospect to be the most open during the RFP process. Based on our

review, it appears that the non-financial aspects of the bids and bidders were given great weight in choosing Prospect.[11]

Based upon the foregoing, we find that the Hospital's trustees acted with reasonable due diligence and in accordance with their duty of care in selecting Prospect. Initially, the trustees attempted to maintain the non-profit status of the Hospital in working with Barnabas and reaching out to other non-profit hospitals. However, when a Barnabas affiliation did not materialize, the continued decline in the Hospital's finances, and the condition the Department of Health placed on the acceptance of Health Care Stabilization Grant funds to find a partner, resulted in the trustees' primary goal shifting from an affiliation with Barnabas to seeking out any appropriate partner to maintain the Hospital within the community. The Hospital Board established an appropriate set of criteria to evaluate potential purchasers and enlisted expert assistance to do so. And, only for-profit companies bid on the Hospital. Thus, the trustees had no choice but to consider a conversion of the Hospital in carrying out its mission and purpose. N.J.S.A. 26:2H-7.11(d)(5).

Ultimately, the Hospital believes that Prospect will continue to carry on the Hospital's mission and purpose, that is, keeping the Hospital open, make capital investments, and continue to provide healthcare to the community. We note that the Hospital's board minutes provided, at times, scant information about the specific deliberations and discussions of the Hospital Board. For instance, the Board's January 8, 2014 meeting, where the Hospital selected Prospect, lasted for over three hours. However, the Board minutes total three pages, with two pages dedicated to CarePoint's presentation and the Affiliation Committee's recommendation. The minutes present no information about the deliberations of the Board members themselves about the candidates, only a note that a motion was made to approve the Affiliation Committee's recommendation. Unfortunately, this lack of clarity in the minutes exists throughout the Hospital Board's minutes and the Affiliation Committee's records, and has made it difficult to obtain a complete picture of events. For instance, other than a memo forming the Affiliation Committee in 2011, the

---

[11] We note that, on April 3, 2014, Prime wrote to the Hospital's CEO with concerns about Prime's prior experience with Executive Resources in another transaction. Specifically, Prime alleged Executive Resources withheld information (it is unclear from Prime's letter whether the information was withheld from the Hospital Board or from Prime). Through counsel, the Hospital responded that the Hospital chose Prospect following a search process and weighing various factors.

Hospital provided no minutes for the Affiliation Committee meetings before July 2012.

Notwithstanding, we were able to discern the Hospital's process (as outlined in Section I(b) above and in this section) in selecting Prospect as a buyer. The Affiliation Committee and the Hospital's strategic consultant diligently delved into the bids and bidders to provide a recommendation to the Board. And thus, we find the trustees acted with reasonable due diligence and in accordance with their duty of care in selecting Prospect as the acquirer.

### (iii) Negotiating the Terms and Conditions of the Acquisition

While the Hospital chose Prospect after a long bidding process, reducing the general terms from the bids to the APA took almost four months. Using Prospect's initial draft letter of intent ("LOI") dated September 27, 2013, the parties negotiated the terms of the LOI between January 8, 2014 (the date the Hospital Board chose Prospect) and January 28, 2014 (execution of the LOI), including the assets to be purchased, clarifying Prospect's capital commitments, and governance of the post-closing Local Advisory Board. Of note, Prospect initially offered to purchase the Hospital's interest in Essex Valley Housing, Inc., however the drafts of the letter of intent show the parties contemplated that there may be a prohibition on such a transfer. In addition, the Board's strategic consultant, Executive Resources, continued its work and provided comparisons between certain draft LOIs using the Board's criteria, and identified areas that required work.

On January 28, 2014, the Hospital and Prospect signed the LOI, and started to draft the APA. The parties then entered a period of due diligence, exchanged questionnaires, and uploaded thousands of pages of material into data rooms. Concurrently, the Hospital Board chairman and the Hospital CEO visited Prospect's facilities in Los Angeles, while the chief nursing officer visited Prospect's Nix Hospital. On February 10, 2014, Curtis Financial issued a valuation report to the Hospital Board. Using the Hospital's balance sheet as of November 30, 2013, but using the same approach applied in the draft valuation completed in June 2013, the appraiser opined the fair market value of the net assets of the Hospital (excluding Hope Gardens) were between $19,000,000 and $27,000,000.

In addition, the Hospital continued its review of Prospect as a potential partner. On March 3, 2014, the Hospital engaged ParenteBeard to conduct reverse due diligence.

ParenteBeard issued a reverse due diligence report on March 25, 2014 and presented its findings to the Hospital Board at its April 2014 meeting. To prepare the report, ParenteBeard reviewed Prospect's financials and management reports, and interviewed Prospect's management team. In the report, ParenteBeard identified potential concerns, such as: (1) Prospect had taken on debt to repay outstanding debt and finance distributions to its parent company; (2) other pending acquisitions stressing access to capital; and (3) no exit plan for Leonard Green & Partners.[12] In addition, ParenteBeard identified potential post-integration issues, and in response to our question, the Hospital advised that Prospect has started to address integration issues by, among other things, conducting weekly meetings and interacting with local management.

On April 16, 2014, the Board approved a substantially final form of APA, subject to the resolution of certain remaining open terms by the authorized officers. The Foundation also approved a substantially final form of APA on April 16, 2014, subject to the resolution of certain remaining open terms by the authorized officers. At a meeting on May 14, 2014, the Board discussed and approved the resolution of the remaining open terms of the APA, including terms related to the Local Advisory Board's right to approve name changes, the Foundation's Right of First Refusal and a permitted sale of the Medical Arts Building before closing of the Proposed Transaction. The parties signed the APA on May 28, 2014.

As with the Board's selection of Prospect discussed above, the Hospital Board's minutes reflect little deliberation or evidence of the Hospital Board's decision-making process in accepting the terms of the APA. However, we were able to determine the parties continued to negotiate the agreement even after the LOI was signed. For instance, Prospect increased its payment to the Foundation from $7,000,000 in the executed LOI to $10,000,000 in the APA, with a parallel reduction in Prospect's initial working capital commitment. And, given the otherwise substantial similarity of the signed letter of intent and the financial terms in the APA, as well as the ultimate agreement reached, we find that

---

[12] In response to our question, the Hospital advised that there is no current plan to end Leonard Green and Partners' relationship with Prospect, and any exit or additional distributions to its parent company would not affect Prospect's ability to fund the transaction. The Hospital also advised that the Hospital Board weighed Prospect's financial strength against the risks in making its decision.

the Hospital's trustees exercised due diligence in negotiating the terms and conditions of the APA and the purchase with Prospect.

### (c)   Conflicts of Interest - CHAPA Subsection (c)(4)

N.J.S.A. 26:2H-7.11(k) prohibits any officer, director, agent, trustee, or employee of the nonprofit hospital from benefiting directly or indirectly from the acquisition, including the receipt of any compensation directly related to the proposed acquisition.     In addition, N.J.S.A. 26:2H-7.11(j) prohibits trustees and senior managers of the nonprofit hospital from investing in the acquiring entity for a period of three years following the acquisition.   We ask that the Court condition its approval of the Proposed Transaction on this prohibition.

To investigate any potential conflicts of interest in accordance with the aforesaid section and N.J.S.A. 26:2H-7.11(c)(4), this Office reviewed conflict of interest questionnaires from all officers, directors, trustees, and senior management of the transacting parties, as well as the consultants employed by the transacting parties.   Each individual for whom a response was required submitted a completed conflict of interest statement requiring that they disclose any conflicts relating to the Proposed Transaction.   The Hospital did not provide completed conflict of interest questionnaires for four former EOGH/EVHI and Foundation board members, but did provide a certification from the former CEO of the Hospital, Kevin J. Slavin, advising of attempts over three months to obtain the signed certifications.   Based upon our independent review of the forms submitted, there appear to be no conflicts of interest or self-dealing relating to the Proposed Transaction among the officers, directors, trustees, senior management or the consultants of the transacting parties in relation to the Proposed Transaction and no receipt of any remuneration in cash or in kind by any of the officers, directors, trustees, senior management directly or indirectly from the Proposed Transaction.

However, we note to the Court certain items from the Hospital's submission on this issue.   Todd Brower, Esquire is the chairman of the Foundation's board and also a partner with McCarter & English, LLP ("M&E"), who represents the Hospital, EVHI, and the Foundation in this matter.   Mr. Brower served (as a non-voting member) and participated on the Affiliation Committee, including scoring the potential bidders, and, at times, acted himself as legal counsel to the Hospital Board.   Mr. Brower recused himself from the Affiliation Committee's recommendation of Prospect to the Hospital Board and from attending or chairing the Foundation Board's meeting where the Foundation approved the transaction.   The

Hospital estimated that M&E will receive almost $950,000 in legal fees through closing, but did not provide the engagement letter with M&E for its work on this matter advising instead that the firm was an "ongoing service provider."[13]  While the Hospital advised that no legal fees are paid directly to Mr. Brower, the signed conflict of interest forms and the Hospital's submissions did not show that Mr. Brower was screened from working on the transaction or share (via a partner draw or otherwise) in the legal fees paid to the firm.

While we do not discern conflicts of interest, as mentioned previously in this letter, the Hospital's submissions lacked the completeness we hope to see in each CHAPA transaction, especially regarding this potential conflict of interest.  We hope that, in the future, when making weighty decisions, such as selling the hospital, boards of trustees strive to diligently record the Hospital's process, including documenting expert engagement, addressing possible conflicts of interest, and ensuring that each trustee acts with the utmost fidelity toward his or her duty, so that a full and complete record is available for public review and comment.

(d)  Management Contracts - CHAPA Subsection (c)(5)

N.J.S.A. 26:2H-7.11(c)(5) requires the Attorney General to consider whether "any management contract under the acquisition is for fair value."  Pursuant to a management services agreement, in exchange for two percent of the Hospital's revenue, Prospect would provide management services to the Hospital.  However, under the agreement, no amount is due if the deal is consummated.  In response to our question, the Hospital advised that the Hospital's management believed the fee agreement is fair, but did not engage a consultant in making its determination, and that the Board relied on "current market and industry standards" of five percent in believing a two percent Advisory Services Fee is fair.  Notwithstanding, the Management Agreement does not require payment unless the deal is not consummated.  Thus, if the deal is consummated, N.J.S.A. 26:2H-7.11(c)(5) is not applicable.  We do note that, as per the Hospital's July 2015 financials, the Hospital has calculated Advisory Services Fee to be $1,872,242, but, according to the Hospital, this amount has not been paid to Prospect.

---

[13] The Hospital did note that it does not have in-house general counsel, and the legal fees may include non-affiliation related legal costs.

(e) <u>Fair Market Value - CHAPA Subsection (d)(1); Whether</u>
<u>Trustees Exercised Due Care in Assigning a Value to the</u>
<u>Hospital's Charitable Assets in Negotiating the</u>
<u>Conversion - CHAPA Sub-section (d)(6); and Whether</u>
<u>Acquisition Proceeds Will be used for Charitable Health</u>
<u>Care Purposes - CHAPA Subsection (c)(6)</u>

(i) <u>Fair Market Value</u>

One of the most significant factors we are asked to consider in a conversion transaction is found at <u>N.J.S.A.</u> 26:2H-7.11(d)(1). It reads as follows:

> Whether the nonprofit hospital will receive full and fair market value for its assets. The Attorney General may employ, at the nonprofit hospital's expense, reasonably necessary expert assistance in making this determination.[14]

As discussed above, the Hospital initially discussed possible affiliation with a non-profit, Barnabas. As a Barnabas affiliation did not materialize, the Hospital engaged the assistance of Executive Resources and a bidding process to obtain the highest and best offer for the Hospital. The Hospital issued an RFP to over twenty different potential partners. In response, the Hospital received bids from three for-profit health systems - CarePoint, Prime, and Prospect.

As discussed more fully below, the Hospital also received a third-party valuation from Curtis Financial Group, an affiliate of ParenteBeard. After reviewing valuations provided to the Hospital Board in 2013 and 2014 (that were based on the Hospital's December 2012 and November 2013 balance sheets, respectively), we requested the Hospital update the valuation. The Hospital provided an updated value analysis (as of the Hospital's December 2014 unaudited financials) estimating the value of the Hospital's net assets to be between $3,000,000 and $11,000,000. And, in light of the $10,000,000 paid to the Foundation and potential future transfers from the indemnification holdbacks and capital

---

[14] See, Eric S. Tower, <u>Directors' Duty to Obtain a Fair Price in the</u>
<u>Conversion of Nonprofit Hospitals</u>, 6 <u>Ann. Health L.</u> 157, 183-184 (1997), ("... a hospital's assets should be sold only after the completion of a competitive bidding process, based upon fixed criteria upon which bids will be evaluated by independent directors, and by no means should the hospital be sold for less than its appraised value unless the community receives some other value as the result of the sale.").

commitments, as well as certain non-monetary commitments, we find that fair market value is being paid.

To determine whether the Hospital will receive fair market value, the first step is to determine the Hospital's value. In its initial draft report dated June 27, 2013, the appraiser calculated the fair market value of the net assets of the Hospital between $26,500,000 and $32,500,000. The firm advised that they determined the "fair market value of 100% of the business enterprise" excluding "any elements of strategic or investment value." Using the market approach, the appraiser reviewed other hospital transactions to determine price per revenue and price per bed multiples to calculate the hospital's capital value. To do so, the appraiser looked at the sale price of five nearby distressed hospitals, and determined price per revenue and price per bed multipliers. The appraiser then determined lower and upper amount of selected enterprise values - $32,000,000 and $38,000,000, respectively. Next, using the Hospital's December 2012 financials, the appraiser reduced these amounts by third-party payor settlements and long-term debt, but added in investments. Of note, the appraiser rejected a price per EBITDA (earnings before interest, taxes, depreciation and amortization) multiple because of the hospital's financial downward trend.

On February 10, 2014, Curtis Financial issued a finalized valuation report to the Board. Using the Hospital's balance sheet as of November 30, 2013, but the same approach applied in the draft valuation, the appraiser valued the Hospital's net assets (excluding Hope Gardens) to be between $19,000,000 and $27,000,000.[15] The appraiser noted developments during the past year - decline in patient volume and admissions, renovated behavioral health unit, loss of stabilization funds, and a new insurer contract. The appraiser did not use other valuation approaches - asset and income approaches - because (1) the asset approach is better suited for real estate or investment firms; and (2) the income approach is inappropriate due to the Hospital's operating losses and lack of near-future cash flow. The Precedent Transaction Method in the market approach was used because this method is good for entire companies.

In response to our inquiry, the Hospital updated the appraiser's final valuation based on the Hospital's unaudited

---

[15] In response to our question as to the difference between the two valuations, the Hospital advised that the Hospital's financial losses caused a debt free working capital deficiency. In addition, the final valuation included two recent hospital transactions not included in the draft valuation.

December 2014 financials. The chart below outlines the differences. In the end, the Hospital's fair market value of net assets was calculated between $3,000,000 and $11,000,000.

|  | February 10, 2014 valuation (unaudited November 2013 balance sheet) | Updated valuation (unaudited December 31, 2014 balance sheet) |
|---|---|---|
| Selected Enterprise Value | $30,000,000 to $38,000,000 | $30,000,000 to $38,000,000 |
| Less Third-Party Payor Settlements | $12,004,000 | $19,330,000 |
| Less Long-Term Debt | $13,857,000 | $12,030,000 |
| Add Investments | $13,857,000 | $6,583,000 |
| Less Debt Free Working Capital | $4,858,000 | $2,113,000 |
| Fair Market Value of Net Assets | $19,000,000 to $27,000,000 | $3,000,000 to $11,000,000 |

Next, we need to determine the financial consideration paid by Prospect. We asked the Hospital to provide a schedule of sources and uses for the Proposed Transaction, along with estimated assets and liabilities acquired by Prospect and assets and liabilities remaining with the Hospital. According to the schedule, the Hospital is, post-closing, retaining no assets and no liabilities, however the Hospital's ownership interest in Essex Valley Housing, mortgage and note on Hope Gardens, and the Hospital's obligations to Hope Gardens will transfer to the Foundation. Prospect will assume assets (including cash, accounts receivable, property) with an estimated value of $59,371,000. Further, Prospect will assume liabilities (including debt, accounts payable, and third-party settlements) totaling $47,740,000. Thus, combining these two values, Prospect will net $11,631,000.

In reviewing this net figure, we note that the Hospital has provided three schedules of estimates of assets and liabilities assumed: one as of June 30, 2015 discussed above and two prior schedules. In the first schedule provided in December 2014, the Hospital estimated the assets assumed by Prospect to be $56,452,000 and liabilities assumed to equal $47,144,000. These figures result in net assets of $9,308,000, or $2,323,000 less than the $11,631,000 described above. Then, in May 2015, the Hospital provided a schedule estimating the assets assumed by Prospect to be $62,368,000 and liabilities assumed to equal $49,855,000. These figures result in net assets of $12,513,000. In comparing these schedules, the Hospital's estimate of cash and cash equivalents, property and equipment, and accounts receivable varied over time, while liabilities remained relatively constant. And, in its July

2015 financials, the Hospital posted a monthly loss of earnings before interest, taxes, and depreciation and amortization of $396,408. Thus, while we use the most recent figures (along with the appraisal) in determining fair market value, we are cognizant that the Hospital's estimates can increase or decrease over time.

Next, we consider the financial commitments by Prospect. According to the APA, Prospect is providing the following financial commitments to the Hospital: (1) pay $10,000,000 to the Foundation; (2) an indemnification holdback $4,000,000; (3) commit $10,000,000 for EOGH's and EHVI's Medicaid Disproportionate Share Hospital Liability; (4) commit $30,000,000 toward new capital projects and previously deferred capital maintenance projects; (5) commit $22,000,000 toward routine maintenance and capital expenditures; and (6) commit $8,000,000 toward working capital expenses.[16] We then remove Prospect's post-closing commitments for working, routine, and deferred capital as well as new capital expenditures. These amounts will benefit Prospect post-closing, not the former Hospital corporation or Foundation, and thus should not be counted. Next, we remove the DSH liability commitment. This liability was already taken into considering in the valuation described above. Finally, we remove the indemnification holdback. This amount will be held by Prospect, and while some of the holdback may pass to the Foundation, any amount paid is contingent. Thus, the known amount changing hands between Prospect and the Foundation is $10,000,000.

Finally, we review other consideration provided by Prospect. First, the $4,000,000 indemnification holdback will be used, in part, to pay for wind-down expenses of the Hospital and EVHI, and satisfy other unknown liabilities. Second, if certain portions of the indemnification holdback and capital commitments remain after certain periods, the Foundation will receive additional funds from Prospect. Third, Prospect is providing a right of first refusal to the Foundation that will provide the East Orange community a say in future disposition of East Orange General Hospital. Fourth, Prospect is investing significant sums for capital investment. While we do not consider the specific monetary commitments as part of the purchase price, the investments can benefit the community in the form of upgraded hospital facilities. Finally, in the event the Hospital's cash and investments (as well as the indemnification holdback) are insufficient to pay for the Hospital's debts, the liabilities will be borne by Prospect through

---

[16] Pursuant to the Foundation Agreement, Prospect EOGH will provide yearly written reports of certain capital expenditures. As a condition of closing, we will require copies of these reports, as well as yearly reports on the status of the indemnification holdback.

the indemnification holdback and/or capital commitments. Prospect is thus taking the risk with respect to potential pre-closing debts arising post-closing. This is especially apt here since the Hospital's finances have continued to deteriorate.

Finally, we compare the above-determined figures. First, we compare the updated valuation (between $3,000,000 to $11,000,000) with the Hospital's most-recently provided estimation of assets and liabilities assumed by Prospect ($11,631,000). Using these figures, it appears the fair market value of the net assets of the Hospital is between $3,000,000 and $11,631,000, with the likely value closer to the higher end of this range. Next, we consider the consideration provided by Prospect - $10,000,000 paid to the Foundation, plus unknown, contingent future amounts paid from unused portions of the indemnification holdback and capital commitment, plus assumption of financial risk for damages exceeding the indemnification holdback, plus non-monetary consideration – such as the right of first refusal. While, we cannot match up the known specific financial commitment ($10,000,000) to the highest estimated value ($11,631,000), the Foundation commitment is at the higher end of the valuation range. Further, the prospect of future payments to the Foundation from Prospect, as well as non-financial commitments, lead to us to conclude, under the specific facts and circumstances in this matter, that Prospect is paying fair market value for the assets in accordance with N.J.S.A. 26:2H-7.11(d)(1).

> (ii) Whether Trustees Exercised Due Care in Assigning a Value to the Hospital's Charitable Assets in Negotiating the Conversion - CHAPA Sub-section (d)(6)

Ideally, nonprofit hospital trustees who have reached a decision to sell a hospital's charitable assets will, in furtherance of their fiduciary duties, seek an independent appraisal from an outside source to establish a value for the hospital's assets and thereby establish a baseline for the purchase price for the hospital. We highly recommend this approach to any hospital that is seeking approval for a sale under CHAPA.

In this case, the Hospital issued a Request for Proposal to seek the highest and best offer. After reviewing the three responses, the Hospital engaged in a process to clarify and understand the bidders' proposals and the bidders themselves. While the Hospital did not include a minimum monetary purchase price in its RFP, such as one based on an independent valuation, the RFP was issued to both non-profit and for-profit institutions, and was not limited to a sale-of-assets structure. Notwithstanding, as discussed in Section IV(e)(i) above, the

Hospital did obtain a third-party draft valuation in 2013, prior to issuing the RFP, and a finalized valuation in February 2014. However, again due to the limited usefulness of the Hospital Board's meeting minutes, we cannot determine exactly how the Hospital used the draft valuation in selecting Prospect, or used the finalized valuation report in approving the form of the APA. Notwithstanding, after reviewing all the submissions, including the valuations themselves, the presentations to the Affiliation Committee and the Hospital Board, as well as the process used to entertain and review bids, we find that, while our calculated purchase price does not meet prior valuations placed on the Hospital, the Board acted with due care to obtain appraisals, and ultimately negotiated to the fair market value of the assets.

### (iii) Use of the Proceeds From the Sale for Charitable Health Care Purposes

The criteria found at N.J.S.A. 26:2H-7.11(c)(6) asks whether the acquisition proceeds will be used for appropriate charitable health care purposes consistent with the nonprofit hospital's original purpose or for the support and promotion of health care and whether the proceeds will be controlled as charitable funds independently of the purchaser or parties to the acquisition. The Proposed Transaction shall not be considered to be in the public interest unless the Attorney General determines that appropriate steps have been taken to safeguard the value of the charitable assets of the Hospital and to ensure that any proceeds from the proposed acquisition are irrevocably dedicated for appropriate charitable health care purposes consistent with the nonprofit hospital's original purpose or for the support and promotion of health care. N.J.S.A. 26:2H-7.11(b).

Here, as discussed above, the Hospital's Board engaged in a bidding process that drew three competitive bids, and, upon the recommendation and work of the Affiliation Committee and expert assistance, the Hospital Board ultimately chose Prospect's bid. The resulting APA provides a $10,000,000 payment to the Foundation (plus potential unused portions of the holdback and capital commitment). The Foundation will sever its connection to EVHI and the Hospital. The funds derived from the purchase will be controlled by the Foundation independently from any other organization, subject to the requirements of CHAPA. In fact, the APA specifically provides that Prospect cannot seek funds from the Foundation in the event the indemnification holdback is insufficient to satisfy future damages against Prospect.

Since East Orange General Hospital will be operated for-profit after closing and the Foundation's mission is to support the

nonprofit hospital, the Foundation will amend its incorporating documents to list no members, thus releasing EVHI as its sole member and expand its purposes to: fostering "low income housing to persons with behavioral health needs" and "to sponsor, develop, promote and encourage public participation in health care services and programs" primarily in the cities of East Orange and Orange, New Jersey. Since the Foundation is taking on rights and responsibilities regarding Hope Gardens, the Hospital advised that the Foundation will focus on residential, behavioral health programming.

As the Hospital's mission (as stated in its RFP) is to "improve the health of the community by working collaboratively to provide high quality, efficient, safe and accessible health care services with the utmost respect and compassion" and maintained a "comprehensive behavioral health program," the Foundation's focus on behavioral health falls within the Hospital's mission. The Foundation is also keeping the Hospital's mission alive by taking on the Hospital's rights and responsibilities with respect to Hope Gardens. Indeed, as noted in the Hospital's 2013 Community Health Needs Assessment, community leaders expressed the need for the "forward thinking approach used with Hope Gardens," including the need to focus on the behavioral health of the community. According to the Hospital, Hope Gardens provides housing for low income persons with psychiatric disabilities or mental illness.

One area of concern is that the Foundation is taking on financial risk in assuming the Hospital's financial obligations with respect to EVSHP and Hope Gardens under the financial guaranty. First, the Foundation will be obligated to infuse funds to cover any operating deficit of EVSHP and buy-out the limited partner. In response to our question, the Hospital now advises that these obligations have been terminated, and thus no risk exists. Second, in the event the limited partner in EVSHP loses tax credits, the Foundation will guarantee reimbursement of lost tax credits. In response to our suggestion, the Foundation through its Amended and Restated Certificate of Incorporation limits its liability up to a potential $3,175,000 in 2015, which will decrease approximately $350,000 per year until the obligation ceases in 2024. This will both provide the Foundation with almost $7,000,000 in untethered funds that will increase over time, while at the same time, meeting the Foundation's potential tax credit loss liability.

Notwithstanding the financial risk, Hope Gardens will continue to provide support for persons with mental health and disabilities, and the Foundation will support this development in the same capacity as the Hospital. Thus, we find, on balance, Based on the foregoing, and the discussions above, we conclude that

appropriate steps were taken to safeguard the value of the charitable assets of the Hospital and that the assets sold will continue to be used for healthcare purposes. The proceeds from the sale will be used for appropriate charitable health care purposes consistent with the non-profit Hospital's original purpose as required by N.J.S.A. 26:2H-7.11(b).

(iv) Donor Designated Funds

We have been advised that the Hospital and the Foundation hold no donor restricted funds as any restricted funds were expended. However, the Hospital advises that the Foundation did received donations from the Calvin A. Agar Foundation and the Florence P. Ott Trust that may contain restrictive purposes. The Foundation's purpose is to benefit East Orange General Hospital, which will cease to exist as a nonprofit hospital at closing. In light of the potential receipt of funds post-closing for the benefit of the former nonprofit hospital and the Foundation trustees' fiduciary duties of care and loyalty to dispose of their assets, our approval hereunder, is conditioned upon the following:

1. The Foundation send notice to the Calvin A. Agar Foundation and the Florence P. Ott Trust of the Proposed Transaction and advise them of the new purpose and mission of the Foundation, and for the fiduciaries to determine if a cy pres application is necessary or continued donations to the Foundation are appropriate;

2. In the event that the Foundation uncovers or receives any funds restricted for use by the Hospital, the Foundation will notify the donor and/or fiduciary of the Foundation's modified purpose, and for the fiduciaries to determine if a cy pres application is necessary or continued donations to the Foundation are appropriate;

3. The Foundation shall provide the Attorney General with an annual report which shall include an audited financial statement and a detailed description of its grant-making and other charitable activities related to its use of the charitable assets received pursuant to P.L. 2000, c. 143, as amended. The annual report shall be made available to the public at both the Attorney General's office and the office of the Foundation, as well as on the Foundation's website;

(f)   Whether Charitable Funds Are Being Placed at Unreasonable
      Risk - CHAPA Subsection (d)(2)

     Pursuant to N.J.S.A. 26:2H-7.11(d)(2), the Attorney
General shall consider whether the financing of the Proposed
Transaction by the nonprofit hospital will place the nonprofit
hospital's assets at an unreasonable risk.

     This criterion appears to focus on the financing of the
transaction "by the nonprofit hospital." We have considered this
criterion in other hospital asset transactions where the selling
nonprofit entity has offered a line of credit to provide the buyer
with initial working capital or where the seller has taken back a
promissory purchase note secured by the hospital's assets. In this
case, the Proposed Transaction is structured as a sale for cash and
an assumption of hospital liabilities by Prospect EOGH. In fact,
one of the reasons the Hospital chose Prospect was its access to
capital and ability to fund the Proposed Transaction.

     The burdensome escrows and other capital commitment funds
could be construed as a form of financing, putting the assets of
the Foundation at unreasonable risk. However, the Hospital is not
providing any traditional financing to Prospect EOGH and the
Foundation will receive $10,000,000 in cash at closing free and
clear. The indemnification and other capital commitment funds will
be held for certain periods, and if not expended, certain amounts
will be released directly to the Foundation.

     We thus find that the charitable assets are not being
placed at unreasonable risk and that any obligations or holdbacks
that could be construed as "financing" are appropriate. Further,
the Foundation's financial guaranty regarding EVSHP and Hope
Gardens (discussed in the prior section) has either been terminated
or the Foundation has put in place a mechanism to limit the
Foundation's exposure.

(g)   Right of First Refusal - CHAPA Subsection (d)(3)

     The retention of a "right of first refusal" ("ROFR") by
a successor nonprofit organization to repurchase the assets of the
Hospital if it is sold by the buyer is another factor the Attorney
General shall consider in determining whether to recommend approval
of a hospital asset sale, N.J.S.A. 26:2H-7.11(d)(3).

     Here, the Foundation will maintain a ROFR for a period of
10 years with respect to the ownership and operation of the
Hospital as a general acute care hospital within its existing
facility. Pursuant to the Foundation Agreement to be entered

between the Foundation, Prospect EOGH, and Prospect Medical Holdings, if Prospect EOGH receives a bona fide offer from a third-party that Prospect intends to accept, it must provide the Foundation with written notice. The Foundation will then have sixty days to notify Prospect of its election to purchase the hospital for the same purchase price and on the same terms and conditions. The right does not apply where Prospect does not sell substantially all the assets of the hospital, or if some assets are sold but no certificate of need or license transfer is required.[17]

### (h) Future Contracts - CHAPA Subsection (d)(7)

CHAPA requires the Attorney General to consider whether officers, directors, board members or senior management will receive future contracts in existing, new, or affiliated hospitals or foundations. N.J.S.A. 26:2H-7.11(d)(7). In response to our questions, we were advised that Prospect has not offered employment to any of the current officers or senior managers of the Hospital at this time. In anticipation of Prospect doing so post-closing, we respectfully request that as a condition of its approval of the Hospital's CHAPA application, the Court require that all compensation arrangements between any former officer, director, trustee or senior manager of the Hospital, or its affiliates, and Prospect, or any of Prospect's affiliates, be in the form of a written contractual agreement and that Prospect submit to the Attorney General for a period of two (2) years from the date of closing of the Proposed Transaction for our prior review and approval, any such agreements. In conjunction with the submission of such written compensation arrangements, we require the submission of a certification from an independent compensation consultant engaged by Prospect documenting that compensation to be paid in any such arrangement is set at fair market value for the services rendered.

### (i) CHAPA Foundation Requirements

As outlined below (and above in Section III), the Attorney General has additional responsibilities under CHAPA where, as here, a sale of a nonprofit hospital to a for-profit buyer results in net sale proceeds.

---

[17] It is noted that the Hospital has an ROFR with respect to Hope Gardens. This right will be transferred to the Foundation at closing.

### (1) Charitable Set Aside Amount

In an acquisition of this nature, CHAPA requires the Attorney General to consult with the principal parties to the transaction and make a determination as to the amount of assets which the nonprofit hospital shall set aside as a charitable obligation, based on the full and fair market value of the hospital at the time of the acquisition as determined by the Attorney General. N.J.S.A. 26:2H-7.11(g).

In prior CHAPA transactions, we have calculated the amount of assets to be set aside as a charitable obligation to reflect the "net proceeds" from the sale, i.e., the proceeds of the sale, plus any excluded assets retained by the Hospital and minus any excluded liabilities retained by the Hospital, as those terms are defined in the definitive agreement. However, in nearly every hospital conversion transaction reviewed under CHAPA, the hospital's liabilities far exceed the proceeds received from its sale, resulting in no funds being set aside as a charitable obligation. This is not the case here. And, we have already determined the fair market value of the Hospital. As discussed in Section IV(e)(i) above, we calculated the fair market value to be between $3,000,000 and $11,000,000.

Next, in order for the Attorney General to determine the amount of assets to be set aside as a charitable obligation, we must first look to whether the Hospital will retain any assets, liabilities, as well as the closing expenses of the Hospital. Once we do so, we can then determine whether any proceeds will remain from the sale to be set aside as a charitable obligation. Here, the Hospital advised that it will retain no assets and no liabilities. Assets and liabilities will either be applied toward each other at closing, assumed by Prospect, or, in the case of Hope Gardens, transferred to the Foundation. Wind down expenses and transaction costs will either be paid by the Hospital before closing or paid by Prospect using the indemnification holdback after closing.

Since the Hospital will have no charitable assets post-closing, we then look to Prospect's financial commitments to determine if the parties set-aside a charitable amount. As discussed in Section IV(e)(i) above, we remove Prospect's post-closing capital commitments, the DSH commitment, and the full value of the indemnification holdback as contingent. We are left with the $10,000,000 payment to the Foundation at closing, along with the possible additional amounts paid to the Foundation from the indemnification holdback and capital commitments over time. The

parties already intend to set aside this amount into the Foundation as a charitable commitment.

In addition, as part of the transaction, the Hospital will transfer its 100% stock ownership of Essex Valley Housing, Inc. and the Hospital's subordinate second mortgage on the Hope Gardens property to the Foundation. The Foundation will also sign a financial guaranty for EVSHP, and if certain events occur, the Foundation will need to satisfy lost federal tax credits. Notwithstanding, the Hospital advises that Hope Gardens has no value because stock and mortgage values are negligible and the Foundation's revised incorporating documents will limit the Foundation's financial exposure for lost federal tax credits. Thus, while the Hospital's ownership interest and mortgage are charitable assets, we did not consider this asset in determining the appropriate charitable set-aside amount.

Finally, we must determine the appropriate charitable set aside amount given the full and fair market value of the Hospital. While we prefer the charitable set-aside amount be an amount equal to or more than the estimated net value of assets received by the buyer (estimated at $11,631,000), we also consider certain practical matters. First, the most recent updated valuation provided by the Hospital estimated the value of the net assets of the Hospital to be between $3,000,000 and $11,000,000. And, $10,000,000 is near the top of this range. In addition, Prospect is assuming currently unknown liabilities of the Hospital where the indemnification holdback and capital commitment are Prospect's only recourse.

In short, despite the financial payment to the Foundation not exceeding the estimated fair market value of the Hospital, we find that the $10,000,000 payment to the Foundation is an appropriate charitable set aside amount.

### (2) Entity receiving the set-aside amounts

After determining the amount, CHAPA next requires the money be "placed in a nonprofit charitable trust or one or more existing or newly established tax-exempt organizations operating pursuant to 26 U.S.C. § 501(c)(3). Pursuant to the APA, the Foundation will receive $10,000,000. The Foundation is an existing Section 501(c)(3) corporation whose purpose has been to support the Hospital. The Foundation is thus an appropriate fiduciary for the sale proceeds and can receive the charitable set-aside.

### (3) Mission and Grant-Making Functions of the Foundation

N.J.S.A. 26:2H-7.11(h) requires the entity's "mission and grant-making functions . . . shall be dedicated to serving the health care needs of the community historically served by" the Hospital. As discussed above, the Foundation will file an Amended and Restated Certificate of Incorporation ("Proposed COI") (attached hereto as Exhibit B) providing that "the charitable mission and grant-making functions of [the Foundation]...shall be dedicated to serving the health care needs of the communities that historically were served by" the Hospital.[18] As stated in the Proposed COI, the Foundation will also, primarily in the cities of East Orange and Orange New Jersey:

1. Promoting health care generally and the provision of health care services to individuals;

2. Establish, sponsor and promote educational programs and other charitable activities devoted to improving and protecting the health and welfare of people;

3. Foster low income housing to persons with behavioral health needs; and

4. Sponsor, develop, promote and encourage public participation in health care services and programs.

As such, we recommend the following as conditions to approval:

1. The Foundation file the proposed Amended and Restated Certificate of Incorporation and Bylaws as attached as Exhibits B and C to this letter and provide thirty (30) days prior written notice to the Attorney General and the opportunity to approve any changes to said governing documents;

2. The Foundation shall provide an annual report that includes audited financial statements and detailed descriptions of the Foundation's grant-making and other charitable activities as required by N.J.S.A. 26:2H-7.11(h)(2). These reports will be made available to the public at both our office and the Foundation's offices by statute, and on the Foundation's website (if one currently exists or is established in the future).

---

[18] In its Proposed COI, the Foundation will change its name to "The Health Care Foundation of the Oranges, Inc."

(4) Independence of assets and the charitable entity

N.J.S.A. 26:2H-7.11(h) requires the entity's assets and its "directors, officers, trustees, subsidiaries, or affiliates … shall be independent of any influence or control by the acquiring entity, its directors, officers, trustees, subsidiaries, or affiliates." Here, as part of the Proposed Transaction, the Foundation will release EVHI as its sole member, and will modify its purposes since it can no longer support the hospital post-closing. In addition, the Foundation's assets will be managed by the Foundation's Board, separate from Prospect.

However, we note below that other connections will exist between Prospect and the Foundation. First, the Foundation, through Hope Gardens, will have an indirect agreement with Prospect EOGH. Currently, to manage Hope Gardens, EVSHP contracts with Moderate Income Management Company, Inc. who provides certain management services in exchange for a $10,000 per year management fee. Under a Memorandum of Understanding ("MOU") between the Hospital and EVSHP, the Hospital provides certain supportive services (social work, nursing care, security) to Hope Gardens residents at no cost. The Hospital also provides maintenance services pursuant to a Property Maintenance Agreement ("PMA") wherein the Hospital provided maintenance and repairs in exchange for $5,000 per year.[19] The Hospital also leases 5,226 square feet of space in Hope Gardens from EVSHP for $1.00 per year plus the Hospital's share of operating and maintenance expenses (currently $1,906.29 per month), including insurance premiums and taxes (the "Lease").

Since the existing Hospital will have no ability post-closing to meet the terms of the MOU, PMA, and the Lease, Prospect EOGH, the Foundation, and EVSHP will enter into a Supportive Housing Services Agreement ("SHSA"). The SHSA provides that Prospect EOGH will provide maintenance and certain property management services to EVSHP in exchange for $5,000 per year plus costs, and Prospect EOGH will provide supportive services to EVSHP in exchange for grant money received by EVSHP from third-parties. In addition, Prospect EOGH will assume the lease between EVSHP and the Hospital. While the current terms between the Hospital and EVSHP may be appropriate given their affiliation and the Hospital's financial obligations toward EVSHP, it is necessary to ensure Prospect EOGH is not financially benefiting through a below-market lease or excessive profit for its services. Thus, we recommend the Court include as a condition of approval that EVSHP and the

---

[19] The total $15,000 management fee is an amount approved by NJHFMA.

Foundation obtain an independent fair market value opinion for the Supportive Housing Services Agreement for this Office's review. If in the opinion of the consultant, Prospect is receiving benefits in excess of the fair market value, Prospect EOGH, the Foundation, and EVSHP must renegotiate the terms of the SHSA so that fair market value will be paid.

Furthermore, we note that in response to our suggestion, the Foundation has included in its Proposed COI that the Foundation's maximum liability for the potential lost federal tax credits will be reduced yearly as set forth in a schedule attached to the Proposed COI, and the guaranty will reduce by approximately $350,000 per year until 2024. We find this acceptable to maintain the maximum amount of Foundation assets as unrestricted for use, while maintaining an appropriate reserve for the potential federal tax credit liability, and limit the connection between Prospect EOGH and the Foundation.

Third and pursuant to the APA, Prospect EOGH will also form a post-closing, self-perpetuating, local community governing advisory board ("LAB"). The LAB will advise and make recommendations to Prospect EOGH. Pursuant to the LAB bylaws, the LAB will, if the Foundation's Board requests, monitor Prospect EOGH's compliance and make recommendations to the Foundation regarding Hope Gardens. There is a concern that over time the LAB's board could be controlled by Prospect EOGH proxies, who could be responsible for monitoring Prospect EOGH's compliance with the APA. We respectfully ask that the Court's Order include a condition that the Foundation cannot delegate to the LAB any APA compliance issues if any LAB board member (other than the President of Prospect EOGH, the President of the Prospect EOGH medical staff, and the member selected by Prospect EOGH in accordance with the Foundation Agreement) is an employee, officer, director, or senior manager of Prospect, Prospect EOGH, or any of its affiliates.

Finally, the Foundation's chairman will be a voting, ex officio member of the LAB, and other Foundation members can be LAB members. It does not appear that the chairman or board members will receive remuneration for these services. However, we recommend the Court include as a condition of its approval that any Foundation board member can only serve on the LAB if the member receives no compensation or remuneration from Prospect or Prospect EOGH, whether directly or indirectly.

(5) The Foundation's Governance

N.J.S.A. 26:2H-7.11(h)(1) and (2) subject the entity's governance to this Office's approval and provides four

requirements:

(1)  The governance must be "broadly based."

(2)  No director, officer, senior manager, or the entity itself can be a "full-time employee of State government."

(3)  No officer, director, or senior manager of the entity can be a "director, officer, agent, trustee, or employee of the nonprofit hospital during the three years immediately preceding the effective date of the acquisition, unless the person can demonstrate to the satisfaction of the Attorney General that the person's assumption of the position of officer, director, or senior manager of the [entity] would not constitute a breach of fiduciary duty or other conflict of interest."

(4)  the entity must establish or demonstrate that it has in place: (a) a mechanism to avoid conflicts of interests and (b) to prohibit grants that benefit the board of directors and management of the acquiring entity or its affiliates or subsidiaries.

In the Hospital's initial submissions, the Foundation's proposed amended incorporating documents did not include these requirements. After discussing these items with the Hospital's counsel, the Hospital submitted updated proposed incorporating documents that include these requirements.

However, six of the proposed post-closing trustees of the Foundation are former hospital trustees. In order to satisfy (3) above, we will require each affected individual to provide a written explanation explaining the reasons they want to be on the board, why they should be on the board, and what they will bring to the board. As such, we recommend the Court include as a condition of its approval that prior to closing of the Proposed Transaction, each affected trustee submit to this Office a letter, certification, or affidavit addressing these issues, and unless the Attorney General approves the trustee, the proposed trustee cannot act as a trustee of the Foundation.

### (6)  Recent CHAPA Amendment

The Legislature amended CHAPA in 2014 adding a new requirement for CHAPA Foundations. N.J.S.A. 26:2H-7.11(h)(4) allows a non-profit entity to seek the charitable set-aside funds upon the recommendation of the Attorney General and the Superior Court if the for-profit purchaser sells the hospital to a non-profit entity

in the future. The Foundation's proposed COI includes this recent amendment, and as per our suggestion, includes a provision that the Foundation will provide notice to the Attorney General's office in the event the Foundation distributes, grants, loans, or encumbers assets totaling 7% of the fair market value of assets in a fiscal year. This provision will allow further oversight over the Foundation's disposition of assets, and ensure that monies will be available in the event a non-profit organization repurchases the hospital.

## V.  Findings of the Acting Commissioner of the Department of Health

In a letter dated September 16, 2015 from Acting Commissioner Bennett to Acting Attorney General Hoffman, Acting Commissioner Bennett wrote, as follows: "...I have reviewed the proposed transaction and determined it is not likely to result in the deterioration of the quality, availability, or accessibility of health care services in the affected communities." The Acting Commissioner added that, "[M]y decision to allow this transfer of ownership is based on the fact that the operation of EOGH under the proposed new ownership would be beneficial to the population in its service area since the transfer of ownership will preserve access to health care services for the community, including the medically indigent and medically underserved population." The Acting Commissioner also wrote that, "[I] also believe that without this action, the financial conditions at EOGH would place the continued operation of the hospital at risk and could eventually lead to its closure, a reduction of services, or bankruptcy."

## VI. Conclusion

In summary, the Hospital's Board and management took reasonable steps to secure the future of East Orange General Hospital. Based on the materials submitted to us as part of the CHAPA process, long-term viability as a stand-alone hospital was unlikely without significant changes to the Hospital's services to the community. Prospect and the Hospital have thus entered into an agreement where East Orange General Hospital can continue to provide healthcare to the community, and the net proceeds can continue the Hospital's mission. Our inquiry focuses on the reasonableness of the process employed by the Hospital's trustees, their due diligence and other factors in reaching their decision and not on whether the Hospital has made the optimal choice. We are satisfied that the trustees reasonably exercised their fiduciary duty in selecting an acquirer who they believe will be best able to maintain the Hospital as a going concern. We are also satisfied that the net proceeds from the sale will be safeguarded

and administered by the Foundation, keeping with the Hospital's original mission. We are satisfied that under the circumstances taken as a whole, the Proposed Transaction is in accordance with the factors set forth in CHAPA.

Thus, when the proposed acquisition is viewed in its entirety, this Office finds that, under the totality of the circumstances, it appears to be in the public interest, and, accordingly, it receives our support, provided that we respectfully request that the Court incorporate the following conditions into its Order approving the transaction:

(i)    The Foundation for East Orange General Hospital, Inc. (the "Foundation") will comply with the requirements of the Community Health Care Assets Protection Act, P.L. 2000, c. 143, as amended, that relate to a nonprofit entity receiving charitable assets, including, but not limited to:

a.  Any member of the Board of Trustees of the Foundation (the "Foundation Board") who accepts a position as a director, officer or employee of Prospect EOGH, Inc., Prospect NJ, Inc., Prospect Medical Holdings, Inc. (collectively "Prospect"), or any of their parents, subsidiaries, or affiliates, shall resign from the Foundation Board, effective as of the closing of acquisition of East Orange General Hospital, Inc. (the "Hospital") by Prospect EOGH, Inc.;

b.  The current trustees and senior managers of the Hospital shall be prohibited from investing in Prospect or its subsidiaries or affiliates for a period of three (3) years following the acquisition;

c.  No member of the Foundation Board shall serve as an officer, director or employee of Prospect, or any of its parents, subsidiaries, or affiliates;

d. The Foundation shall provide the Attorney General with an annual report which shall include an audited financial statement and a detailed description of its grant-making and other charitable activities related to its use of the charitable assets received pursuant to P.L. 2000, c. 143, as amended. The annual report shall be made available to the public at both the Attorney General's office and the office of the Foundation, as well as on the Foundation's website (if one currently exists or is established in the future); and

e.  The Foundation's assets and its directors, officers, trustees, subsidiaries, or affiliates shall be independent of any influence or control by Prospect, its directors, officers, trustees, subsidiaries, or affiliates.

(ii)  The Foundation shall file the proposed Amended and Restated Certificate of Incorporation and Bylaws as attached to this letter and provide thirty (30) days prior written notice to the Attorney General and the opportunity to approve any changes to said governing documents.[20]

(iii)  The Foundation shall send notice to the Calvin A. Agar Foundation and the Florence P. Ott Trust of the acquisition of the Hospital and advise them of the new purpose and mission of the Foundation, and for the fiduciaries to determine if a cy pres application is necessary or continued donations to the Foundation are appropriate.

(iv)  In the event that the Foundation uncovers or receives any funds restricted for use by the Hospital, the Foundation shall notify the donor and/or fiduciary of the Foundation's modified purpose, and for the fiduciaries to determine if a cy pres application is necessary or continued donations to the Foundation are appropriate.

(v)  Foundation Board members are prohibited from serving on the Local Advisory Board if the board member receives any form of compensation or remuneration from Prospect or any of its subsidiaries, parents, or affiliates, whether directly or indirectly.

(vi)  The Foundation shall not delegate to the Local Advisory Board any oversight or monitoring of compliance by Prospect EOGH's, Prospect NJ's, or Prospect Medical Holdings, Inc.'s, or any of its affiliates' obligations under the Asset Purchase Agreement if any Local Advisory Board member (other than the President of Prospect EOGH, the President of the Prospect EOGH medical staff, and the member selected by Prospect EOGH in accordance with the Foundation Agreement) is an employee, officer, director, or senior manager of Prospect EOGH, Prospect NJ, or Prospect Medical Holdings, Inc., or any of its affiliates.

---

[20]  The proposed Amended and Restated Certificate of Incorporation and Bylaws are attached hereto as Exhibits B and C.

(vii)  The Foundation and Essex Valley Supportive Housing Partnership, L.P. shall obtain an independent fair market value opinion for the Supportive Housing Services Agreement (including, but not limited to, the leased space, supportive services, and maintenance and operation services) for this Office's review. If in the opinion of the consultant Prospect is receiving benefits in excess of fair market value, Prospect EOGH, the Foundation, and EVSHP must renegotiate the terms of the Supportive Housing Services Agreement so that fair market value will be paid.

(viii) All compensation arrangements between any former officer, director, board member or senior manager of the Hospital, or the Hospitals' Affiliates, and Prospect, or any of Prospect's affiliates, shall be in the form of a written contractual agreement and Prospect shall submit to the Attorney General for a period of two (2) years from the date of closing of the acquisition of the Hospital by Prospect for the Attorney General's prior review and approval, any such agreements. In conjunction with the submission of such written compensation arrangements, the Attorney General shall require the submission of a certification from an independent compensation consultant engaged by Prospect documenting that compensation to be paid in any such arrangement is set at fair market value for services rendered.

(ix)  The Foundation shall submit to the Attorney General the detailed written reports of funds expended from or applied to Prospect's capital expenditures for the next five (5) years following the closing of the transaction as provided for in Section 4(a) of the Foundation Agreement.

(x)  The Foundation shall submit to the Attorney General detailed annual written reports of funds expended from or applied to Prospect's indemnification holdback.

Respectfully submitted,

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY

By:

Michelle L. Miller
Acting Director
NJ BAR ID 03062-1994

c:    Acting Commissioner Cathleen D. Bennett
      Gerard Brew, Esquire
      Richard Nolan, Esquire