UNITED STATES ATTORNEY'S OFFICE
PAUL J. FISHMAN
United States Attorney
EAMONN O'HAGAN
Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, NJ 07102-2535
Tel: (973) 645-2874

*Attorneys for the United States of America*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| *In re* <br><br> EAST ORANGE GENERAL HOSPITAL, INC., *et al.*,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 15-31232-VFP <br><br> (Jointly Administered) <br><br> Judge: Hon. Vincent F. Papalia <br><br> Hearing Date: January 20, 2016 <br> Hearing Time: 11:30 a.m. |

**LIMITED OBJECTION OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES TO (I) DEBTORS' MOTION TO APPROVE (A) SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES AND (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (II) NOTICE OF POSSIBLE ASSUMPTION AND ASSIGNMENT OF <u>EXECUTORY CONTRACT OR UNEXPIRED LEASE</u>**

THE UNITED STATES OF AMERICA, on behalf of the Secretary of the United States Department of Health and Human Services ("<u>HHS</u>"), hereby files its Limited Objection (this "<u>Limited Objection</u>") to (I) Debtors' Motion to Approve (A) Sale of Substantially all of Their Assets Free and Clear of Liens, Claims, and Encumbrances and (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases [ECF No. 57] (the "<u>Motion</u>") and (II)

---

[1] The Debtors and the last four digits of their Employer Identification Numbers are East Orange General Hospital, Inc. (7166) and Essex Valley Healthcare, Inc. (7667). The Debtors' principal place of business is located at 300 Central Avenue East Orange, NJ 07018.

Notice of Possible Assumption and Assignment of Executory Contract or Unexpired Lease [ECF No. 231] (the "Assignment Notice") and in support thereof, respectfully represents as follows:

## RELEVANT FACTUAL BACKGROUND

1. The above-captioned debtors (the "Debtors") filed the Motion on November 20, 2015. Portions of the relief sought in the Motion were approved by the Court on December 15, 2015, including bidding procedures for the Debtors' assets [ECF No. 171] (the "Bid Procedures Order"). The Bid Procedures Order scheduled an auction for the sale of substantially all of the Debtors' assets for January 12, 2016 (the "Sale") and a hearing to approve the Sale for January 20, 2016.

2. HHS is a party to a Medicare Provider Agreement (the "Provider Agreement") with the Debtor East Orange General Hospital, Inc. ("EOGH"). Pursuant to the Motion and the Asset Purchase Agreement attached thereto (the "APA"), the assets to be "purchased" in the Sale include "Debtors' Medicare and Medicaid provider agreements and associated provider numbers." Motion at 6.[2] The Assignment Notice received by HHS indicates that the Debtors' "**may**" intend to assume and assign the Provider Agreement pursuant to 11 U.S.C. § 365. The Assignment Notice erroneously states that the required cure amount with respect to the Provider Agreement is "$0.00." Assignment Notice at 16. In addition to listing the incorrect cure amount of $0.00, the Assignment Notice makes no acknowledgment of the prospective purchaser's successor liability imposed by applicable Medicare laws and regulations.

3. Thus, to ensure that the assumption and assignment of the Provider Agreement ultimately complies with applicable requirements of both the Bankruptcy Code and Medicare

---

[2] The Medicaid provider agreement referenced in the APA concerns the Medicaid program administered by the State of New Jersey Department of Human Services. This Limited Objection does not address any issues related to EOGH's Medicaid provider agreement and number.

2

laws, HHS proposed to the Debtors that the order approving the Sale include the following provision (the "Proposed Language"):

> Nothing in this Sale Order shall be construed as authorizing the sale of the Medicare Provider Agreement as an asset to the Buyer free and clear of successor liability for pre-Closing Medicare debt, whether or not such debt is as of yet undetermined, nor as restricting Medicare's right of setoff and recoupment. Any assumption and assignment of the Medicare Provider Agreement will be authorized in a stipulation pursuant to 11 U.S.C. § 365, which will be negotiated by the parties (*i.e.*, the United States, the Debtors and the Buyer) and submitted for this Court's approval. The Debtors acknowledge the $0.00 cure amount listed in the Notice of Possible Assumption of Executory Contracts [ECF No. 231] is erroneous with respect to the Medicare Provider Agreement. Further, the parties agree the cure amounts required to be paid in connection with such assumption and assignment, the terms of such repayment and the Buyer's liability for Medicare debt, whether presently known or unknown, will be addressed by the terms of said stipulation.

4. While HHS is hopeful that the Debtors will voluntarily accept the Proposed Language, this Limited Objection is submitted to the extent the final form of the order approving the Sale fails to include the Proposed Language (or includes anything to the contrary).

## LIMITED OBJECTION

5. As an initial matter, the Provider Agreement is not an asset of the estate which can be sold. Medicare's interpretive rules specify that:

> As a rule, when a provider organization is sold, the Medicare provider number stays with it. A buyer is assigned the provider number and the provider agreement if the buyer purchases a participating provider organization. A provider number cannot be sold. A provider identification number is not the 'property' of any individual or legal entity. The number is issued by the Medicare program and is under the control of the Secretary of DHHS, subject to law, regulation, and program policy.

Medicare State Operations Manual, CMS Publication 100-07, section 3210 (5/21/04). To the extent the APA seeks to treat the EOGH's Provider Agreement as an asset of the estate that can be sold free and clear of liens, encumbrances and security interests, the Motion must be denied.

3

Rather, as discussed herein, the Provider Agreement is an executory contract in bankruptcy, and must be assumed and assigned pursuant to 11 U.S.C. § 365 if it is to be transferred.

6.  Subject to certain conditions and exceptions, a debtor has the right to assume or reject its executory contracts and unexpired leases. 11 U.S.C. § 365. If a debtor proposes to assume and assign an executory contract, the debtor must cure existing defaults and provide adequate assurance of future performance by the assignee under those contracts being assigned. See 11 U.S.C. 365(b)(1)(A)-(C) & (f)(2). Courts have recognized that a Medicare provider agreement is an executory contract for purposes of section 365. In re University Medical Center, 973 F.2d 1065, 1075 (3d Cir. 1992); see also U.S. v. Consumer Health Services, 108 F.3d 390, 394 (D.C. Cir. 1997); In re Heffernan Memorial Hospital District, 192 B.R. 228, 231 n.4 (Bankr. S.D. Cal. 1996); In re St. Johns Home Health Agency, Inc., 173 B.R. 238, 242 n.1 (Bankr. S.D. Fla. 1994) (and cases cited therein). Where a debtor assumes an executory contract, it assumes the contract *cum onere*, i.e., its burdens as well as its benefits. Adventure Resources, Inc. v. Holland, 137 F.3d 786, 798 (4th Cir. 1998), cert. denied, 525 U.S. 962 (1998), citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 531 (1984).

7.  If a debtor rejects a Medicare provider agreement, this terminates the agreement and the debtor's participation in the Medicare program. Similarly, Medicare regulations recognize a purchaser's refusal to accept assignment of the previous owner's provider agreement as a voluntary termination of that provider agreement. See 42 C.F.R. § 489.52. The facility's Medicare provider agreement is terminated along with the Certification Number from the Center for Medicare and Medicaid Services ("CMS") that tracks that agreement, effective with the closing date of the change of ownership transaction. If the provider was accredited and deemed to meet Medicare requirements, the deemed status of the accredited provider also ceases. In order for the hospital to once again

4

participate in the Medicare program after the termination, the new owner is required to apply for participation, complete the appropriate Form CMS-855A and undergo a review for initial enrollment by the Medicare Administrative Contractor, as well as submit to CMS, via the State Survey Agency, the Medicare certification application package.

8.  Notably, section 3210.5A of the State Operations Manual states that, in such a circumstance, the new owner is treated as a new applicant, the facility is subject to an initial survey and the facility cannot participate until the CMS Regional Office determines all federal requirements are met, including the Medicare Hospital Conditions of Participation. This section also states that the new owner must put in writing its refusal to accept assignment and notify CMS 45 calendar days prior to the ownership change to allow for the orderly transfer of any beneficiaries that are patients of the provider. The survey must be completed after the closing since the provider agreement of the former owner terminates upon the change of ownership date. Furthermore, the effective date of participation for the hospital's provider agreement, which is also the date the hospital will be eligible for Medicare payment for covered services, may not be sooner than the date the hospital meets all federal requirements. See 42 C.F.R. § 489.13 (a)-(c). The hospital is not eligible for Medicare payment from the date of the termination of the prior owner's agreement until the effective date of the new provider agreement. Further guidance on such transactions may be found in CMS' Survey and Certification Letter 13-60, dated September 6, 2013 (available at: https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/Survey-and-Cert-Letter-13-60.pdf).

9.  The Provider Agreement at issue here incorporates the Medicare Act and its implementing regulations and interpretative manual provisions. Among other things, the Medicare Act requires all Medicare payments to be adjusted to account for prior overpayments.

5

42 U.S.C. § 1395g(a). Even the Third Circuit, which has limited HHS's right of recoupment to the same cost report year, has agreed that where a debtor assumes its Medicare Provider Agreement "there is no question that [HHS] could withhold [the provider's] post-petition reimbursement in order to recover pre-petition overpayments without violating the automatic stay." In re University Medical Center, 973 F.2d at 1075. Therefore, the Debtors must provide an adequate cure for the outstanding amounts owing to the United States as a condition of assuming and assigning the Provider Agreement. As noted above, the "$0.00" cure amount listed in the Assignment Notice is incorrect. As acknowledged in the Stipulation and Consent Order between the Debtors and HHS, filed with this court on December 7, 2015 [ECF No. 111], the hospital owed CMS approximately $9.7 million in outstanding overpayments as of the petition date. For this reason, HHS specifically objects to the Assignment Notice.

10. Applicable Medicare regulations further provide that an entity that takes an assignment of a Medicare provider agreement is subject to the same rules and obligations as the prior party to that provider agreement. The assignment of an existing provider agreement allows Medicare payments to the new owner to continue without interruption. However, Medicare regulations provide that an existing provider agreement is automatically assigned to the new owner, subject to all the applicable statutes, regulations and terms and conditions under which it was originally issued. See 42 C.F.R. § 489.18(c). One of these conditions is the adjustment of current payments on account of previously made overpayments as required by 42 U.S.C. 1395g(a).

11. Accordingly, EOGH cannot assign the Provider Agreement to a new owner without providing that the purchaser will assume liability for any pre-sale Medicare overpayments (including those determined after any closing). See United States v. Vernon

Home Health, Inc., 21 F.3d 693, 694 (5th Cir. 1994) (purchaser "accept[ed] the automatic assignment of the provider agreement," making it jointly and severally liable with seller for overpayments pursuant to Medicare regulations at 42 C.F.R. § 489.18(d)).  As in Vernon Home Health,  EOGH cannot assign its Provider Agreement to new owners without recognizing and ensuring that the purchaser is liable for the repayment of any Medicare overpayments relating to periods prior to the closing which have been determined and may be determined in the future. See also In re Charter Behavioral Health Sys., LLC, 45 Fed. Appx. 150, 151 n.1 (3d Cir. 2002) (unpublished) (noting that if a new owner "elects to take an assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments but assumes successor liability for overpayments and civil monetary penalties asserted by the Government against the previous owner"); BP Care, Inc. v. Thompson, 337 F.Supp.2d 1021, 1028-30 (S.D. Ohio 2003) (holding once a new operator assumes the provider agreement of the former operator, the new owner will be charged with and is responsible for all liabilities because a facility is purchased "as is"); Delta Health Group, Inc. v. U.S. Dept. of Health and Human Services, 459 F.Supp.2d 1207, 1226 (N.D. Fla. 2006) (upholding purchaser's liablility for CMP imposed on bankrupt facility; court notes "it appears well established that the new owner who assumes an existing provider agreement has successor liability for unresolved CMPs, . . . This has been accepted at the agency operations level; at the DAB administrative level; and in every reported judicial decision that has considered the matter").

    12.    Because the Proposed Language will preserve all of the foregoing issues, HHS objects to the Sale to the extent such language is not included in the Court's order approving the same.  Further, in the event the successful bidder refuses to agree to the inclusion of the proposed language in the Sale Order , HHS respectfully requests that the Court decline to

7

approve any "free and clear" sale of the Provider Agreement and provide an opportunity, if necessary, to submit further objections to any attempt to "sell" the Medicare Provider Agreement without successor liability.

Dated: January 11, 2016

                                            PAUL J. FISHMAN
                                            United States Attorney

                                            /s/ *Eamonn O'Hagan*
                                            EAMONN O'HAGAN
                                            Assistant U.S. Attorney

                                            *Attorneys for the United States of America*